# EXHIBIT D

Kazuo Okada
Ariake Frontier Building Tower A
Tokyo, Tokyo 135-0063
Japan

24 January 2013

Stephen A. Wynn
John J. Hagenbuch
Dr. Ray R. Irani
Robert J. Miller
J. Edward Virtue
Alvin V. Shoemaker
D. Boone Wayson
Elaine P. Wynn
Board of Directors
Wynn Resorts, Limited
3131 Las Vegas Blvd. South
Las Vegas, NV 89109

Dear Fellow Directors:

I write to you in my capacity as a Director of Wynn Resorts, Ltd. ("Wynn Resorts" or the "Company"). As you know, the Board has excluded me from its meetings and deliberations since February 18, 2012 (from which I was also excluded in large part) and I have been embroiled in litigation with the Company ever since. Since we therefore cannot discuss these matters at a meeting of the Board, I must write to you to outline certain serious information that has come to my attention independently from my service as a Director of the Company. I also write to request the production of additional information and documents about certain transactions underlying the Company's "Cotai Strip" casino development project in Macau, and to urge the appointment of a special investigator to lead an independent investigation of the actions of the Company, its agents and affiliates in Macau, and to recommend appropriate remedial actions.

As you know, I have previously expressed serious concern about the propriety of certain actions undertaken by the Company with respect to the Cotai project. The *Wall Street Journal* ("WSJ") also ran an article last summer, on July 1, 2012, raising serious questions about the Company's efforts to obtain land, licenses, and other approvals related to the Cotai project.[1] Independently from my role as a Director, I have been provided with copies of documents that,

---

[1] Entitled "In Wynn's Macau Deal, a Web of Political Ties," and attached hereto. Online version also available at: http://online.wsj.com/article/SB10001424052702304782404577488692803611700.html.

$l_2$

The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 2

on their face, purport to be the underlying agreements (collectively, the "<u>Cotai Documents</u>") signed by Mr. Stephen Wynn related to the Cotai land concession obtained by affiliates of the Company.

The Cotai Documents—which were not previously provided to or approved by the Board, as far as I know—raise additional, serious questions about the propriety of the actions taken by Mr. Wynn, the Company, and its affiliates in pursuing the Cotai project. I am concerned that these actions could expose Wynn Resorts (of which a company affiliated with me, Aruze USA, is either the largest shareholder or largest creditor, owed at least $1.9 billion) to crippling liability and civil and criminal penalties.

I am also concerned that, if the truth is not revealed now, the individuals involved in any wrongdoing would remain in positions of power within the Company and undertake additional misguided actions that could expose the Company to additional liabilities.

For example, I strongly believe that Mr. Wynn's recent actions towards me were motivated largely by my questioning of and refusal to approve Company actions in Macau in May 2011 and at other times. Since then, Mr. Wynn has launched a biased and incomplete "investigation" of me in which I was not permitted any meaningful response, had me threatened with the publication of the results of that "investigation" unless I would cause Aruze USA to sell him **personally** all of its interest in the Company, caused the Company to improperly redeem Aruze USA's shareholdings in the Company, and to initiate litigation against me, Aruze USA and Universal Entertainment Corporation, and most recently scheduled a special meeting of the Company's shareholders to try to have me removed as Director. These actions will result in significant losses and legal costs for the Company, and cause significant distraction for Company officers and directors.

In light of Mr. Wynn's efforts to have me removed from the Board of Directors at a February 22, 2013 special meeting of shareholders, I wish to ensure my duties as a Director are fulfilled during whatever time remains of my Board tenure, despite the Board's efforts to exclude me. Thus I encourage each of you to "Take the high road" and "Do the right thing," as I advised Mr. Wynn several years ago, and ensure we as a Board take these matters seriously and investigate them completely. Thus, I hereby urge as a member of the Company's Board of Directors that the Board take the following steps within ten (10) days:

    o    Collect and provide to me (and any other Director who wishes to receive them) copies of (i) all books and records related to the Cotai Documents and the land concessions and permitting obtained with respect to the Cotai development project; (ii) an explanation of the rationale behind the Cotai Documents and how they were negotiated (assuming they are indeed authentic); (iii) all communications between the Company, Mr. Wynn, and/or any of their representatives or affiliates, on the one hand, with any of the individuals Ho Ho and/or Clifford Cheong and/or the companies Tien Chao Entertainment Ltd. ("Tien Chao") and/or Cia. de Entretenimento e Investimento Chinese  Limitada



The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 3

    ("Chinese Entertainment"), on the other hand; and (iv) any documents concerning any "vetting" or other investigation undertaken by the Company, its affiliates, Mr. Wynn, and/or any of their representatives, of Mr. Ho, Mr. Cheong, Tien Chao and/or Chinese Entertainment, .

o    Just as the Company retained Louis Freeh's firm to investigate me, appoint a special investigator to investigate the Cotai Agreements and related issues. However, unlike the Freeh investigation, this investigation should be headed by a mutually-acceptable, independent person with no preordained agenda other than to reveal the truth. I suggest the investigation could be led by someone like former U.S. Attorney Patrick Fitzgerald or a comparably reputable former law enforcement official. Such person would need to be supported by appropriate investigative resources including on the ground in Macau.

I look forward to your positive response to this request.

### Investigation and Receipt of the Cotai Documents

In May 2011, I was the only Director to object and vote against the Company's unprecedented decision to donate $135 million to the University of Macau Development Fund. That donation represented approximately 70% of the University of Macau Development Fund's entire endowment. The Chancellor of the University of Macau also has ultimate oversight of gaming matters in Macau. One month later, the Company's Cotai casino project in Macau received the land concession it had been seeking for five years.

The Company's public filings have described this donation as a routine matter consistent with the Company's purported "long-standing practice of providing philanthropic support for deserving institutions." In truth, the only other donation disclosed in a Company Annual Report previously was the donation of a $10 million Ming vase to the Macau Museum in 2006—the year Wynn Resorts first applied for the land concession in question.

I believe it was my objection to this donation, in part, that provoked the unbalanced and extreme response from Mr. Stephen Wynn described above (*e.g.*, the illegal share redemption, one-sided "investigative report," and suspiciously timed "about face" by the Company concerning the pursuit of a casino resort in the Philippines by affiliates of Universal Entertainment, among others). Mr. Wynn has even created a special committee of the Board consisting of all Board members except me to conduct all Board business, thereby effectively shutting me out of the Board process. Thus, an independent investigation into these matters should also help each of you understand the true motivations behind the Company's misguided legal actions against me, Universal Entertainment and Aruze USA, and why those actions should be stopped by the Board.

Universal Entertainment, Aruze USA and I have attempted to gather additional information about the Company's Macau activities, to better understand why Mr. Wynn reacted



The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 4

so strongly to my May 2011 opposition to the Company's $135 million donation and to prepare our defense against the Company's baseless litigation claims. During our investigation, we received copies of the "Cotai Documents," enclosed herewith. The Cotai Documents appear to be agreements executed on one side by Mr. Wynn, on behalf of entities that were or later became Company subsidiaries, and on the other side by a person identified as "*Ho Ho*," on behalf of the companies "Chinese Entertainment" and "Tien Chiao."

I cannot verify the authenticity of the Cotai Documents, and that is part of why the Board should have these matters investigated. I recommend the Board investigate their authenticity and uncover the facts regarding these matters (and answers to the obvious questions outlined below), including by questioning Mr. Wynn, Marc D. Schorr (who was a director together with Mr. Wynn of some or all of the Cotai entities affiliated with the Company), Linda Chen (who I have understood to be a close advisor to Mr. Wynn on matters related to Macau) and the Company's internal legal advisors (who we would expect would have been consulted on such important matters).

### The Cotai Documents Raise Serious Questions That Require Investigation

The Cotai Documents detail a series of highly suspicious transactions. For example, Ho Ho is a mysterious person who neither Macau insiders nor the press have yet been able to identify, to my knowledge. According to public statements by Mr. Wynn, he was introduced to Ho Ho by the then-Chief Executive of Macau, Edmund Ho. To the best of my knowledge and recollection, Mr. Wynn's relationship with Ho Ho has never been disclosed to or discussed at any meeting of the Board.

Tien Chiao appears to have been owned by the thus far unidentified individual named "Ho Ho" and Cliff Cheong, a person I understand had connections to former Macau Chief Executive Edmund Ho and who has litigated with the Sands organization over a "finder's fee" allegedly due from the Sands organization in connection with the original casino bidding process in Macau. Pursuant to one of the Cotai Documents (a document that purports to be a 2006 joint venture agreement), a Wynn Resorts affiliate committed to pay a $35 million "finder's fee" to Tien Chiao upon the joint venture company's being awarded a concession in Cotai and granted to Tien Chiao a non-dilutable 12.5% economic interest in the joint venture company that would own the Company's Cotai resort. Tien Chiao was not required to make any capital contribution to the joint venture company in the document. The agreement does not impose detailed obligations on Tien Chiao but does state the "finder's fee" is to be paid "[i]n consideration of Tien Chiao's efforts in obtaining the rights to the Development Site."

There is no apparent reason for Tien Chiao to have received a "finder's fee," particularly one so large. Mr. Wynn was quoted in another article, published on www.macaubusiness.com, as claiming the agreements with Tien Chiao related to rights Tien Chiao already had to the land[2],

---

[2] *See* "Steve Wynn Explains Tien Chao Deal," May 14, 2012, www.macaubusiness.com, available at: http://www.macaubusiness.com/news/steve-wynn-explains-tien-chiao-deal/16067/.

The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 5

but the 2006 "joint venture agreement" does not specify any such rights.  In the article, Mr.
Wynn also is quoted as claiming that Tien Chiao and its principals were "vetted" before any
agreements were entered with Tien Chiao, but I do not recall ever seeing any such "vett[ing]"
documents.  Moreover, as for the "finder's fee" reference in the 2006 "joint venture" document
attached here, the land had already been "found" and Wynn Resorts already had a gaming
concession and thus direct relationship with Macau governmental regulators by 2006.

Later, in 2008, the deal between the Wynn Resorts parties and Tien Chiao was
dramatically restructured, according to another Cotai Document.  Under what appears to be a
revised 2008 agreement, Tien Chiao relinquished its rights in return for a commitment by the
Wynn Resorts side to pay $50 million to Tien Chiao upon obtaining a concession contract from
the government of Macau published in the official gazette of Macau.  The 2008 document
describes the $50 million payment as consideration for Tien Chiao's selling its shares in the joint
venture company, but continues to be structured like a finder's fee.  Thus, Tien Chiao appears
again to have been promised and paid a substantial "finder's fee" without any discernible
obligations in the agreements or legitimate ability to assist in securing a concession in Cotai.

Wynn Resorts' public disclosures concerning the Cotai transaction avoided any reference
by name to Tien Chiao or the joint venture company, instead referring to a commitment made to
"an unrelated third party" to pay it $50 million in consideration for its "relinquishment of certain
rights with respect to a portion of approximately 52 acres of land in the Cotai area of Macau."
This and subsequent disclosures by Wynn Resorts appear to give the impression that the
unnamed and "unrelated third party" had rights in the Cotai parcel (which I understand is owned
by the government of Macau) when in fact the Cotai Documents, if authentic, appear to show
that the only rights the "unrelated third party" had were rights created by its joint venture
agreement with the Company's affiliates.

Other important questions raised by the Cotai Documents include the following:

| Agreement ("First Cotai Agreement") | |
|---|---|
| **Parties:** | Wynn Resorts (Macau), S.A. ("<u>WRM</u>"), with Mr. Wynn as signatory<br>Chinese Entertainment, with Ho Ho as signatory. |
| **Date:** | August 25, 2005 |
| **Key Terms:** | The parties will form a joint venture entity (JV) to pursue a designated Development Site in Cotai.<br><br>WRM will own 87.5% of the JV (and has the right to convey a portion of this 87.5% interest to another U.S. casino company); Chinese Entertainment will own 12.5%, with its interest convertible into Wynn Resorts stock at Mr. Wynn's discretion and based on a valuation to be mutually agreed.<br><br>Once the JV's rights in the Development Site have been confirmed by |



The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 6

| | |
|---|---|
| | publication in the Macau governmental gazette, WRM will pay US$35 million to Chinese Entertainment.<br><br>WRM will be responsible for 100% of the capital needs and costs of the JV. |
| **Key Concerns:** | 1. There is no indication what commercial value Chinese Entertainment is providing in return for receipt of $35 million and a 12.5% interest in the future Cotai casino resort to be financed and developed entirely by the Company and/or its affiliates.<br><br>2. Who is Chinese Entertainment?  Our understanding is that the corporate registry in Macau indicates that its shareholders are Ho Ho and a person commonly known as Cliff Cheong.  The WSJ article notes that they have been unable to determine who Ho Ho is and that Mr. Wynn stated to the WSJ that he was introduced to Ho Ho by then-Macau Chief Executive, Edmund Ho.  Mr. Cheong is well known for his litigation with the Sands organization over a "finder's fee" allegedly due to him and he is described by the WSJ as a close associate of Edmund Ho's and well-known Chinese junket operator.  The WSJ quotes Mr. Wynn as saying he has never heard of Mr. Cheong, which seems very surprising given Mr. Cheong's lawsuit with the Sands organization and apparently close relationship with Ho Ho.<br><br>3. Was the Wynn Resorts Board or Company counsel presented the opportunity to consider this agreement and the relationship created by it, especially with respect to FCPA and other legal compliance considerations?<br><br>4. See further concerns below. |
| **Heads of Agreement ("Second Cotai Agreement")** | |
| **Parties:** | Wynn Cotai Holding Company, Ltd. ("Wynn Cotai"), with Mr. Wynn as signatory.<br>Cotai Partner, Ltd. ("CP"), with Mr. Wynn as signatory.<br>Tien Chiao, with Ho Ho as signatory.<br>[Cotai Land Development Company, the JV company ("CLD"), is indicated to be a party to the Second Cotai Agreement but there is no signature block for it.] |
| **Date:** | April 19, 2006 |
| **Key Terms:** | [The terms essentially implement, with greater detail, the First Cotai Agreement]<br>Ownership of CLD is 77.5% Wynn Cotai, 10% CP, 12.5% Tien Chiao.<br>On publication in the Macau gazette that CLD has obtained rights to the Cotai |



The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 7

| | |
|---|---|
| | site, Tien Chiao will be paid a $35 million "finder's fee". |
| | In respect of its 12.5% interest in CLD, which will own the casino development, Tien Chiao is not obligated and will never be obligated to make any capital contributions but its 12.5% interest cannot be diluted. |
| | CLD will be permitted to develop the main portion of the Cotai site (200,000 square meters) and Tien Chiao to develop an additional 18,000 square meter portion. Wynn Macau will manage CLD's casino based on market-rate management fees. |
| | Same concept as First Cotai Agreement on conversion of Tien Chiao's shares into Wynn Resorts stock. |
| **Key Concerns:** | 5.  Again, what commercial value was Tien Chiao providing for the extraordinary terms it received? |
| | 6.  Why did Wynn Cotai and CP need a "finder" for land that had already been found (especially since it appears CLD submitted an application for the land before the Second Cotai Agreement was executed)? |
| | 7.  Why would the Company need any kind of legitimate facilitator given that Wynn Macau was already a concession holder in Macau and thus had well-established relationships with governmental regulators? |
| | 8.  CLD's application for the Cotai land concession appears to have been filed with the Department of Land, Transport and Public Works during a period when its then-chairman, Ao Man Long, has been found to have been widely soliciting bribes (for which he was arrested in December 2006 and convicted in 2008).  Given this situation and that it is not clear what role Tien Chiao was serving in return for the extraordinary terms it was receiving, was there an adequate internal investigation to protect the Company? |
| | 9.  Did this agreement and the underlying transactions contemplated by it receive adequate FCPA and other review by legal counsel? |
| | 10. Which U.S. casino company was expected to acquire the interests of CP and what do they know about the Cotai transactions? |
| | 11. Why was the First Cotai Agreement with Chinese Entertainment but the second with Tien Chiao? |
| **Share Purchase Agreement ("Third Cotai Agreement")** | |

10

The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 8

| Parties: | Wynn Cotai, with Mr. Wynn as signatory. |
|---|---|
| | CP, with Mr. Wynn as signatory. |
| | Palo Real Estate Development Company Limited ("Palo") , with Mr. Wynn as signatory (Wynn Cotai, CP and Palo, collectively, the "Buyers") |
| | Tien Chiao, with Ho Ho as signatory. |
| Date: | August 1, 2008 |
| Key Terms: | The Third Cotai Agreement replaces the Second Cotai Agreement. |
| | On publication in the Macau gazette that an entity acceptable to the Buyers has obtained rights to the Cotai site, Tien Chiao will be paid $50 million (payable like a finder's fee but now characterized as payment for Tien Chiao's transferring its shares in CLD to the Buyers (although the transfer is not required to occur until *after* payment of the $50 million) and for relinquishing any other rights it may have under the earlier Cotai Documents. |
| Key Concerns: | 12. Why would Tien Chiao give up the extraordinary non-dilutable equity rights they had under the Second Cotai Agreement? It does not seem to make any sense that Tien Chiao would give up a 12.5% interest in the casino company joint venture (an interest for which they were not required by the Cotai Documents to make any capital contributions) in return for the promise of an additional $15 million because payment of such $15 million was contingent on the same event (confirmation of rights to the Cotai site) that would make that 12.5% interest worth far more than $15 million. What is the real explanation for the dramatic restructuring of the deal between the parties? |
| | 13. As before, what commercial value could Tien Chiao have provided that justified any payment to it?  The agreements do not impose any obligations on Tien Chiao to provide any services or indicate what value Tien Chiao could offer. Further, nothing in the public registry in Macau indicates that Tien Chiao had any kind of underlying rights to the Cotai land. |
| | 14. In public disclosures made by the Company and Wynn Macau about the $50 million payment obligation, it is described as being in consideration for rights relinquished by a third party (apparently Tien Chiao) in the Cotai land project.  However, the records we have identified indicate that the only rights Tien Chiao relinquished were its rights under the Third Cotai Agreement.  There is no indication in the Cotai Documents or anything we have found in Macau public records that indicates that Tien Chiao has or had any inherent rights in the Cotai site, which we understand was owned by the government of Macau.  Have all Company and Wynn Macau |

The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 9

disclosures about the Cotai land matter been non-misleading in accordance with applicable U.S. and Hong Kong law?

15. Why have Company and Wynn Macau disclosures about the Cotai land transaction consistently referred to "an unrelated third party" and avoided mentioning joint venture partner Tien Chiao or joint venture entity CLD by name?

16. The concession was ultimately granted by the government of Macau to Palo. Why was the application for the concession that was originally made by CLD transferred to Palo and if doing so was possible why would there be a need to acquire the interests of Tien Chiao in CLD? Again, the transaction does not appear to make sense on its face, which should lead us all to raise the question what the real explanation for the transaction is.

17. The Macau government states in the May 2, 2012 Gazette notice about the granting of the concession to Palo that the application was transferred to Palo due to Palo's "having greater legitimacy to apply for the grant of the land with waiver of tender by virtue of being the subsidiary company of Wynn Resorts (Macau), S.A., holder of a concession for the operation of games or other games of chance in Macau SAR" (this is an unofficial English translation of the official text in Chinese). This appears to reinforce the point above that it is not clear what assistance Tien Chiao could possibly have provided the Company given the Company's well-established relationships with the government of Macau.

18. To what extent were any members of the Board of the Company, the Company's general counsel and other officers, aware of the details of these matters? Were they thoroughly considered and investigated at a level appropriate to protect the interests of the Company and its shareholders in light of the FCPA and other concerns?

As you know, I co-founded this Company along with Mr. Wynn. I was the Company's Vice Chairman until November 2011 and along with Mr. Wynn am the longest-serving member of the Company's Board. To the best of my knowledge and recollection during my service as a Director, the details of these transactions were not previously brought to the attention of the Board, which alone causes me to question the integrity of the Company's governance process and internal controls; nor am I aware that the Board's specific informed consent to the Cotai Documents was obtained.

The Board of Directors
Wynn Resorts, Ltd.
24 January 2013
Page 10

These are some of my threshold concerns about the Cotai land transaction and risks it may have created for the Company.  I think they should be of concern to any director of the Company who is diligent in exercising his or her fiduciary duties.

Additionally, the Company's unfounded litigation against me, Universal Entertainment, and Aruze USA has forced us to investigate these and related matters in order to respond effectively, and we will continue to do so.

As you are aware, we are also investigating matters relating to the original land concession grants in Macau, interests in the Macau project that were granted to certain people with various connections in Macau and how the proceeds of contributions made to Valvino Lamore LLC (the predecessor to the Company) in 2002 were used in connection with the Company's activities in Macau.

### My Recommendation to Appoint a Special Investigator

Notwithstanding the differences we have had with each other, I hope you will agree with me that it is imperative on each of us, as Directors of the Company, to consider these matters with due care and attention.  There may be explanations that Mr. Wynn can provide to address our concerns, and the production of additional documents may assist us in discerning the truth. But I consider it essential that the Board appoint a mutually-agreeable, and this time truly independent special investigator of the highest reputation and integrity to investigate these matters further.

As I expressed above, I look forward to your positive response to this proposal.

Sincerely yours,

Kazuo Okada

# AGREEMENT

## I. PARTIES

This document constitutes an Agreement between WYNN RESORTS (MACAU) S.A. a limited liability company incorporated in Macau SAR according to the laws of the Macau SAR with head office at 335-341 Alameda Dr. Carlos Assumpção 9th Floor, Hotline Center and COMPANHIA DE ENTRETENIMENTO E INVESTIMENTO CHINESE, LIMITADA a limited liability company incorporated in Macau SAR according to the laws of the Macau SAR with head office at 75 Avenida da Praia Grande, Edifício Veng Fai, 3rd floor.

## II. PURPOSE

### A. Purpose

Both parties require assurances that each party has the capability and resources to assume the responsibilities related to the incorporation of a Joint Venture company (the "Joint Venture") under the laws of the Macau SAR to file an application with the Direcção de Serviços de Obras Públicas e Transportes of the Macau SAR Government for the concession of a plot of land with the minimum area of 200,000 sq meters located in Cotai at Taipa Island (the "Development Site") to build two luxurious casino/hotel/resorts.

### B. Principles

The Parties will abide by the following principles:

1.  The Articles of Association of the Joint Venture to be incorporated under the laws of the Macau SAR should establish that 87.5% (eighty seven point five per cent) of the Joint Venture's registered capital would be held by Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates and that 12.5% (twelve point five per cent) of the Joint Venture's registered capital would be held by Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates;

2.  The Articles of Association of the Joint Venture to be incorporated under the laws of the Macau SAR should establish that Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates would be allowed to sell a portion of its 87.5% (eighty seven point five per cent) holding of the Joint Venture to another US gaming/entertainment company (the "CP Partner") and that Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates consent on the sale and can not exercise his first right of refusal to the transaction.

## III. AUTHORITIES

Both parties have the authority and the capacity to enter into this Agreement.

## IV. MUTUAL INTEREST OF THE PARTIES

Both parties have a mutual interest and commitment to the terms of this Agreement and acknowledge that this Agreement is essential to the Purpose as set forth in section II and together will collaborate to achieve it.

## V. RESPONSIBILITIES OF THE PARTIES

Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates agree to and Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates or his agents or designees accept the following:

1.  Once the leasing rights to the Development Site are granted to the Joint Venture and published in the Macau Official Gazette, Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates will pay to Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates an upfront payment on the amount of US$35,000,000.00 (US$ thirty five million);

2.  Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates and the CP Partner will provide the necessary funds for the Joint Venture to pay the land premium due for the Development Site's leasing rights;

3.  Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates and the CP Partner will fund 100% (one hundred per cent), in debt and equity, of the design and development costs of two casino/hotel resorts to be built on the Development Site;

4.  Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates acknowledge that Wynn Resorts (Macau) S.A. and its affiliates are businesses that are subject to and exist because of privileged licenses issued by governmental authorities. If requested to do so by Wynn Resorts (Macau) S.A. or its subsidiaries or affiliates, Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates shall obtain any license, qualification, clearance or the like which shall be requested.

5.  Neither Party in any act related to this Agreement, shall act unjustifiably or arbitrarily to injure particular persons or entities or particular categories of persons or entities.

## VI. SHARE CONVERSION

Both parties agree that the 12.5% (twelve point five per cent) of the Joint Venture's registered capital held by Companhia de Entretenimento e Investimento Chinese, Limitada or its subsidiaries or affiliates can be converted into Wynn Resorts Limited stock (publicly traded) or cash at Wynn's discretion, at a mutually agreed valuation.

## VII. EQUITABLE APPORTIONMENT OF COSTS

Each party shall bear the costs of its own activities under this Agreement. This Agreement contemplates no transfer of funds between the Parties..

## VIII. PERIOD OF AGREEMENT AND MODIFICATION/TERMINATION

This Agreement will become effective when signed by the parties. The Agreement will terminate upon the incorporation of the joint venture, but may be amended at any time by mutual agreement of the parties. In the event this Agreement is terminated, each party shall be solely responsible for the payment of any expenses it has incurred.

Macau on August 25, 2005

For:
Wynn Resorts (Macau) S.A.


Name: Stephen A. Wynn

Title: Chairman of the Board of Directors

For:
Companhia de Entretenimento e
Investimento Chinese, Limitada


Name: Ho Ho

Title: Chairman



# Heads of Agreement

# 合作協議

**THIS HEADS OF AGREEMENT** is made and entered into as of this 19th day of April 2006 (the "Effective Date"), by and among Wynn Cotai Holding Company, Ltd. ("Wynn Cotai"), a company organized and existing under the laws of the Isle of Man, Cotai Partner, Ltd. ("CP"), a company organized and existing under the laws of the Isle of Man, Tien Chiao Entertainment and Investment Company Limited ("Tien Chiao"), a company organized and existing under the laws of Macau SAR and Cotai Land Development Company S.A., a company organized and existing under the laws of Macau SAR ("Cotai Land Company"). Wynn Cotai, TIEN CHIAO and Cotai Land Company are sometimes referred to individually as a "Party" and collectively as the "Parties".

本合作協議 (下稱 "協議" ) 係由根據馬恩島法律成立的 Wynn Cotai Holding Company, Ltd. (下稱"_Wynn Cotai")、Cotai Partner, Ltd. (下稱"CP")、根據澳門特別行政區法律成立的天驕娛樂投資有限公司 (下稱 "天驕" )及路氹土地發展股份有限公司 (下稱 "路氹發展公司" ) 之間於 2006 年 4 月 19 日簽訂 (生效日期) 。

## RECITALS

## 說明

WHEREAS, an application (the "Land Application") on behalf of Cotai Land Company was made to the Government of Macau for the issuance of a land concession for approximately 218,000 square meters of land (the "Development Site") located in Cotai, Macau SAR;

鑒于有關公司已代表路氹發展公司向澳門政府申請 (下稱 "土地申請" ) 批給位於澳門特區路氹 218,000 平方米左右的土地 (下稱 "開發場地" ) ;

WHEREAS, Tien Chiao, or a company appointed by Tien Chiao will acquire one parcel of the Development Site consisting of 18,000 square meters (the "Tien Chiao Parcel") and Cotai Land Company will acquire 200,000 square meters of the Development Site.

鑒于天驕或其指定的公司將取得開發場地之 18,000 平方米土地 (下稱 "天驕地段"), 路氹發展公司將取得開發場地之 200,000 平方米;

## ARTICLE 1

## 第一條

**SHAREHOLDERS OF COTAI LAND DEVELOPMENT COMPANY, S.A.**
**路氹土地開發股份有限公司股東**

| SHAREHOLDER | OWNERSHIP |
|---|---|

| | |
|---|---|
| WYNN COTAI HOLDING COMPANY, LTD. ("WYNN COTAI") | 77.5% |
| COTAI PARTNER, LTD. | 10.0% |
| Tien Chiao Entertainment and Investment Company Limited ("Tien Chiao"). | 12.5% |
| 股東 | 股權比例 |
| WYNN COTAI HOLDING COMPANY, LTD. ("WYNN COTAI") | 77.5% |
| COTAI PARTNER, LTD. | 10.0% |
| 天驕娛樂投資有限公司 (下稱 "天驕" ) | 12.5% |

## ARTICLE 2

### FINDER'S FEE

In consideration of Tien Chiao's efforts in obtaining the rights to the Development Site on behalf of Cotai Land Company, Wynn Cotai or its affiliates will pay to Tien Chiao the sum of US$35,000,000 as a one-time finder's fee (the "Finder's Fee") as next provided. The Finder's Fee will be paid within 15 business days after the land concession/leasing agreement has been signed by Cotai Land Company and the leasing and development rights to the Development Site have been gazetted.

第二條

天驕佣金（土地中介費）

鑒于天驕在取得開發場地之權益上的努力做出的努力，Wynn Cotai或其關聯公司將代表路氹發展公司於路氹發展公司簽署批/租土地合同及有關租賃、開發權益在澳門特區公報發表後後15日內向天驕或其附屬公司一次性支付3,500万美元。

## ARTICLE 3

### SUBDIVISION OF THE DEVELOPMENT SITE

The Development Site will be subdivided so that (a) Tien Chiao or the company appointed by Tien Chiao, will own and develop a parcel of land of 18,000 square meters (the "Tien Chiao Parcel") and (b) Cotai Land Company will own and develop a parcel of land of not less than 200,000 square meters on the remainder of the Development Site (the "Cotai Land Parcel"). Each of the Tien Chiao Parcel and the Cotai Land Parcel will be specifically designated in the plans and specifications to be submitted by Wynn Cotai to the Macau SAR government. Wynn Cotai has the right of first refusal on the Tien Chiao Parcel in the event of a sale of the Tien Chiao parcel.

第三條

開發場地分配

開發場地的分配為：（甲）天驕或其所指定的公司將擁有和開發18,000 平方米土地（下稱 "天驕地段"）；（乙）路氹發展公司將擁有和開發200,000平方米土地（下稱 "路氹地段"（詳情見規劃說明書）。WYNN COTAI對於天驕地段的出售享有優先取捨權。

## ARTICLE 4

## EQUITY CONTRIBUTION

All equity contributions made to, and fees and costs incurred by, Cotai Land Company for the development of the Cotai Land Parcel will be paid for by Wynn Cotai or its affiliates. Tien Chiao will not be responsible for any fees/costs incurred by Cotai Land Company.

### 第四條

### 股東出資

路氹發展公司為開發路氹地段而投入的所有股資及費用將由 Wynn Cotai 或關聯公司負責，天驕將不承擔路氹發展公司所致任何費用。

## ARTICLE 5

## NON-DILUTION OF TIEN CHIAO 12.5%

Tien Chiao's interest in Cotai Land Company will not be diluted below 12.5%. The mechanism in implementing this non-dilution covenant must be legal, binding and enforceable and shall be to the reasonable satisfaction of Tien Chiao.

### 第五條

### 天驕 12.5%股份不被稀釋

天驕在路氹發展公司中的權益將不被稀釋而低於 12.5%，具体执行非稀释条款的机制必须合法，有约束力并可以执行，直到征得天驕满意为止。

## ARTICLE 6

## LAND SALE NET PROFIT INTEREST

Through its ownership in Cotai Land Company, Tien Chiao will be entitled to 12.5% of the net profits from the sale by Cotai Land Company of all or any part of the Development Site.

### 第六條

### 土地銷售淨利潤

天驕將享有路氹發展公司所售全部或部分開發場地 12.5%淨利潤。



## ARTICLE 7

### LAND PREMIUMS

Cotai Land Company will be responsible for any upfront and continuing land premiums payable with respect to the Cotai Land Parcel.  Tien Chiao or the company appointed by Tien Chiao will be responsible for any upfront and continuing land premiums payable with respect to the Tien Chiao Parcel.

## 第七條

### 土地溢价金

路氹發展公司將負責所有有關路氹地段的前期及後續土地溢价金；天驕或其指定的公司將負責天驕地段的前期及後續土地溢价金。

## ARTICLE 8

### MANAGERS AND MANAGEMENT FEES

Wynn Resorts (Macau) SA ("Wynn Macau"), as gaming concessionaire in Macau SAR, will manage and operate all gaming facilities to be located on the Cotai Land Parcel in return for a market rate management fee on such gaming revenues. An affiliate of Wynn Cotai will manage or operate all other facilities to be located on the Cotai Land Parcel for a market rate management fee on such non-gaming revenues.  All management fees shall be the sole property of the company rendering such management services.

## 第八條

### 管理及管理費

永利渡假村（澳門）股份有限公司（下稱 "永利（澳門）"）作為澳門特區博彩承批人，將管理、經營路氹地段所有的博彩設施，所得管理費按市場價確定。Wynn Cotai 關聯公司將管理、經營路氹地段其它所有設施，所得管理費按市場非博彩收入回報價確定。管理費為提供管理服務的公司獨有財產。

## ARTICLE 9

### COTAI LAND COMPANY BOARD OF DIRECTORS

Cotai Land Company will have a maximum of five directors, at least four of whom will be appointed by or on behalf of Wynn Cotai and one of whom will be appointed by or on behalf of Tien Chiao.  Initially, there will be three directors, one appointed on or behalf of Tien Chiao.  Upon opening of a casino resort by Wynn Cotai on



the Cotai Land Parcel, the directors will be entitled to a director's fee and expense reimbursement in accordance with a director's compensation policy to be determined by Cotai Land Company.

第九條

**路氹發展公司董事會**

路氹發展公司將至多設 5 名董事，其中四名由 Wynn Cotai 指定作爲其代表，一名由天驕指定作爲其代表，最初有三名董事，其中一名由天驕指定作爲其代表。從 Wynn Cotai 在路氹地段的渡假村/酒店開業起，董事們將根據路氹發展公司的董事會受償政策而享有董事酬金及費用報銷。

**ARTICLE 10**

**WYNN COTAI RIGHT OF FIRST REFUSAL**

Wynn Cotai will have a right of first refusal over any proposed transfer, assignment or sale of Cotai Land Company shares by Tien Chiao or its successors and assigns.

第十條

**優先取捨權**

Wynn Cotai 對於路氹發展公司的天驕股份轉讓或出售享有優先取捨權。

**ARTICLE 11**

**NON-EXERCISE OF RIGHT OF FIRST REFUSAL**

If Wynn Cotai does not exercise its right of first refusal with respect to either sale of the Tien Chiao Parcel or transfer, assignment or conveyance of shares, Tien Chiao may transfer to a third party approved by Wynn Cotai, such approval not to be unreasonably withheld.

第十一條

**轉讓**

假如 Wynn Cotai 未行使就天驕出售或以任何方式轉讓其路氹發展公司的股份之優先權，天驕可將該股份轉讓給 Wynn Cotai 同意的第三方，該同意不得無故拒絕。



## ARTICLE 12

### DEVELOPMENT COOPERATION

Tien Chiao and Wynn Cotai will cooperate to assure the efficient and timely development of the land parcels.

### 第十二條

### 合作開發

天驕與 Wynn Cotai 彼此協助以保證有效而及時開發土地。

## ARTICLE 13

### INSPECTION OF BOOKS

Tien Chiao will have the right to inspect Cotai Land Company's books and accounts.

### 第十三條

### 賬本紀錄查看權

天驕有權查看路氹發展公司的賬本和記錄。

## ARTICLE 14

### INTELLECTUAL PROPERTY

Wynn Cotai will be the sole owner of any and all intellectual property rights associated with the plans, specifications, drawings, designs, concepts and other materials prepared by or on behalf of Wynn Cotai or its affiliates for the improvements to be located on the Development Site.

### 第十四條

### 知識產權

Wynn Cotai對其代表或其本身或關聯公司擬就完善開發場地所作的規劃、說明、圖紙、設計、概念等材料的知識產權獨佔所有。

## ARTICLE 15

## DEVELOPMENT AND CONSTRUCTION COSTS

Cotai Land Company and/or Wynn Cotai will be responsible for all development and construction costs with respect to any developments located on the Cotai Land Parcel. Tien Chiao or the company appointed by Tien Chiao will be responsible for all development and construction costs with respect to any developments located on the TIEN CHIAO Parcel.

第十五條

開發/建築費用

路氹發展公司及或 Wynn Cotai 將負責有關路氹地段所有開發、建設費用；天驕或其指定的公司將負責有關天驕地段所有開發、建設費用。

## ARTICLE 16

## COOPERATION WITH FINANCING

Tien Chiao agrees to cooperate with Cotai Land Company's and Wynn Cotai's financing activities and will execute any documents, consents, pledge of interests and similar documents as are necessary to finance the development, construction and other costs of the projects on the Cotai Land Parcel. Tien Chiao 's liability with respect to any pledged Cotai Land Company shares will be expressly limited to the value of the shares pledged, representing 12.5% of Cotai Land Company, so that Tien Chiao will have no further legal or financial liability for any such financing. Wynn Cotai will make a reasonable effort in the financing to not pledge the shares of Cotai Land Company.

In the event of default and enforcement of security or foreclosure by the lenders on Cotai Land Company's shares, the lenders will be required to enforce such security or foreclose on the shares in accordance with the 7:1 ratio of Wynn Cotai and CP shares combined to Tien Chiao shares, consistent with Wynn Cotai's, CP's and Tien Chiao 's 77.5%, 10% and 12.5% ownership interests, respectively, in Cotai Land Company.

第十六條

融資合作

天驕同意為路氹發展公司和 WYNN COTAI 在開發建設路氹地段及其它項目費用進行融資時予以必要的合作，如簽署文件、同意及質押利益。天驕質押路氹發展公司股權的責任將只明確限於質押的12.5%本身，除此之外，天驕對融資不負有任何其它債務和法律責任。

WYNN COTAI將在融資時作合理努力使項目公司的股權免於質押。

如果違約而導致執行擔保或債權人執行路氹發展公司的質押股權時，債權人將分別按 7:1 比例執行路氹發展公司中 WYNN COTAI 與 CP 所有的 87.5%和天驕所有的 12.5%股權

## ARTICLE 17

### SHARE EXCHANGE

The Parties agree at Wynn Cotai's option, Tien Chiao 's 12.5% ownership of Cotai Land Company can be exchanged into shares of Wynn Resorts, Limited, a company listed on the NASDAQ Exchange or cash, at Wynn Cotai's discretion, at a mutually agreed valuation at the completion of the project.    If no valuation can be mutually agreed, a reference price can be determined by an independent third party mutually agreed by Tien Chiao and Wynn Cotai.

第十七條

股份交易

雙方同意，在項目完成後，天驕的 12.5%股權轉可換成永利渡假村有限公司(在 NASDAQ 交易所掛牌的上市公司)的股票或現金，由 WYNN COTAI 選擇，並按雙方同意的股價爲之，若雙方未能就股價達成共識，可找一雙方同意的獨立的第三者建議一股價作爲參考。

## ARTICLE 18

### EXECUTIVE COMPENSATION

Cotai Land Company will make reasonable efforts to ensure that compensation for executives in Cotai Land Company does not exceed United States industry standards.

第十八條

執行官報酬

路氹發展公司將盡力確保該公司的執行官薪金不超過美國業界標準。



## ARTICLE 19

### DESIGNATION OF BANK ACCOUNTS

Tien Chiao will designate, in writing, to Wynn Cotai and Cotai Land Company the bank accounts in which it wishes to receive any payments . .

第十九條

指定銀行帳號

天驕將以書面形式向 Wynn Cotai 及路氹發展公司指定意欲收取任何付款的銀行帳號。

## ARTICLE 20

### GOVERNING LAW

Macau SAR.

第二十條

管轄法律

澳門法。

## ARTICLE 21

### FOREIGN CORRUPT PRACTICES ACT

Tien Chiao represents and warrants to Wynn Cotai and CP, that no payments made hereunder shall violate the terms of the US Foreign Corrupt Practices Act.

第二十一條

反海外腐敗法

天驕向 Wynn Cotai 及 CP 表示及保證本協議所涉款項遵守反海外腐敗法。

In witness whereof, the undersigned have signed this agreement this 19th day of April, 2006

二〇〇六年四月十九日簽字為証

Wynn Cotai Holding Company, Ltd.

By: _____
Name:
Title:

Cotai Partner, Ltd.

By: _____
Name:
Title:

Tien Chiao

By: _____
Name:
Title:

## ARTICLES OF ASSOCIATION OF PUBLIC LIMITED COMPANY "COTAI DESENVOLVIMENTO IMOBILIÁRIO, S.A." "COTAI DEVELOPMENT COMPANY, LIMITED"

### CHAPTER ONE

### Name, Duration, Object and Head Office

### Article one

1.      The company adopts the form of a public limited company.

2.      The company adopts the name___ in Chinese, COTAI LAND DEVELOPMENT COMPANY, LIMITED in English and COTAI DESENVOLVIMENTO IMOBILIÁRIO, S.A. in Portuguese and the duration shall be for an undetermined period of time.

### Article two

The corporate object is real estate development.

### Article three

1.      The company has its head office at Alameda Dr. Carlos d'Assumpção, No. 335-341, 9th floor, Hotline Building, in the Macau Special Administrative Region.

2.      The Board of Directors may decide on the following, without authorization from any other governing body:

   a)  Change of head office to any other location within the limits established by the Law;

   b)  Open and close branches, agencies, offices or any other form of social representation, either in the Macau Special Administrative Region or in any other location of the Popular Republic of China or abroad.

### CHAPTER TWO

### Share Capital and shares

### Article four

The share capital, fully subscribed and paid up in cash, is of one million patacas, divided and represented by one thousand shares with a face value of one thousand patacas each, and there shall be securities representative of one, ten, one hundred, and a thousand shares.

**Article five**

1.      The shares are nominal.  There shall be Class A nominal shares and Class B nominal shares.

2.      The Class A nominal shares may only represent twelve point five per cent (12.5%) of the paid up and subscribed share capital, conferring the right to vote, the  right to a dividend of the distributable profit and the right to the values corresponding to equity at the company's liquidation or share amortization. The Class B nominal shares may only represent eighty seven point five per cent (87.5%) of the paid up and subscribed share capital, conferring the right to vote, the right to a dividend of the distributable profit and the  right to the values corresponding to equity at the company's liquidation or share amortization.

3.      The securities representative of the shares shall be signed by two directors or by one director and one duly authorized agent and one of the signatures may be by stamp. The securities representative of the shares shall be kept at the head office of the company or at a location to be indicated by the Board of Directors.

**CHAPTER THREE**

**Governing bodies**

**Article six**

1.      The General Meeting, the Board of Directors, the Sole Inspector and the Secretary are the company's governing bodies.

2.      The Board of Directors and the Sole Inspector shall be elected by the General Meeting , for a period of three years and may be reelected one or more times.

3.      The Secretary shall be elected by the Board of Directors, for a period of three years and may be reelected one or more times.

4.      The members of the governing bodies shall take office immediately upon election and shall keep their functions until successors are elected.

5.      If one of the members of one of the governing bodies should become permanently unable, the members of the respective body, or in their absence, the chairman of the Board of Directors shall appoint a temporary replacement until the next General Meeting takes place.

## Section I

## General Meeting

## Article seven

The General Meeting shall have the powers granted by Law and by the present Articles of Association and shall be comprised of the shareholders with a right to vote, that is, the holders of common shares in accordance with the requirements defined in these Articles of Association.

## Article eight

1.      The General Meeting board shall be comprised of a chairman and a secretary elected by the General Assembly for an undetermined period of time.  The secretary shall replace the chairman in his absences and impediments and either of them can be non-shareholder.

2.      The chairman of the General Meeting and the secretary of the General Meeting may only be reelected or removed from office by the General Meeting.

## Article nine

The General Meeting shall be convened by the Chairman of the General Meeting or by his replacement, with the prior notice and publishing required by law.

## Article ten

1.      The Chairman of the General Meeting or his replacement shall convene the Regular General Meeting within three months following the end of the fiscal year to decide on matters required by law, and also to decide on any other matters of interest to the company and which are specifically indicated in the notice of meeting.

2.      The Chairman of the General Meeting shall convene the Extraordinary General Meeting whenever required by any of the governing bodies or by any shareholder who holds at least 5% of the share capital.

## Article eleven

In the absence of a notice of meeting by the Chairman of the General Meeting, the General Meeting may be convened by any member of the governing bodies or by the shareholders who hold at least 5% of the share capital.

**Article twelve**

The Extraordinary General Meeting convened by the shareholders, shall only take place provided 51% of the share capital is present or represented.

**Article thirteen**

1.      The shareholders may appoint, in accordance with the terms of the law, anyone to represent them in the General Meetings, by means of a simple letter addressed, two days in advance, to the chairman of the Board of the Meeting, with the indication of the meeting which the representative shall be attending.  The shareholders who are corporate bodies shall indicate, in accordance with the same terms, who shall be representing them at the General Meetings.

2.      The shareholders who wish to include any subjects in the agenda of the Meetings shall indicate, with accuracy, the subjects that they would like to see discussed, in a letter addressed to the chairman of the board of the Meeting.

3.      The request for any of the minutes of the Meeting to be drawn up by a notary shall be submitted, by letter, to the chairman of the board of the Meeting, at least five days prior to the date the Meeting will be taking place.

**Article fourteen**

1.      Only the shareholders who, 20 days prior to the date the General Meetings hold 100 shares registered in their names in the company book-entry, can vote at the General Meetings.

2.      The shareholders who hold less than 100 shares may form groups and thus complete that number and appoint a representative. A document indicating the name of the representative and the signatures of the represented parties shall be submitted to the chairman of the board of the Meeting, at least 5 days prior to the date the Meeting will be held.

3.      One vote shall correspond to each share.

**Article fifteen**

1.      Unless otherwise determined by the law or the articles of association, the deliberations of the General Meeting shall be approved by, at least, 51% of the present or represented votes.

2.      Shareholders may deliberate, without resorting to the General Meeting, on any proposal submitted by a shareholder holding nominal shares dully registered, provided all

shareholders, with a right to vote, declare in writing how they will vote, in a document comprising the proposal.

## Section II

### Board of Directors

### Article sixteen

1.     The Board of Directors shall pursue the interests of the company and assure its management.

2.     The Board of Directors is comprised of three members, elected by the General Meeting, of which one shall be proposed by the shareholders who hold class A shares and the other two by the shareholders who hold class B shares.

3.     The members of the Board of Directors shall elect one of its members as chairman of the Board of Directors.

### Article seventeen

1.     In the case of the definitive impediment of the chairman of the Board of Directors, the Board of Directors shall proceed with his replacement until the next General Meeting is held, electing a new chairman from within its members, who shall appoint a new director.

2.     In the case of the definitive impediment of a director, the Board of Directors shall proceed with his replacement until the next General Meeting is held, and the chairman of the Board of Directors shall choose a new director.

### Article eighteen

The Board of Directors may, after the completion of the enterprises to be built by the company at Cotai, decide to remunerate its members.

### Article nineteen

1.     The Board of Directors shall meet whenever convened by its chairman or by the Supervisory Committee or by the Sole Inspector, whenever justified by the interest of the company, and at least every three months.

2.     The meetings shall be convened by letter addressed to the respective members with the indication of the hour, agenda and venue of the meeting.  The meetings may take place in the Macau Special Administrative Region or elsewhere, and may be held by audio visual means, and the minutes of each meeting shall be prepared and signed by all members who are present. Any irregularities in the notice of meeting may be waived

provided no director is opposed to the holding of the meeting and the deliberations relate to subjects approved by all the members present.

3.      The Board of Directors may deliberate, without notice of meeting and without convening, provided all the members of the Board of Directors declare in writing how they will be voting the deliberation proposal, and provided the subjects to be deliberated on, have been expressly accepted by all members.

### Article twenty

1.      The Board of Directors shall only deliberate whenever a simple majority of its members is present or represented.

2.      A director may represent another director by means of a letter addressed to the chairman.  If the representative is the chairman of the Board of Directors, all other directors shall the informed.

3.      The deliberations of the Board of Directors shall be taken by simple majority of votes of the directors that are present or represented, and the chairman of the Board of Directors or his replacement shall have the casting vote.

### Article twenty one

With the exception of the acts by which the law requires its intervention, the Board of Directors may appoint agents, who may be members of the public, to carry out dully specified acts.

### Article twenty two

The following acts shall be subject to the approval of the Board of Directors reached at a meeting expressly called for this purpose:

a)      The acquisition, disposal of movable and immovable property or the participation in any movable or immovable property;

b)      The mortgaging, pawning of any movable or immovable assets of the company;

c)      The authorizing of commercial or financial operations that originate the attribution or obtaining of credits of values of more than 20% of the net worth of the company and for a period of more than six months;

d)      The issuance, within the scope of its powers and in accordance with the terms of article 27 of these Articles of Association, of any certificates that may have or will have the quality of shares;

e)   The issuance of any type of debt certificate, namely any type of bonds, including the bonds convertible into shares;

f)   The approval of the policies, the multi-annual plans and the management system of the company;

g)   The approval of the annual investment plan, the current expense plan and the recruitment of staff;

h)   The approval of the long term management strategy and policy;

i)   The submission of proposals to the General Meeting on:

    i.    Distribution of profit and dividends;
    ii.    Alterations to the Memorandum of Association;
    iii.    Increase or reduction of share capital;
    iv.    Issuance of any type of guarantee that may have or will have the quality of shares.

## Section III

### Supervisory Committee

### Article twenty three

1.   The inspection of the company business shall be of the responsibility of the Supervisory Committee, comprised of three members, one being the chairman and another his replacement, all elected by the General Meeting.

2.   The General Meeting may choose the Sole Inspector system.

3.   One of the members of the Supervisory Committee shall be an auditor or an audit company.

4.   The sole Inspector shall be an auditor or an audit company;

5.   The Supervisory Committee shall meet, at least every three months.

## Section IV

### Company Secretary

### Article twenty four

1.      The company secretary shall carry out the administrative acts defined in the law, including the relations between the company and its governing bodies and the public authorities, in accordance with the terms of the law and the articles of association.

2.      The company secretary, elected by the Board of Directors, cannot be a member of the Board of Directors.

### Article twenty five

1.      The company shall be committed:

    a)  With the signature of the chairman of the Board of Directors;

    b)  With the signature of two directors;

    c)  With the signature of one or more agents in accordance with the terms of the respective powers of attorney.

2.      For the regular acts of day to day management, the signature of one of the directors proposed by the shareholders who hold class B shares, or an agent shall be sufficient.

### CHAPTER FOUR

### Capital Increase, Transfer of Shares and Amortization of Shares

### Article twenty six

1.      The Board of Directors is authorized to increase the share capital, one or more time, up to the maximum limit of two hundred million patacas, defining the conditions for the issuance of shares representing the capital increase or increases.

2.      The capital increase or increases referred to in the previous number shall only be executed by cash realizations.

3.      The shareholders who hold nominal shares dully registered shall have the right of first refusal in the subscription of new shares and in the pro-rata allocation of shares resulting from the non-exercising of the right of first refusal.

4.      All share capital increases shall be exclusively paid by the shareholders who hold class B shares. The shareholders who hold class A shares shall not be responsible for any costs or expenses relating to the capital increases and shall always maintain unaltered their participation of twelve point five per cent in the company's share capital.

## Article twenty seven

1.     The shareholders who hold class A shares shall not transfer or in any way alienate and directly or indirectly burden any class A share, without the express authorization of the shareholders who hold class B shares who will have the right of first refusal in the transfer of any class A share.

2.     If the shareholders who hold class B shares do not intend to exercise their right of first refusal, the holders of class A shares may transfer any share provided that the acquirer is approved and accepted by the holders of class B shares.

3.     The holders of class B shares may only refuse the transfer to third parties of the shares referred to in the previous number, for reasons dully justified and considered.

## Article twenty eight

1.     The company may amortize shares whenever:

   a) There is an agreement between the company and the shareholders;

   b) Any shareholder burdens, for any reason the ownership or any other right in rem on the shares, unless authorized by the Board of Directors;

   c) Any shareholder alienates his shares in violation of the provisions established in article twenty seven of the present articles of association;

   d) Any shareholder does not transfer his shares whenever the right of first refusal is exercised;

   e) Any shareholder carries out any act that seriously affects the business of the company;

   f) In the case of divorce or judicial separation of property, and the ownership of the shares is not attributed to the bearer;

   g) A court of last resort ruling declares that the shareholder is incapable of managing his businesses, for reasons of insanity, insolvency or bankruptcy.

2.     The amortization of shares referred to in paragraph f) of the previous number may only be taken following a deliberation that has been approved by, at least, the number of votes that correspond to 51% of the share capital.

3.     The amortization shall be decided within 90 days from the date in which the company became aware of the facts that originated it, and the shareholder shall be informed of the decision by registered letter and within 15 days.

4.      The value of the amortization shall be calculated based on the company's last balance sheet.

5.      The amortization value shall be paid within a maximum of six months, without interest, from the date of the approving deliberation.

### Article twenty nine

The company may acquire own shares in accordance with the terms of the Law.

### CHAPTER FIVE

### General Provisions

### Article thirty

The company adopts for the company's year, the period between January and December of each year, in accordance with the terms of article 253 of the Commercial Code, and the Board of Directors may alter this period.

### Article thirty one

1.      The company may only be dissolved in the cases foreseen in the Law or by deliberation reached at a General Meeting by a majority of at least two thirds of the votes representative of the share capital.

2.      The liquidation of the company's assets, in the case of dissolution, shall be made, outside the Court, by a Liquidation Committee comprised of the directors in office, unless the General Meeting reaches a different decision.

### Article thirty two

The profit of each year shall be applied, first in the establishment of provisions and reserves in accordance with the terms of the Law, and the remaining amount shall be distributed according to a deliberation of the General Meeting taken by a simple majority of its members.

### Article thirty three

1.      Any alteration to the present Articles of Association, apart from having to comply with the conditions established herein, may only be deliberated by a General Meeting especially convened for this purpose and shall be the object of a documented report prepared by he Board of Directors;

2.      The deliberation that approves the alteration to the present articles of association shall be approved by a number of votes that represent, at least 2/3 of the share capital.

3.      Number four of article twenty six may only be altered by deliberation unanimously approved by the members of the General Meeting.

*Corrected "I mean, Development"; Corrected "I mean, Development"; Corrected "I mean, Development"; Corrected "I mean Development";*

(signatures)

## SHARES PURCHASE AGREEMENT
### 股份轉讓協議

This Shares Purchase Agreement (this "<u>Agreement</u>") entered into as of [ *1 August* ], 2008 (the "<u>Effective Date</u>") by and among Wynn Cotai Holding Company, Ltd. ("Wynn Cotai"), Cotai Partner, Ltd. ("Cotai Partner"), each a company incorporated under the laws of the Isle of Man, and Palo Real Estate Development Company Limited, a company organized and existing under the laws of Macau (collectively, the "<u>Buyer</u>") and Tien Chiao Entertainment and Investment Company Limited ("<u>Tien Chiao</u>") a company incorporated under the laws of the Macau SAR (the "<u>Seller</u>").

本放股份轉讓協議 (下稱"協議") 是由根據馬恩島法律成立的 Wynn Cotai Holding Company, Ltd. (下稱"Wynn Cotai"), Cotai Partner, Ltd. (下稱"Cotai Partner", ) 和根據澳門特別行政區法律成立的 Palo Real 房地產發展股份有限公司 (合稱"買主") 以及根據澳門特別行政區法律成立的天驕娛樂投資有限公司 (下稱"天驕 ","賣家") 之間於 2008 年[＿＿]月[＿＿]日簽訂 (下稱"生效日期")。

**WHEREAS,** Tien Chiao, Wynn Cotai and Cotai Partner are the sole shareholders of Cotai Land Development Company S.A. (the "<u>Company</u>"), a company organized and existing under the law of Macau SAR.

鑑於，天驕、Wynn Cotai 和 Cotai Partner 都是根據澳門特別行政區現行之法律所成立的路氹土地發展股份有限公司（下稱"公司"）的唯一股東員。

**WHEREAS,** the Company was formed to apply to the Macau SAR Government for a parcel or parcels of land (the "Intended Site") located in the Cotai area of the Macau SAR and to engage in its development.

鑑於，該公司是為了向澳門特別行政區政府申請一塊或多塊位於澳門特別行政區路氹城的土地作為參與該土地的開發活動而設立的 (下稱"預期場地")。

**WHEREAS,** the Company has no more interest to engage in the development of the Intended Site parcel or parcels of land located in the Cotai area of the Macau SAR and in light of the fact that the original commercial agreement set out among the shareholders became economically unfeasible due to a variety of factors including but not limited to certain changes in the laws and regulations applicable to holding interests in land in the Cotai area, the Buyer and its affiliates desire to acquire all the shares held by the Seller in the Company and have offered Seller the Consideration (defined below) and Seller, in exchange for the Consideration desires to sell all the shares including all its social and economic rights, claims and interests, that by virtue of being a shareholder it my have in the Company.

鑑於，公司對位於澳門特別行政區路氹城的預期場地再沒任何開發興趣，原本與股東所簽訂的商業協議，包括各種因數，但是不局限於包括在法律和條例上所持有位於路氹城的土地的興趣都變得難以實行。買主及其附屬機構渴望取得賣家所持有所有公司的股份並提供了補償金（定義在下面）給賣家。賣家，為換取補償金渴望賣掉所有公司股票，包括所有社會和經濟權利，以及作為公司股東的一切利益權利。

**WHEREAS,** the Buyer (individually or collectively), or an affiliate of the Buyer intends to develop its own parcel or parcels of land (the "Buyer's Land") independent and separate from any development undertaken by Seller or its affiliates.

鑒於，買主（單獨或集體的），或買主的附屬機構打算獨立發展自己的一塊或多塊土地（"買主的土地"）與賣家和其附屬機構的所開發活動完全分開。

**WHEREAS**, the provisions of this Agreement shall have legal force and supersede any and all previous negotiations and agreements between Buyer and Seller, particularly in view of sections 2 and 4 below, once the consideration referred to in section 1 has been effective paid to Seller.

鑑於，本協議(尤其是以下第二及第四條規定)在買方實際支付賣方以下第二條所指補償金時方產生法律效力及取代任何之前買方與賣家之間所達成的協議。

Buyer and Seller agree as follows:

買主和賣家如下同意：

1.   <u>Consideration</u>.  Within 15 days after the rights to the Buyer's Land are published in the Macau Official Gazette in the name of an entity acceptable to Buyer, Buyer (individually or collectively), or an affiliate of Buyer, shall pay, to an account designated by Seller, Fifty Million United States Dollars (US$50,000,000) (the "<u>Consideration</u>").

1.   補償金。自買主的土地以可接受之名刊載於澳門特別行政區的公報的十五天內，買主或其附帶機構將存入五千萬美元正 (美元$50,000,000) (下稱"補償費") 到賣家所指定的付款銀行帳戶。

2.   <u>Seller Release</u>. Immediately effective upon payment of the Consideration, Seller, on behalf of itself, its respective affiliates (including but not limited to <u>Companhia de Entretenimento e Investimento Chinese Limitada</u>), officers, directors, employees and agents and without the need for further action beyond execution of this Agreement, endorses and transfers to Buyer (in proportions to be advised by Buyer prior to such endorsement) all of the shares it holds in the Company, in accordance with applicable Macau law, and releases and forever disclaims any and all claims and interests, whether such claims or interests are direct, indirect, financial or otherwise, on or in any way related to (i) the Intended Site and any actions or events which may take place with respect to the Intended Site; (ii) the Buyer (individually and collectively), all of Buyer's affiliates and subsidiaries (including but not limited to Wynn Resorts (Macau) S.A. and Wynn Resorts, Limited) and (iii) any ownership interests of any kind whatsoever in or to the Company, the Intended Site, Buyer (individually and collectively) and Buyer's affiliates and subsidiaries. Seller expressly acknowledges and agrees that the release set forth in this section shall constitute Seller's full release of any interests in and to all shares, stock or other evidence of any ownership interests in the Buyer's Site; in the event Seller does not effect such transfer within the time period required by Buyer in Buyer's sole discretion, after the effective payment of the Consideration referred to in the section 1, Seller acknowledges that Buyer shall be within its rights under both Macau law and the Company's articles to dissolve the Company. Seller expressly acknowledges and agrees that Buyer and its affiliates shall have no responsibilities, duties or obligations whatsoever, including but not limited to any responsibility to ensure or otherwise facilitate a grant of any land to Seller, with respect to Seller's intentions with respect to any land wherever such land may be located.

2.   賣家放棄。由支付補償費的即日起，賣家，代表自己本身、附屬機構 (包括但不限於中凱偉業娛樂投資有限公司)、理事、主管、僱員及代理和不用進一步的行動來執行這個協議，在符合澳門特別行政區法律，認同及轉讓所有公司股份給買主 (比例將在之前的的背書被買主所建議) 、永遠放棄任何權利和利益。此利益及權利不論是否有直接、間接、有關財政及其他的或有關的 (i) 預期場地和其他有關預期場地之的行動或事件； (ii) 買主(單獨地和全體地)，附屬機構或子公司(包括但不限於永利渡假村(澳門)股份有限公司及 Wynn Resorts Limited 和 (iii) 任何一種涉及公司、預期場地、買主(單獨地和全體地)和買主的附屬機構及其子公司的擁有權利益。賣家明確地承認和同意在此小節中所制定的，賣家完全放棄所有股份、股票、及對買主的土地擁有權的所有興趣；在過程中，買方不影響轉讓過程，上述在第一條提及，由買方實際支付賣家補償金後，賣家承認買方在澳門特別行政區法律和公司

的章程下擁有解散公司的權利。進一步說明買家承認和同意買家和其附屬機構將沒有任何責任、義務或包括但是不局限於任何責任確定或授權給任何土地於買家，到買家的任何土地中關於任何土地無論何處這樣的陸地可能是位於。

3.    Representations and Warranties. Each of Buyer and Seller represents and warrants to the other that: (i) the person signing this Agreement on its behalf has been duly authorized to execute this Agreement and any related documents; (ii) this Agreement constitutes a valid and binding obligation of the applicable party; (iii) no agent, broker or similar entity is or shall be entitled to any fee or any other commission in connection with any of the transactions contemplated in this Agreement and (iv) it has made or ordered no payment, taken no action, and has directed no person, firm, corporation, partnership or any entity to make any payment or take any action, that violates or could violate the United States Foreign Corrupt Practices Act of 1977, as amended and (v) solely with respect to Seller, that Seller has valid and legal title to the shares it holds in the Company and such shares are not subject to any lien or other type of encumbrance of any kind.

3.    代表和保證。每一位買家和賣家的代表和保證均需要： (i) 簽署此協議的代表均需正式被認定可執行此協議和所有相關文件； (ii) 這個協議構成一個有效和共有約束力的合約； (iii) 代理、經紀或者相關的個體都不會有資格獲得在任何與此協議有關聯的費用或佣金 (iv) 此協議的所有款項，指派任何人、企業、合作伙伴、股份有限公司或個體的行爲違守，1977 年被修改的反海外腐敗法及 (v) 完全尊重賣家，賣家有效和合法擁有公司的股份，此股份並不代表任何類的阻礙或任何先得權。

In furtherance of the parties' mutual interest in ensuring the publication of the rights to the Buyer's Land in the Macau Official Gazette, Buyer further represents and warrants to Seller that Buyer shall take all necessary and appropriate action as required by Macau law with respect to (i) initiating and completing the process by which the rights to the Buyer's Land are published in the Macau Official Gazette and (ii) notifying the applicable Macau government agencies of the commercial arrangement set forth in this Agreement, including the filing of this Agreement with such agencies if so required. Seller shall cooperate with Buyer as necessary in furtherance of the above.

爲進一步確保各成員對預期場地擁有權於澳門特別行政區的公報內刊載的共同利益，買主須按照澳門特別行政區法律所規定，進一步代表和授權給賣家承擔所有必要和適當的行爲 (i) 開始執行及完成預期場地擁有權於澳門特別行政區的公報內刊載的整個過程 (ii) 就這個協議內所列明的商業安排，包括這個協議的歸檔，必須要通知各澳門特別行政區政府的適當部門。就上述的條款，如必要，賣家與買主需互相合作。

4.    Integration. Buyer and Seller, on behalf of themselves and their affiliates, acknowledge and agree that (i) this Agreement is the complete, final and exclusive statement of the terms between the parties and supersedes any and all other negotiations and agreements whether oral or written, between them relating to the subject matter hereof and (ii) immediately effective upon execution of this Agreement, the Heads of Agreement shall terminate and shall be null, void and of no further force or effect. Buyer and Seller further agree that once the provisions of Section 1 have been satisfied, this Agreement shall operate to (i) effect the release set out in Section 2 without the need for further action by either party and (ii) terminate any relationship, whether commercial, legal or otherwise, between Buyer, Seller and any of their affiliates or subsidiaries.

4.    整合。買家和賣家，代表自己和其附屬機構，承認和同意 (i) 此協議所聲明的條款內的各方之間，是完整、最終和獨有的，並且代替任何其他口頭或書面的交涉和協議，關於他們之間的

此點 (ii) 當這協議立即生效時，合作協議將即時終止及無效，沒有進一步的效用。買主和賣家更進一步同意，一旦滿足了條款的第 1 條，這個協議將執行到 (i) 任何一方不用作進一步行動令第 2 條款生效，並且 (ii) 終止任何關係，包括商務、法律或，與買主，賣家和他們的附屬機構或子公司之間。

5.    <u>Jurisdiction and Venue</u>. If any party has a claim against another party arising out of or in connection with this Agreement such claim shall be referred to the courts of Macau SAR, to the jurisdiction and venue of which each of the parties to this Agreement irrevocably submits. The jurisdiction of the courts of Macau SAR over such claim shall be an exclusive jurisdiction and no courts outside Macau SAR shall have any jurisdiction to hear and determine such claim.

5.    <u>管轄權和地點</u>。如任何一方關於或源於此協議而提出反對另一方的要求，這要求將交予澳門特別行政區的法庭，此協議內每一方所建議的管轄權和地點均不可撤回。澳門特別行政區法庭的管轄權涉及這樣的要求將是唯一的，和除澳門特別行政區的法庭外，其他以外地區的法庭將不會有任何的管轄權來聽取和解決這樣的要求。

[The remainder of this page has been left intentionally blank.  The next page is the signature page.]

[這頁的剩下留作空白。簽名頁在下頁。]

IN WITNESS WHEREOF, the applicable parties have caused this Agreement to be
executed by their respective officers thereunto duly authorized as of the date first above
written.
這協議由各方合法的代表簽訂，在上述的生效日期正式生效。

**SELLER**
賣家
Tien Chiao Entertainment and Investment
Company Limited
天驕娛樂投資有限公司

By: _____
Name: _____
Title: _____


**BUYER**
買主
Wynn Cotai Holding Company, Ltd.

By: _____
Name: _____
Title: _____

Cotai Partner, Ltd.

By: _____
Name: _____
Title: _____

Palo Real Estate Development Company Limited
Palo Real 房地產發展股份有限公司

By: _____
Name: _____
Title: _____

News, Quotes, Companies, Videos

JP EDITION | Sunday, July 1, 2012 As of 2:58 PM EDT

Home | World | U.S. | New York | Business | Tech | Markets | Market Data | Opinion | Life & Culture | Real Estate | Careers

Earnings | Economy | Health | Law | Autos | Management | Media & Marketing | Energy | Small Business | Startups | More Industries

TOP STORIES IN BUSINESS

| | 1 of 12 | | 2 of 12 | | 3 of 12 | | 4 of 12 |
| Europe's Yacht Makers Sail On | | Probe of Boeing 787 Battery Fire Expands | | The Return of Kim Dotcom | | Caterpillar Unit in Scandal Has Unusual Roots |

BUSINESS  |  July 1 2012, 2:58 p.m. ET

# In Wynn's Macau Deal, a Web of Political Ties

Article | Stock Quotes | Comments (7)

MORE IN BUSINESS »

By KATE O'KEEFFE

The Macau government's decision in May to grant Wynn Resorts Ltd. [WYNN +0.49%] land rights for a $4 billion casino-resort has paved the way for what Chairman Steve Wynn has called "the single most important project" in the company's history.

The decision also has triggered a $50 million payment by Wynn Resorts to a little-known Macau company as part of a complex deal whose seven-year history has involved the Chinese territory's former top official, his close associate and a businessman from a prominent Beijing family, according to public records, Wynn executives and company documents reviewed by The Wall Street Journal.



UPI Photo/Alexis C. Glenn
STEVE WYNN

The deal's history and the connections among the companies and people involved open a window on business dealings in the booming Chinese gambling enclave of Macau, which generates more than five times as much gambling revenue as the Las Vegas strip.

To expand in Macau, U.S. casino operators have had to grapple with a complicated and opaque government approval process. On occasion, those efforts have drawn U.S. government scrutiny. Wynn said in February that the Securities and Exchange Commission was investigating a pledge it made last year to donate $135 million to the University of Macau. The company said the donation was made in accordance with all applicable laws and was consistent with the company's tradition of philanthropy. The university's top academic official said Wynn's gift will support activities at the school's Asia-Pacific Academy of Economics and Management.

Meanwhile, Wynn rival Las Vegas Sands [LVS +0.66%] has said it is under investigation by both the SEC and the Justice Department for possible violations of the Foreign Corrupt Practices Act, which bans bribery by U.S. companies abroad. Las Vegas Sands says it is cooperating with investigators.

Macau land deals also are facing scrutiny at home. In late May, the Chinese territory's top court found a former top government official guilty of helping a Hong Kong property mogul win land rights in return for a $2.5 million bribe in 2005.

In a lengthy lunch interview at Wynn Macau's Cafe Esplanada last month, Mr. Wynn, flanked by two senior lawyers, two Wynn Macau Ltd. board members, two

お使いの縮小しつつある
バックアップウィンドウ
よりも早く

intel Xeon

Don't Miss


Can the New Blackberry Save RIM?


Lance Armstrong: Why Oprah, Why Now?


A 10-Foot Python Takes Flight

More in Business

Caterpillar's China Woes Deepen

Dreamliner Probes Intensify

Wal-Mart Toughens Supplier Policies

Pearson Warns on Earnings

Paths Diverge for Chinese Telecom Firms

Sign Up For Business News By Email

The latest news and analysis delivered to your in-box. Check the boxes below to sign up.

SIGN UP

New! To sign up for Keyword or Symbol Alerts click here.

To view or change all of your email settings, visit the Email



both he and his wife, said that it was Edmund Ho, Macau's former top official, who ... discuss ... Edmund Ho ... the first chief executive of Ma... ed it ... he met ...

de...



High Rollers
Last year Macau's casinos
raked in $33.5 billion in gambling
revenue, or more than five times
that of the Las Vegas Strip.

Grown ... city's leader about ...

Setup Center.



The Baltimore Ravens and the
San Francisco 49ers will face off
in Super Bowl XLVII on Sunday,
Feb. ...

To Stay in Form and Keep Those Infectious Punjabi
Time Off Counts                      Dance Rhythms

2.  アジア諸国で高まる反中国感情

3.  古いPCはウィンドウズ8にアップグレードしないほうがいい

4.  「787」バッテリー火災の原因、１つではない可能性

5.  高まるテウムイオン電池への懸念―「787」の事故受け

RSS一覧

the space-starved territory for another
casino project. Edmund Ho told him
about a plot that had been earmarked
for a person named Ho Ho, Mr. Wynn
said, and provided Ho Ho's phone
number to a Wynn staff member, who
set up a meeting in Wynn's Macau
offices. A Wynn lawyer said the
company doesn't believe the Messrs.
Ho are related.

According to a document dated Aug.
25, 2005, and signed by Stephen A.
Wynn and Ho Ho, Wynn Resorts
agreed to jointly pursue rights to the
site in Macau's Cotai area with a
company controlled by Ho Ho. The
company, called Cia. de
Entretenimento e Investimento Chinese

Limitada, is 90% owned by Ho Ho, with prominent Macau businessman Cliff
Cheong owning the rest, according to Macau public records. Both men list Mr.
Cheong's office as their residential address in Macau.

While Ho Ho is little-known in Macau, Mr. Cheong has close connections to one of
the city's most powerful people, Edmund Ho.

A representative for Mr. Cheong, who is involved in the junket business, said he
wasn't available to comment. Junkets are middlemen who bring Chinese gamblers
to Macau and account for three-quarters of the city's gambling revenue.

Mr. Cheong's relationship with Edmund Ho was outlined in a lawsuit that he and two
associates filed against Las Vegas Sands. The suit alleged that Mr. Cheong and his
associates were owed money for helping Las Vegas Sands win a casino license in
Macau. The casino company paid the three men $42.5 million to settle the suit in
June 2009, according to its 2009 annual report.

In the suit in Clark County District Court in Nevada, Mr. Cheong testified that he
served as a key liaison between Macau's chief executive and Las Vegas Sands
during the final hours of the casino-license bidding in 2002.

One of Mr. Cheong's associates in the suit, Dax Turok, told the court that Mr.
Cheong "had his finger on the pulse all the time" on Macau policy because of his
close relationship with Edmund Ho. Mr. Cheong was also a member of the advisory
committee on the handover of Macau to China, Mr. Turok said.



Associated Press

Wynn resorts in Macau. The Macau government
decided in May to grant Wynn Resorts Ltd. land
rights for a $4 billion casino-resort.

Mr. Wynn told the Journal that he has
never heard of Mr. Cheong. He also
said his company vetted Ho Ho and his
associates thoroughly because he and
other executives were very aware of the
Foreign Corrupt Practices Act.

"This whole business of the Foreign
Corrupt Practices Act—we were
schooled in this," Mr. Wynn said. "Right
away we started checking everybody

STREAM

Corporate Intelligence: Live Coverage

CORPORATE INTELLIGENCE                    JAN 19, 2013

More Bing In Facebook, And More Facebook
In Bing
After Facebook announced a new search engine that will sent
traffic to Microsoft's search engine, Bing repaid the favour
today, announcing that it would layer its search results with
more Facebook content.

CORPORATE INTELLIGENCE                    JAN 19, 2013

Dish Network And The Mysterious Case Of The
Missing Ads
A lawsuit over Dish Network's ad-skipping device is about
"privacy, consumer autonomy, and technological innovation"
according to Dish, and "an illegal product that clearly infringes
on our copyrights" according to Fox

CORPORATE INTELLIGENCE                    JAN 19, 2013

University of Phoenix Retirement Plan: Nice
Work, If You Can Get It
After some challenging years, the university's parent Apollo
Group is desperate to reboot its reputation. But the post-
retirement compensation terms for its founder, John Sperling
won't do it any favors on the PR front.

GO TO FULL CORPORATE INTELLIGENCE STREAM »

FOLLOW CORPORATE INTEL ON THE GO
WSJ.com/corporateintelligence on your smartphone or
tablet

Latest Headlines
Obama Vows Aggressive Agenda

Latest News
Support Grows for Roe v. Wade
More Children Get ADHD Diagnosis
GOP Pushes Bill With May 19 Debt Deadline

More Headlines

Today's Interest Rates
Compare quotes from 1,000s of banks. Fast, private and free!
www.Bankrate.com

Current Mortgage Rates
Solutions for Your Small Business. Business Begins Here.
www.business.com

CD Rates listed.
Find current mortgage rates locally. Local CD Rates and more
financial
www.HelloLocal.com

with Mr. Ho Ho, and everybody came up dandy." He also said that he is confident none of the people involved in the deal were government officials. "Edmund told me they are upstanding people from Beijing families," Mr. Wynn said, declining to elaborate further. The company hasn't been accused of wrongdoing in the Macau deal.

The Journal was unable to locate records showing the land was ever owned by Ho Ho. Wynn Resorts' contract for the land shows Wynn as the first official owner of the plot. Ho Ho, whose given name means river in Chinese, couldn't be located.

A representative for Edmund Ho, who is now vice chairman of the Chinese People's Political Consultative Conference, China's top political advisory body, declined to comment.

In May 2006, Wynn and its partners established a joint venture called Cotai Land Development Co., according to Macau public records. Mr. Wynn, Marc Schorr, the casino company's chief operating officer, and Ho Ho were the company's three directors. Under the arrangements, according to a company document reviewed by the Journal, Wynn Resorts would pay another company controlled by Ho Ho $35 million as a "one-time finder's fee" when the venture secured land rights for the casino from the government.

Two years later, as the global economic crisis brewed and China cut back visas allowing its citizens to visit Macau, Wynn Resorts sought to dissolve the agreement, Mr. Wynn said. As an inducement for its partners, Wynn agreed to pay an additional $15 million to Ho Ho and his associates to walk away once Wynn got the land rights, according to Mr. Wynn and a company document reviewed by the Journal.

Wynn disclosed the deal in a September 2009 statement to the SEC in which the company said it had agreed to pay $50 million to its partner for the "relinquishment of certain rights with respect to its business interests."

The SEC filing identified a Macau company called Tien Chiao Entertainment Ltd. as Wynn's partner. Though neither Ho Ho's nor Cliff Cheong's name is mentioned in the public records for the company, Wynn lawyers and corporate documents indicate that Ho Ho controls Tien Chiao, whose shareholders are listed as Ho Ho's brother and a man with a business registered at Mr. Cheong's office.

In later disclosures, Wynn said the $50 million payment would go to a third party unrelated to Wynn.

Macau's Department of Public Works, which granted the land to Wynn, declined to comment.

Mr. Wynn said he also got Macau to agree to give him a contiguous plot of land instead of the plot initially under discussion, which was divided by a road. Mr. Wynn said he had earlier been troubled by this layout: "How are we gonna do something sexy with a street going through the middle?" he remarked.

—Alexandra Berzon contributed to this article.

[?]







NATIONAL MEMO
Air Bagan Survivor
Tells Of Terrifying
Landing

DIVINE ART
The Wildlife Of
Assateague Island &
Chincoteague
National Wildlife
Refuge in Photos

JOIN THE DISCUSSION
7 Comments, add yours

MORE IN
Business »