LIONEL SAWYER & COLLINS
SAMUEL S. LIONEL (SBN 1766)
slionel@lionelsawyer.com
CHARLES H. McCREA, JR. (SBN 104)
cmccrea@lionelsawyer.com
STEVEN C. ANDERSON (SBN 11901)
sanderson@lionelsawyer.com
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada  89101
Telephone:  702.383.8888
Facsimile:   702.383.8845

MORGAN, LEWIS & BOCKIUS LLP
MARC J. SONNENFELD*
msonnenfeld@morganlewis.com
1701 Market Street
Philadelphia, Pennsylvania  19103
Telephone:  215.963.5000
Facsimile:   215.963.5001

JOSEPH E. FLOREN*
jfloren@morganlewis.com
BENJAMIN P. SMITH*
bpsmith@morganlewis.com
CHRISTOPHER J. BANKS*
cbanks@morganlewis.com
One Market, Spear Street Tower
San Francisco, California  94105-1126
Telephone:  415.442.1000
Facsimile:   415.442.1001

Attorneys for Plaintiff,
KAZUO OKADA
*pro hac vice application forthcoming

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KAZUO OKADA, an individual,<br><br>                   Plaintiff,<br><br>          v.<br><br>WYNN RESORTS, LIMITED, a Nevada corporation,<br><br>                Defendant. | Case No. 13-cv-00136-JCM-PAL<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

**Page**

MOTION FOR PRELIMINARY INJUNCTION ............................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................................ 3

III.    ARGUMENT ........................................................................................................................ 6

        A.      Mr. Okada Is Likely to Succeed on the Merits of His Complaint Against
                Wynn Resorts for Disseminating False and Misleading Proxy Materials in
                Violation of Section 14(a) of the 1934 Act ............................................................. 6

                1.      The Biased and Admittedly Non-Independent Freeh Sporkin Report ........ 8

                2.      The Company Code of Conduct and FCPA Training ............................... 10

                3.      The "Imperative" Need to Remove Mr. Okada ....................................... 11

                4.      Mr. Okada's Investments in the Philippines ............................................ 13

                5.      Steve Wynn's Activities in Macau............................................................. 15

        B.      Mr. Okada Will Suffer Irreparable Harm Absent a Preliminary Injunction
                to Halt the Special Meeting in Which Wynn Seeks to Remove Mr. Okada
                from Its Board of Directors .................................................................................. 18

        C.      The Balance of Equities Weighs in Mr. Okada's Favor ....................................... 19

        D.      A Preliminary Injunction Is in the Public's Interest ............................................. 20

IV.     CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**(s)

CASES

*Berkman v. Rust Craft Greeting Cards, Inc.*,
    454 F. Supp. 787. (S.D.N.Y. 1978) .................................................................. 18

*Blasius Indus. v. Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988) ........................................................................ 20

*Flynt Distrib. Co. v. Harvey*,
    734 F.2d 1389 (9th Cir. 1984) .......................................................................... 6

*Gitlitz v. Bellock*,
    171 P.3d 1274 (Colo. Ct. App. 2007) ............................................................. 19

*In re Netsmart Techs., Inc. S'holders Litig.*,
    924 A.2d 171 (Del. Ch. 2007) .......................................................................... 7

*In re Oracle Corp. Derivative Litig.*,
    824 A.2d 917 (Del. Ch. 2003) .......................................................................... 9

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) .......................................................................... 6

*Krauth v. Executive Telecard, Ltd.*,
    890 F.Supp. 269 (S.D.N.Y.1995) .................................................................... 20

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
    148 F. Supp. 2d 1141 (D. Kan. 2001) ............................................................. 20

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ............................................................................ 7

*ODS Techs., L.P. v. Marshall*,
    832 A.2d 1254 (Del. Ch. 2003) .................................................................. 7, 18

*Palumbo v. Deposit Bank*,
    758 F.2d 113 (3d Cir. 1985) ........................................................................... 19

*Seinfeld v. Gray*,
    404 F.3d 645 (2d Cir. 2005) ............................................................................. 7

*Shaev v. Saper*,
    320 F.3d 373 (3d Cir. 2003) .......................................................................... 7, 8

*Shoen v. AMERCO*,
    885 F. Supp. 1332 (D. Nev. 1994) .......................................................... 7, 20, 21

**TABLE OF AUTHORITIES**
(continued)

**Page**(s)

*St. Louis Police Ret. Sys. v. Severson*,
No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012).............. 7, 18, 19

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)................................................................................. 6

*Street v. Vitta*,
685 F. Supp. 379 (S.D.N.Y. 1988)........................................................................ 19

*TSC Indus. v. Northway, Inc*.,
426 U.S. 438 (1976)............................................................................................... 7

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993)................................................................................. 8

*Virginia Bankshares*, *Inc. v. Sandberg*,
501 U.S. 1083 (1991)........................................................................................... 18

*Winnemucca Indian Colony v. United States ex rel. Dep't of Interior*,
837 F. Supp. 2d 1184 (D. Nev. 2011)..................................................................... 6

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................. 6

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
339 F.3d 101 (2d Cir. 2003)........................................................................... 18, 19

STATUTES AND REGULATIONS

Nev. Rev. Stat. § 78.335 ....................................................................................... 5

Sec. Exch. Act of 1934 § 14(a) .......................................................... 1, 2, 6, 7, 8, 18, 19

SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ............................................................. 1, 2, 6

OTHER AUTHORITIES

Kate O' Keefe, *In Wynn's Macau Deal, a Web of Political Ties*, THE WALL STREET
JOURNAL (July 1, 2012), *available at*
http://online.wsj.com/article/SB10001424052702304782404577488692803611700.ht
ml. ...................................................................................................................... 16

SEC Release No. 34-15230, 1978 WL 186739 (Oct. 13, 1978) .................................... 7

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Kazuo Okada ("Mr. Okada"), a co-founder and member of the Board of Directors of Defendant Wynn Resorts, Ltd. ("Wynn Resorts" or the "Company"), hereby moves the Court for a preliminary injunction to enjoin Wynn Resorts from holding the Special Meeting of shareholders that Wynn Resorts has called for February 22, 2013 for the sole purpose of asking the shareholders to vote to remove Mr. Okada as a director of Wynn Resorts (the "Removal Proposal").  Wynn Resorts called the Special Meeting by a Notice and Proxy Statement that it filed with the U.S. Securities and Exchange Commission ("SEC") on January 3, 2013 (the "January 3 Proxy" or "Proxy"), which contains numerous materially false and misleading statements concerning the purported reasons why shareholders should vote in favor of the Removal Proposal, in violation of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and SEC Rule 14a-9 promulgated thereunder.  A preliminary injunction is necessary and warranted to prevent the irreparable harm that otherwise will result from Wynn Resorts' violations of federal securities laws if Wynn Resorts' shareholders vote on the Company's Removal Proposal based on the biased, incomplete, and materially false and misleading statements in the Company's Proxy.

This Motion for Preliminary Injunction is based on this Motion, the following Memorandum of Points and Authorities, the Declarations of Kazuo Okada ("OD") and Joseph E. Floren ("FD") served and filed herewith, the Complaint filed on January 24, 2013 and all other papers on file in this action, and on such other matters that may be presented to the Court.  Mr. Okada respectfully requests that his Motion be heard as soon as practicable.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In its effort to deceive shareholders into removing Mr. Okada from its Board, Wynn Resorts has presented them with a grotesquely slanted Proxy riddled with material misrepresentations and omissions of material fact regarding the purported reasoning behind the Removal Proposal suddenly urged on by the Executive Committee of the Board.  The Proxy falls far short of the "'balanced,' 'truthful,' and 'materially complete' account" of the facts that Wynn

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

1                          Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  Resorts was required by law to provide.

2          Mr. Okada is a founding director of Wynn Resorts and until very recently was its largest

3  shareholder, controlling 19.66% of the Company's outstanding common stock through Aruze

4  USA, Inc. ("Aruze USA"), of which Mr. Okada is the President and majority owner of its parent

5  company, Universal Entertainment Corporation ("Universal").  Although Wynn Resorts' Board

6  unlawfully redeemed and canceled Aruze USA's entire equity interest in February 2012 – thus

7  converting Aruze USA into Wynn Resorts' largest creditor – Mr. Okada seeks the restoration of

8  those shares in other litigation initiated by Wynn Resorts, and to continue to exercise the good

9  stewardship of the Company as both a major shareholder and a director.

10         Wynn Resorts issued the materially false and misleading definitive proxy statement that is

11  the subject of this motion on January 3, 2013.  FD Ex. A.  The Proxy announces that the Board,

12  acting through an "Executive Committee" comprised of all directors other than Mr. Okada, has

13  called a Special Meeting of the Company's shareholders for February 22, 2013, at which the

14  Executive Committee will seek shareholders' approval of a proposal to remove Mr. Okada from

15  the Board, despite the fact that in 2011 he earned a three-year extension of the office he has held

16  since Wynn Resorts' inception in 2002.  The Proxy misstates numerous material facts regarding

17  the "independent" investigation and other purported reasons for the Executive Committee's

18  Removal Proposal in order to cover up the truth – the Company seeks Mr. Okada's removal

19  because he represents a threat to Steve Wynn's power and asked too many questions about the

20  Company's shady dealings in Macau.  Mr. Okada details below these violations of Section 14(a)

21  of the 1934 Act and Rule 14a-9 thereunder.

22         Because the Special Meeting is rapidly approaching, a preliminary injunction is necessary

23  to prevent irreparable harm to Mr. Okada through the loss of his position as a director.  Mr.

24  Okada stands to lose that right if ousted on the basis of the one-sided, biased and incomplete

25  attempted indictment in the Proxy.  Moreover, the Executive Committee's own actions – delaying

26  its effort to remove Mr. Okada for nearly a year, and citing only illusory threats in the Proxy –

27  demonstrate that the balance of harms tip in Mr. Okada's favor.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                    Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## II.    STATEMENT OF FACTS

**Background and Founding of Wynn Resorts.**  Mr. Okada is an experienced entrepreneur in the gaming business who founded Tokyo-based Universal in 1969 and is now its Chairman.  He first met Steve Wynn in 2000, shortly following Wynn's public ouster as CEO of Mirage Resorts.  Wynn was anxious to rebuild his reputation on the strip, but lacked the capital to launch a substantial project.  Unlike Las Vegas insiders, Mr. Okada shared Wynn's vision and was willing to become his partner and financier.  Mr. Okada arranged for Aruze USA (a Universal subsidiary) to contribute $260 million in startup capital to Valvino Lamore, LLC ("Valvino"), the company he co-founded with Wynn to build a new casino from the old Desert Inn (now the Company's flagship resort, Wynn Las Vegas), which later became Wynn Resorts. Through Aruze USA, Mr. Okada had contributed over $450 million to the venture by the time the Company went public as Wynn Resorts in October 2002.

**Mr. Okada's Role as Director.**  Perhaps Mr. Okada's most important contributions to the Company have been as a director, a position he has held since before Wynn Resorts' initial public offering in October 2002.  OD ¶7.  Mr. Okada served as Vice Chairman of the Board from that time until the elimination of that position in 2011.  His stalwart management has earned him multiple reelections to the Board.  Most recently, upon the recommendation of the Board, the shareholders elected Mr. Okada on May 17, 2011 to serve as a director for another three years, until the 2014 Annual Meeting of shareholders.  FD Ex. B at 2.  During Mr. Okada's directorship, the Company has grown and prospered and its stock price has consistently outperformed the market, to the benefit of all shareholders.  OD ¶4; *see* FD Ex. C at 35.

Although Mr. Okada and Steve Wynn began as equal partners, by 2011 Mr. Okada's Aruze USA owned 24,549,222 shares of Wynn Resorts stock, nearly 20% of the outstanding shares, making it the Company's largest shareholder.  FD Ex. D at 26.  By contrast, Steve Wynn's stake had dwindled to 10,026,708 shares, about 8% of the shares outstanding, as a result of his various dispositions of stock and a divorce settlement.  *Id.*

**Disagreement with Steve Wynn over the Company's Macau Activities**.  As a director, Mr. Okada has always worked to ensure that the Company's business was conducted correctly.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

3

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

OD ¶7.  By 2011, however, Mr. Okada had become concerned about the propriety of the

Company's efforts to expand in Macau, China.  In the Spring of 2011, Steve Wynn asked the

Board to rubber-stamp an incredible $135 million "donation" to the University of Macau

Development Foundation.  *Id.* ¶11.  The Chancellor of the University of Macau also oversaw

gaming regulation in Macau, this "donation" would represent 70% of the small school's

endowment, and Wynn Resorts was at the same time seeking a government concession to begin a

new casino resort project on Macau's Cotai strip.  Mr. Okada objected to the unprecedented

donation, alone among all members of the Board.  *Id.*; FD Ex. A at 13.  The Board approved

Steve Wynn's donation plan over Mr. Okada's objection, however, and shortly after the $135

million pledge the Company received the concession from the Macau government for its Cotai

project that it had been seeking for five years.  *See* FD Ex. E at 2.

The absurdly large and suspiciously timed "donation" appeared obviously improper,

leading Mr. Okada to ask more questions and seek access to related books and records, a nearly

unqualified right to which he is entitled as a director.  *See* OD ¶12.  Though he is still awaiting

production of meaningful documents from the Company, *id.*, Mr. Okada has independently

obtained copies of documents that, on their face, show there is much more worthy of investigation

regarding Steve Wynn's activities in Macau.  *See id.* ¶13.  He has written the Board urging the

appointment of a special investigator to lead a truly independent investigation regarding

additional highly suspect agreements of which he has learned independently from his role as a

director.  OD Ex. C.

**Wynn's Retaliatory "Investigations" and Share Redemption.**  When Mr. Okada began

asking questions about Macau, Steve Wynn resolved to manufacture an excuse to get rid of him.

Without Mr. Okada's knowledge, Wynn Resorts commissioned two purported "investigations" to

no apparent effect (and the results of which it has refused to disclose to Mr. Okada), and then

finally engaged the law firm Freeh Sporkin & Sullivan LLP ("Freeh Sporkin") to conduct yet

another purportedly "independent" investigation into Mr. Okada and his companies' activities.

*See* OD ¶21; FD Ex. A at 8.  In fact, this investigation was anything but "independent" – Freeh

Sporkin admitted that it was directed and controlled by Company management.  FD Ex. F at 1.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

4

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  And despite his status as a director, Mr. Okada was not made privy to the subjects or process of

2  the Freeh Sporkin investigation.  OD ¶¶14-15.  Because the Company and Freeh Sporkin

3  deliberately kept him in the dark, Mr. Okada was completely unaware until Mr. Freeh interviewed

4  him on February 15, 2012 that the principal focus of the Freeh Sporkin investigation (and

5  apparently already-written report) was actually a series of hospitality expenses that had been

6  reimbursed years earlier by Universal, the Japan-based public company of which Mr. Okada is

7  Chairman – matters on which Mr. Okada had little or no personal knowledge, and as to which he

8  could not have been expected to provide any details without an opportunity to research the facts.

9  OD ¶15.

10        On February 18, 2012, less than three days after Mr. Okada was granted his first and only

11  opportunity to meet with Freeh Sporkin investigators, Freeh Sporkin gave its final report (the

12  "Freeh Report") to the Wynn Resorts Board (except for Mr. Okada, who did not receive a copy

13  and was cut off from the meeting).  *Id.* ¶¶16-18.  The day before, Wynn had threatened to reveal

14  the report unless Mr. Okada would sell Aruze USA's stock at a discount, notwithstanding that

15  Freeh had promised Mr. Okada an opportunity to respond to his report after obtaining a copy.  *Id.*

16  ¶18.  This promise was immediately broken.  On February 18, before Mr. Okada even received a

17  copy of the report, let alone had any opportunity to respond to it, the Board voted to cancel and

18  forcibly redeem Aruze USA's 24,549,222 shares of Company stock in exchange for a discounted

19  10-year note, established an "Executive Committee" of directors other than Mr. Okada to conduct

20  all Company business, and overnight initiated litigation against Mr. Okada, Universal, and Aruze

21  USA in Clark County District Court, Nevada.  *See* FD Ex. A at 10-11.

22        **Wynn's Effort to Remove Mr. Okada as Director.**  Although Steve Wynn had

23  successfully leveraged his influence over the Board to oust Aruze USA as a majority shareholder

24  (the illegality of which will be established in separate litigation), it would not be so easy to

25  remove Mr. Okada from his elected position as a director of the Company, which may be done

26  only by two-thirds of the voting power of all issued and outstanding stock.  *See* Nev. Rev. Stat. §

27  78.335.  The Company initiated this effort in March 2012, *see* FD Ex. G, then abandoned it, and

28  took no action to remove Mr. Okada at its November 2012 Annual Meeting.  *See id*. Ex. H at 2.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5                    Case No. 13-CV-00136-JCM-PAL

DB1/ 72860956.4          PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    Finally, on January 3, 2013, the Executive Committee caused Wynn Resorts to file the

2  Proxy giving rise to this Complaint.  The Proxy notices a Special Meeting of the Company's

3  shareholders in Las Vegas on February 22, 2013, for the following exclusive purposes:

4         1. To consider and vote on a proposal to remove Mr. Kazuo Okada
          as a director of the Company (the "Removal Proposal"); and
5
          2. To consider and vote on a proposal to adjourn the Special
6         Meeting to a later date, if necessary or appropriate in the view of
          the Board of Directors of the Company (the "Board") or the
7         Executive Committee of the Board (the "Executive Committee"), to
          solicit additional proxies in favor of the Removal Proposal if there
8         are insufficient proxies at the time of such adjournment to approve
          the Removal Proposal (the "Adjournment Proposal").
9

10  In the Notice of Special Meeting, the Executive Committee recommends "that stockholders vote

11  'FOR'" both proposals, contending that on the basis of the February 2012 Freeh Report "that it is

12  essential from a gaming regulatory standpoint to remove Mr. Okada from the Board and that

13  failure to take steps to separate the Company from Mr. Okada . . . poses material risks to the

14  Company."  FD Ex. A at 8.  On January 25, 2013, the Executive Committee sent a further letter to

15  shareholders urging them to vote for the Removal Proposal, repeating these statements.  FD Ex. I.

16    The Proxy represents a usurpation of shareholders' right to participate in corporate

17  governance.  Its one-sided and incomplete account of events makes numerous material

18  misstatements and omits material facts necessary to render other statements therein not

19  misleading, as detailed below.

20  **III.    ARGUMENT**

21    Mr. Okada seeks a preliminary injunction because he "is likely to succeed on the merits,"

22  "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities

23  tips in his favor," and "an injunction is in the public interest."  *Winter v. Natural Res. Def.*

24  *Council, Inc.*, 555 U.S. 7, 20 (2008); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.

25  2009); *Winnemucca Indian Colony v. United States ex rel. Dep't of Interior*, 837 F. Supp. 2d

26  1184, 1188-90 (D. Nev. 2011).

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

A.    **Mr. Okada Is Likely to Succeed on the Merits of His Complaint Against Wynn Resorts for Disseminating False and Misleading Proxy Materials in Violation of Section 14(a) of the 1934 Act**

This Court should enjoin the February 22, 2013 Special Meeting because Mr. Okada is likely to succeed on his claim that the Company's false and misleading Proxy violates Section 14(a) and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.[1] "Section 14(a) … makes it unlawful for directors to provide information that is false or misleading with respect to any material fact in a proxy statement." *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392, at *11 (N.D. Cal. Oct. 23, 2012); *accord Shoen v. AMERCO*, 885 F. Supp. 1332, 1346-48 (D. Nev. 1994) (finding 14a-9 violation where proxy "omitted mention of at least one material fact"). "Omission of information from a proxy statement is actionable if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005).   Disclosures must "provide a 'balanced,' 'truthful,' and 'materially complete' account of all matters they address." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 199-200 (Del. Ch. 2007) (internal citation omitted); *see Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003) ("cryptic references" from which a shareholder might infer that other material information existed was not sufficient to comply with § 14(a) disclosure obligations).  "[A] proxy statement that fails to 'accurately depict the purposes or effects' of the matters before the shareholders for a vote may be misleading." *Severson*, 2012 U.S. Dist. LEXIS 152392, at *13-14 (quoting *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1260-61 (Del. Ch. 2003)).  Indeed, when directors present a proposal to shareholders for approval, "[t]he Board is required to ***disclose its motivations candidly***." *ODS Techs.*, 832 A.2d at 1261 (emphasis added) (citing SEC Release No. 34-15230, 1978 WL 186739, at *2-3 (Oct. 13, 1978) (requiring

---

[1] Mr. Okada's motion is supported by his Declaration and the Declaration of Joseph E. Floren and its exhibits, as well as the Complaint and the exhibits thereto.  This Court may properly consider all these documents in determining whether to issue a preliminary injunction.  When evaluating a preliminary injunction motion, this Court has wide latitude to consider all types of evidence, including evidence that may not be admissible at the preliminary injunction stage. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary injunction."); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

1  disclosure of reasons and "an explanation of the factors and/or principles supporting or serving as

2  a foundation for the reason stated")).

3       In the context of misleading proxy solicitations, "[a]n omitted fact is material if there is a

4  substantial likelihood that a reasonable shareholder would consider it important in deciding how

5  to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Put differently, "there must be

6  a substantial likelihood that disclosure of the omitted fact would have been viewed by a

7  reasonable investor as having significantly altered the 'total mix' of information made available."

8  *Id.*; *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (same).  To raise its

9  Removal Proposal lawfully, Wynn Resorts must ensure that its Proxy includes ***all*** material

10  information bearing on its recommendation to strip Mr. Okada of his directorship – not simply

11  those facts that best support its case.  *See Shaev*, 320 F.3d at 381 ("Material not included in the

12  proxy statement is generally not charged to the knowledge of the stockholder," and thus past

13  amendments to management compensation plan constituted material omissions from solicitation

14  for new amendment); *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198-

15  200 (2d Cir. 1993) (information appearing in company's 10-K, but not distributed to

16  shareholders, was not part of "reasonably available mix" for purposes of evaluating § 14(a)

17  omissions).  The January 3 Proxy statement is false and misleading in the following material

18  respects, each of which independently violates § 14(a) and warrants preliminary injunctive relief.

19            **1.    The Biased and Admittedly Non-Independent Freeh Sporkin Report**

20       The January 3 Proxy relies extensively upon the February 2012 Freeh Report, which the

21  Proxy describes as an "independent report" of an "independent investigation" that supposedly

22  "uncovered and documented . . . more than three dozen instances over a three-year period in

23  which Mr. Okada and his associates engaged in improper activities . . . in apparent violation of

24  U.S. anti-corruption laws and in contravention of the Company's Code of Conduct."  FD Ex. A at

25  8.  The Proxy goes on to claim that "Mr. Okada failed, during the [February 15, 2012] interview

26  [of Mr. Okada by Freeh Sporkin] or subsequently, to offer evidence to contradict the findings of

27  the Freeh Report or to exculpate himself or his affiliates."  *Id.* at 10.  These statements are false

28  and materially misleading.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

8

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    The Freeh Sporkin investigation was anything but "independent" as claimed by Wynn

2    Resorts.  As the report itself (which is not included in the Proxy) admits, this "investigation" was

3    "conducted *under the sole direction of the [Wynn Resorts] Compliance Committee.*"  FD Ex. F

4    at 1 (emphasis added).  The Compliance Committee that had "sole direction" of the investigation

5    was dominated by Company management.  Its three members were:  (i) Wynn Resorts Executive

6    Vice President and Chief Administrative Officer John Strzemp; (ii) Wynn Resorts Chief

7    Operating Officer and Director Marc D. Schorr; and (iii) Wynn Resorts Director Robert Miller.

8    The Company admits that Messrs. Strzemp and Schorr were members of management, not

9    "independent" under any standard.  FD Ex. J at 25-26; *id.* Ex. D at 28-29.  Given that the

10   investigation was directed and controlled by management, it does not meet any standard of

11   "independence."  *See, e.g.*, *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003)

12   (addressing "independence" standards for investigation led by directors).  The Proxy does not

13   disclose this, because the Company wishes to leverage the name and reputation of Mr. Freeh and

14   to mislead its shareholders into concluding that his investigation was "independent."

15   Moreover, as detailed in Mr. Okada's Declaration, ¶¶14-21, and Complaint, ¶¶74-78, the

16   Freeh Sporkin "investigation" was in fact an ambush, its outcome preordained and orchestrated in

17   an adversarial fashion.  Even Mr. Freeh described his report as "akin to a final brief being

18   submitted with the opportunity for a response to be made."  FD Ex. K.  Neither Mr. Freeh nor any

19   of the Company's lawyers provided Mr. Okada with meaningful information or documents

20   regarding Mr. Freeh's investigation while it was taking place.  OD ¶15.  Mr. Okada's first chance

21   to learn of the details being investigated by Freeh was at a day-long interview with Freeh Sporkin

22   investigators in Tokyo on February 15, 2012, at which he learned for the first time that Freeh

23   Sporkin was focused upon a series of hospitality expenses for which Universal had reimbursed

24   Wynn Resorts years earlier – matters about which he had little or no knowledge.  *Id.*  At the

25   interview, however, Mr. Freeh indicated to Mr. Okada that his report was all but complete, and

26   rejected requests by Mr. Okada's counsel to either review or provide additional information in

27   response to the report before it would be forwarded to the Wynn Resorts Board on February 18,

28   2012.  *Id.* ¶¶15-18; FD Ex. K.  The Company then immediately broke Mr. Freeh's promise that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

9                                    Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   Mr. Okada would have "the opportunity for a response" after issuance of the report, and instead

2   executed its strategy to deem Mr. Okada and his companies "unsuitable," forcibly redeem Aruze

3   USA's shares, and file suit immediately after receiving the report on February 18, 2012, all before

4   Mr. Okada even was permitted to see the report.  *See* OD ¶¶20-21; FD Ex. A at 10-11.  The

5   Proxy's claim that Mr. Okada "failed . . . to offer evidence to contradict the findings of the Freeh

6   Report or to exculpate himself or his affiliates" deliberately gives the false impression that Mr.

7   Okada had such an opportunity, which Wynn Resorts denied him.

8        The true purpose of the Freeh Report is best explained by the ultimatum communicated to

9   Mr. Okada on the eleventh hour before its delivery to the Wynn Resorts Board.  On February 17,

10   2012, hours before the Special Meeting set for 9:00 am on February 18, Steve Wynn threatened

11   through counsel that the Freeh Report would be distributed and considered by the Board if Mr.

12   Okada did not sell his shares in Wynn Resorts to Steve Wynn personally at a substantial discount.

13   OD ¶18.  The Proxy does not disclose this, either.

14        Nor does the Proxy disclose that, to this day, none of the various exhibits quoted and

15   referenced in the Freeh Report have been disclosed to Mr. Okada so that he might address and

16   respond to them.  OD ¶20.  The Proxy even ignores the express hedging language in the Freeh

17   Report, which did not reach conclusions that "improper activities" had actually occurred but

18   instead only that "substantial evidence" had been developed in his Company-controlled

19   investigation creating "appear[ances]" of such.  Ex. F at 1-2.

20        Shareholders deserve to know how the Freeh Report was utilized as a device to personally

21   enrich Steve Wynn and to tighten his monarchical grip over the Company.  As the solitary pillar

22   of purported evidence substantiating the Executive Committee's argument that Mr. Okada should

23   be removed as a director, the truth of the Freeh Report's preparation is vitally important to the

24   Removal Proposal, and the aforementioned false statements and material omissions are and will

25   be highly material to the mind of a reasonable shareholder.

26        **2.    The Company Code of Conduct and FCPA Training**

27        The January 3 Proxy states that "Mr. Okada is the only director of the Company who has

28   not signed the Company's Code of Conduct, despite repeated requests by the Company, and not

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10                           Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    participated in mandatory FCPA training for directors for the past two years." FD Ex. A at 9.  In

2    reality, Mr. Okada is a strong believer in conducting business ethically and in full compliance

3    with the law everywhere in the world, and fully supports the principles behind the Company's

4    Code of Conduct, as was repeatedly made clear to Company representatives.  OD ¶22.

5          At the outset, the Proxy deceives shareholders by failing to acknowledge that Mr. Okada

6    has fully endorsed prior versions of the Wynn Resorts Code of Conduct.  *Id.*  The Proxy goes

7    further astray by neglecting to disclose that this *Amended* Code of Conduct was prepared ***after***

8    Mr. Okada had already been asked to resign as a director, and included provisions that the

9    Company knew Mr. Okada would be unable to accept without clarification due to his business as

10   Chairman and principal owner of Universal.  *Id.*  Mr. Okada attempted, through his attorneys, to

11   reach an agreement regarding certain provisions of the Amended Code of Conduct that could

12   have hindered his ability to develop a casino in the Philippines, *see* FD Ex. L, a project that Wynn

13   Resorts has been aware of since 2008.  *Id*. Ex. M at 106.  No agreement was reached, and Mr.

14   Okada could not justify risking creating a legal issue regarding Universal's substantial investment

15   in the Philippines by signing an Amended Code of Conduct that arguably might prohibit it,

16   offered by a Board that had already expressed its intention to remove him as a director.  OD ¶23.

17         Meanwhile, the January 3 Proxy fails to acknowledge that Mr. Okada was precluded from

18   attending the October 31, 2011 FCPA training session referenced therein.  This training – again,

19   scheduled ***after*** Mr. Okada was asked to resign as a director – fell on a date when Mr. Okada was

20   obligated to be overseas and it was not feasible for him to attend.  OD ¶23.  The Company

21   refused Mr. Okada's request to either (i) reschedule or (ii) obtain a recording of the training

22   session so that he could confirm he had reviewed it.  *Id.*; *see also* FD Ex. N.  By failing to

23   disclose these facts, the Proxy creates the materially misleading impression that Mr. Okada was

24   provided an opportunity but failed to attend the mandatory training.  The reality is that the

25   Company refused to schedule a training session on a date when Mr. Okada could reasonably

26   attend.  *See* FD Ex. N.

27         The statements in the Proxy create an impression in the mind of a reasonable shareholder

28   that Mr. Okada willfully evaded good faith legal compliance precautions by Wynn Resorts.  This

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    simply is not the case, and Wynn Resorts shareholders deserve to know the truth.

2                   **3.      The "Imperative" Need to Remove Mr. Okada**

3           The Proxy misleadingly claims that it is "imperative that Mr. Okada be removed as a

4    director of the Company at the [February 22, 2013] Special Meeting," FD <u>Ex. A</u> at 8, as opposed

5    to allowing his term to expire at the regular 2014 Annual Meeting of shareholders, *see id*. <u>Ex. B</u> at

6    2, which has not yet been scheduled.  In a baseless effort to justify its extraordinary act of calling

7    a Special Meeting, the Executive Committee cites the Company's "strategic plan to expand its

8    operations into new jurisdictions," including Pennsylvania and Massachusetts.  The Proxy

9    thereafter claims that Mr. Okada's removal is necessary to protect Wynn Resorts' "integrity and

10   stature in the gaming industry" as it "appl[ies] for and receiv[es] additional gaming licenses

11   (including jurisdictions where the Company has recently filed applications)."  FD <u>Ex. A</u> at 13.

12          Contradicting this apparent urgency is the omitted fact of the Company's abandoned

13   efforts from March 2012 to implement the same extraordinary strategy that it attempts today.  On

14   March 7, 2012, the Executive Committee caused Wynn Resorts to file preliminary proxy

15   materials (the "March 2012 Proxy") for a proposed Special Meeting of stockholders for the

16   purpose of voting on a proposal to remove Mr. Okada as a director.  *Id*. <u>Ex. G</u>.  Then, as now, the

17   Committee purportedly believed "it is essential from a gaming regulatory standpoint to remove

18   Mr. Okada from the Board and that failure to take steps to separate the Company from Mr. Okada

19   and his affiliates poses material risks to the Company."  *Id*. at 3.  Despite the imminent threat that

20   Mr. Okada has allegedly represented, the Executive Committee found it in the Company's best

21   interests to wait nearly nine months before suddenly calling its shareholders to action.  The

22   January 3 Proxy fails to disclose why it is now supposedly urgent to remove Mr. Okada from the

23   Board given that it has not been urgent since early 2012.

24          The January 3 Proxy also conveniently omits any mention of the fact that the Company

25   has sat on the proposal to remove him as a director for nearly a year following the Executive

26   Committee's "unsuitability" determination in February 2012, when according to the January 3

27   Proxy, the Company's Gaming Compliance Committee had ***already*** concluded a "year-long

28   investigation" into Mr. Okada's investments overseas.  *Id*. <u>Ex. A</u> at 8.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No. 13-CV-00136-JCM-PAL
DB1/ 72860956.4                 PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    Also omitted is the fact that the Company and its Executive Committee waived another

2    opportunity to raise the supposedly urgent need to remove Mr. Okada at the Company's regular

3    2012 Annual Meeting of shareholders, which was held on November 2, 2012. *See id*. Ex. H at 2.

4    The Annual Meeting provided an appropriate forum for the Executive Committee to raise, and for

5    shareholders to decide, the issue, if it really needed to be decided.  But the Executive Committee

6    again did nothing, for reasons it has not explained.  The January 3 Proxy discloses no facts that

7    supposedly support Mr. Okada's removal which have come to light in the two months between

8    the November 2, 2012 Annual Meeting and the January 3 Proxy for a Special Meeting.

9    And while the Proxy states that "[i]f the Removal Proposal is approved by the Company's

10    stockholders, the size of the Board will be reduced from nine to eight," FD Ex. A at 14, nowhere

11    does it remind shareholders how Steve Wynn very recently consolidated his control when the

12    Executive Committee decreed in a December 13, 2012 Form 8-K that four longtime directors had

13    "resigned from the Board" to "devote more time to their other business commitments" and "to

14    reduce the number of inside directors."  *Id*. Ex. O at 2.  The Board was thus reduced in size from

15    twelve to nine members and, according to the same Form 8-K, Steve Wynn's term of directorship

16    was extended from 2013 to the Annual Meeting in 2014.  *Id*.

17    It should also be remembered that, in making its claims of "unsuitability," the Proxy fails

18    to disclose that Mr. Okada, Aruze USA, and Universal were found "suitable" by the Nevada

19    Gaming Control Board in 2005, and that there has been no modification to that finding.  OD ¶6.

20    No real explanation is offered why a Special Meeting is suddenly needed to support a planned

21    expansion, nearly two years after the Compliance Committee initiated its purported investigation

22    into Mr. Okada, especially considering the Company's 2013 Annual Meeting is expected to be

23    held "during the first week of May 2013."  *Id*. Ex. A at 15.

24    **4.    Mr. Okada's Investments in the Philippines**

25    The Proxy contends that "[i]n January 2011, after the Company became aware that Mr.

26    Okada was falsely representing to multiple people that he . . . and the Company were involved in

27    a joint venture together in the Philippines, the Company retained an independent investigatory

28    firm to conduct an independent investigation into various risks associated with investing in the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

13

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    gaming industry in the Philippines." FD Ex. A at 9.  The Proxy then asserts that about a month

2    later, on February 24, 2011, the Board held a meeting during which (1) it received the conclusions

3    of an independent investigation concerning "the risks of participating in the gaming industry in

4    the Philippines" and the FCPA; (2) Mr. Okada supposedly challenged the other directors'

5    statements about the FCPA and endorsed "hiring 'third party consultants' to give gifts to

6    officials" abroad; and (3) the board thereafter recommended against participation in Mr. Okada's

7    Philippines venture.  *Id.*

8            The only thing that is accurate about the Proxy in this regard is that Wynn Resorts

9    ultimately declined – after several years of consideration – the opportunity to be involved in a

10   casino resort project in the Philippines.  In truth, Wynn Resorts and Steve Wynn in particular had

11   been well aware of Mr. Okada's efforts to pursue a casino project in the Philippines, since at least

12   April 2008, and have expressly supported those efforts.

13           In September 2009, the IPO Prospectus for Wynn Macau, Ltd. (a subsidiary of Wynn

14   Resorts) also acknowledged and ratified Universal's plans to open a casino in the Philippines:

15                      In addition to its investment in Wynn Resorts, Limited,
                        *[Universal] has invested in the construction of a hotel casino resort*
16                      *in the Philippines, which is anticipated to open to the public in*
                        *2010.* Mr. Okada confirms that, as at the Latest Practicable Date,
17                      except for his indirect shareholding interests in Wynn Resorts,
                        Limited through Aruze USA, Inc., neither he nor his associates
18                      holds, owns or controls more than 5% voting interests in an entity
                        which, directly or indirectly, carries on, engages, invests,
19                      participates or otherwise is interested in any company, business or
                        operation that competes, or is reasonably expected to compete, with
20                      the business carried on by us in Macau.

21   FD Ex. M at 106 (emphasis added).  Moreover, Steve Wynn himself acknowledged his

22   longstanding knowledge of the Philippines project on a May 1, 2008 conference call with stock

23   analysts:

24                      Well, first of all, I love Kazuo Okada as much as any man
                        that I've ever met in my life. He's my partner and my friend. And
25                      there is hardly anything that I won't do for him. Now, we are not at
                        the present time an investor, nor do we contemplate, an investment
26                      in the Philippines.  This is something that Kazuo Okada and his
                        company, [Universal], has done on its own initiative. *He consults*
27                      *me and has discussed it with me extensively and I've given him my*
                        *own personal thoughts on the subject and advice.  And, to the extent*
28                      *that he comes to me for any more advice or input, all of us here at*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

14                                   Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*the Company will be glad to give him our opinions*.  But that's short of saying this is a Wynn Resorts project.  It is a [Universal] project.

FD Ex. P at 9 (emphasis added).

Though no investment was contemplated in 2008, Steve Wynn was reconsidering the opportunity by 2010.  On June 14, 2010, Steve Wynn and Mr. Okada jointly visited Manila to conduct due diligence on behalf of Wynn Resorts and Universal.  As illustrated in photographs attached to Mr. Okada's Complaint, ¶62, the pre-arranged trip involved meetings with dignitaries and officials and informational presentations on the project.

The Proxy also fails to disclose that, in April 2011, ***months after*** its purported "discovery" of Mr. Okada's "falsely representing" that Universal and Wynn Resorts were involved in a joint venture, and months after the Board supposedly confronted Mr. Okada about Universal's Philippines project and Mr. Okada's purportedly unacceptable statements about FCPA compliance issues, Wynn Resorts' Board unanimously nominated Mr. Okada and recommended that shareholders reelect him to the Board at the Company's May 17, 2011 Annual Meeting.  FD Ex. D at 8.  In urging shareholders to re-elect Mr. Okada as a director, Wynn Resorts stated in its April 7, 2011 proxy solicitation, publicly filed with the SEC, that Mr. Okada still "br[ought] an international perspective that is essential to the Company's strategic vision.  In addition, his primary business as a manufacturer and developer of gaming equipment adds significant value to our operations." *Id*. at 9.  Without disclosing the Compliance Committee's alleged concerns over Mr. Okada's purported views of the permissibility of foreign bribery, the Company further stated to all shareholders in the April 7, 2011 filing that "Aruze USA has been found suitable by the Nevada Gaming Commission as a major shareholder of the Company." *Id*.

The reason why Wynn Resorts makes no mention in its current, January 3 Proxy of its previous, truthful, laudatory statements about Mr. Okada in connection with the May 2011 Annual Meeting and Mr. Okada's election to the directorship that is now at issue is because the Company's prior statements were true and are inconsistent with Wynn Resorts' more recently invented, false theories to the effect that Mr. Okada is "unsuitable" and that the Company was purportedly gravely concerned about Universal's activities and Mr. Okada's supposed statements

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

15

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Case No. 13-CV-00136-JCM-PAL

1    to the Board as of and prior to April 2011.  Without full and truthful disclosure by Wynn Resorts

2    of the foregoing omitted and/or misstated material facts, shareholders of Wynn Resorts are likely

3    to be misled in making their decision whether to accept the Executive Committee's

4    recommendation that Mr. Okada be removed from the Board.

5              **5.    Steve Wynn's Activities in Macau**

6              The January 3 Proxy meanwhile attempts to deflect Mr. Okada's criticism of a May 2011

7    contribution by Wynn Macau of $135 million to the University of Macau Development

8    Foundation.  The Proxy states that "[t]he pledge was consistent with the Company's long-

9    standing practice of providing philanthropic support for deserving institutions in the markets in

10   which it operates" and followed "an extensive analysis which concluded that the gift was made in

11   accordance with all applicable laws."  FD Ex. A at 12-13.

12             The January 3 Proxy, however, fails to disclose that prior to making its $135 million

13   commitment to the Development Fund, Wynn Resorts had been pursuing a land concession on the

14   Cotai Strip in Macau for the development of a new casino since at least February 2006.  *Id*. Ex. Q

15   at 2.  Nor does the January 3 Proxy disclose that the Chancellor of the University of Macau also

16   has ultimate oversight of gaming matters in Macau; that the $135 million pledge represents

17   approximately 70% of the University of Macau Development Fund's entire endowment; and that

18   shortly after the "donation," in September 2011, Wynn Resorts finally received the land

19   concession it had been seeking on the Cotai Strip for approximately five years.  *Id*. Ex. E at 2.

20   All of this transpired within months of the February 24, 2011 Board meeting about FCPA

21   compliance referenced in the January 3 Proxy.  *Id*. Ex. A at 9.

22             The Proxy also is false and misleading in that Wynn Resorts' purported "long-standing

23   practice" of philanthropy does not exist.  The Proxy fails to disclose that the only other charitable

24   donation Wynn Resorts has disclosed in SEC filings in its history was a $10 million Ming

25   dynasty vase donated to the Macau Museum in 2006—the same year in which Wynn Resorts first

26   applied for a land concession on the Cotai Strip in Macau.  *Id*. Ex. R at 42-43; *id*. Ex. Q at 2.

27             These two "donations" are not isolated examples of how Steve Wynn has jeopardized the

28   Company's lucrative gaming licenses by suspicious and unusually lavish donations designed to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No. 13-CV-00136-JCM-PAL

DB1/ 72860956.4                    PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    curry favor with foreign government officials.  As the Wall Street Journal reported[2] on July 1,

2    2012, the $4 billion Cotai project – referred to by Steve Wynn as "the single most important

3    project" in the Company's history – has been linked to a $50 million payment by Wynn Resorts

4    to an obscure Macau company and individuals with connections to Macau's former top

5    government official, his close associate and a businessman from a prominent Beijing family.  OD

6    ¶13; *see id*. Ex. C.  The Proxy discloses nothing about this.

7        The Proxy also fails to disclose that, despite repeated demands by Mr. Okada, Steve Wynn

8    has refused to disclose to Mr. Okada how he actually spent about $90 million that Mr. Okada

9    caused Aruze USA to contribute to the Company's predecessor in 2002.  On October 15, 2012,

10   the District Court for Clark County, Nevada ordered Wynn Resorts to disclose to Mr. Okada

11   "[e]xpenditures greater than $10,000 from the $120 million capital contribution of Aruze USA,

12   Inc.; and [e]xpenditures of any amount for or on behalf of government or gaming officials from

13   the $120 million capital contribution of Aruze USA, Inc."  FD Ex. T at 2.  Despite this court

14   order, Mr. Okada has still not received a satisfactory explanation of how his money was used, or

15   the extent to which Steve Wynn abused his trust by making expenditures for improper purposes.

16   OD ¶12.  Again, the Proxy discloses nothing about this.

17       Mr. Okada recognized the mortal risk to the Company posed by Steve Wynn's willingness

18   to pay to play with foreign officials, but the Company has sought to push him aside for asking the

19   wrong questions.  As noted in the section titled "RISK FACTORS" of the Company's most recent

20   10-K filing with the SEC, "[w]e are entirely dependent upon our resorts in Las Vegas and Macau

21   for all our cash flow.  As a result, we are subject to a greater degree of risk than a gaming

22   company with more operating properties."  FD Ex. S at 20-21.  The filing also acknowledges

23   "[f]ailure to adhere to the regulatory and gaming environment in Macau could result in the

24   revocation of Wynn Macau, S.A.'s concession," or "risk that U.S. regulators could determine that

25   Macau's gaming regulatory framework has not developed in a way that would permit us to

26   conduct operations in Macau in a manner consistent with the way in which we intend, or the

27

28   [2] Kate O' Keefe, *In Wynn's Macau Deal, a Web of Political Ties*, THE WALL STREET JOURNAL, (July 1, 2012), *available at* http://online.wsj.com/article/SB10001424052702304782404577488692803611700.html.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

17

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    Nevada gaming authorities require us, to conduct our operations in the United States." *Id.* at 23.

2            Shareholders voting on the Removal Proposal need to know the complete set of facts

3    behind Steve Wynn's pursuit of the Cotai gaming concession in order to properly evaluate the

4    January 3 Proxy's claim that "an extensive analysis" by the Company concluded that the $135

5    million University of Macau donation "was made in accordance with all applicable laws," as well

6    as the attendant false insinuation that Mr. Okada's opposition to the donation was unfounded and

7    interfered with effective governance of the Company.

8            In summary, the Executive Committee made <u>no attempt</u> to provide a full and complete

9    account of, for example, how the Freeh Report was finalized and then acted upon before its

10   subject had any opportunity to discover and respond to its allegations, or how the Company

11   delayed its "imperative" efforts to remove Mr. Okada for nearly a year after its aborted March

12   2011 Proxy, which levied identical allegations of "unsuitability."  "A proxy statement should

13   inform, not challenge a shareholder's critical wits." *Virginia Bankshares*, *Inc. v. Sandberg*, 501

14   U.S. 1083, 1097 (1991).  The Board's failure to inform assumes heightened materiality in light of

15   the clear pecuniary and managerial gains Steve Wynn and his Executive Committee stand to gain

16   by removing their greatest obstacle to control.  The January 3 Proxy "actually cross[es] the line

17   from omitting material information to becom[ing] affirmatively misleading." *ODS Techs*., 832

18   A.2d at 1260-61 (materially misleading presentation of amendments was purportedly designed to

19   discourage hostile takeover bids generally, but in actuality failed to mention another company

20   with known interest in an acquisition); *see also Berkman v. Rust Craft Greeting Cards, Inc*., 454

21   F. Supp. 787, 791-92. (S.D.N.Y. 1978) (proxy solicitation's failure to disclose known conflict of

22   interest among candidates for renomination to board "bordered upon a breach of fiduciary duty,"

23   in addition to satisfying § 14(a) materiality requirement).  The Executive Committee omitted a

24   "full and fair explanation of the rationale for [the] proposal that [they] are recommending

25   stockholders to approve," and the Committee's failure "to disclose its motivations candidly"

26   constitutes a clear violation of Section 14(a).  *See ODS Techs.*, 832 A.2d at 1261.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

18                         Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**B.    Mr. Okada Will Suffer Irreparable Harm Absent a Preliminary Injunction to Halt the Special Meeting in Which Wynn Seeks to Remove Mr. Okada from Its Board of Directors**

If the Special Meeting goes forward and Mr. Okada is removed from the Company's Board due to the misleading proxy materials, Mr. Okada – and the Company – will suffer irreparable harm.  *See Severson*, 2012 U.S. Dist. LEXIS 152392, at *17 (finding irreparable harm because "the alternative of invalidating the election at a later date, and unwinding any transactions that might be made in reliance on the results of a tainted election, all point to the conclusion that a post hoc remedy is inadequate").

Indeed, the right to participate in corporate management has intrinsic value, and loss of that power even for a short period may constitute irreparable harm.  The Second Circuit in *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir. 2003), found that, "a bargained-for minority right to participate in corporate management has value in and of itself and a denial of that right, without more, can give rise to irreparable harm," particularly where that right is "central to preserving an agreed-upon balance of power … in corporate management." *Id.* at 114-15; *see Street v. Vitta*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (special meeting to elect new directors threatened irreparable harm to shareholder-directors, who stood to lose rights to inspect corporate books and to exert a "voice in management"); *Gitlitz v. Bellock*, 171 P.3d 1274, 1280 (Colo. Ct. App. 2007) (following *Wisdom Import* and "conclud[ing] that a loss of a contractual right to manage and control a business may constitute irreparable harm; that monetary damages are an inadequate remedy for such a loss; and that a contractual right to participate in the management and control of a business has intrinsic value in and of itself that may not be adequately compensated by monetary damages"); *see also Palumbo v. Deposit Bank*, 758 F.2d 113, 116 (3d Cir. 1985) (plaintiff-director's removal premised on misleading proxy solicitation constituted injury in fact sufficient to confer § 14(a) standing).  This perfectly captures the reasons why Mr. Okada – as well as the Company's shareholders – will suffer irreparable harm if Mr. Okada is removed pursuant to the misleading Proxy.  Mr. Okada is a central component of the "balance of power" at the Company as he is the only director who is not aligned with Steve Wynn, and he is the only director who dared object to the $135 "donation" and Wynn's Macau

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

19

Case No. 13-CV-00136-JCM-PAL

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    activities.  With Mr. Okada off the Board, Steve Wynn and his allies would be free to run the

2    Company unchecked by the truly independent voice that Mr. Okada provides, harming both Mr.

3    Okada and the Company's shareholders.

4            A special election ousting Mr. Okada will deprive him of a vested right to conduct

5    corporate governance, and almost certainly ensure that he is unable to regain that right.

6            **C.        The Balance of Equities Weighs in Mr. Okada's Favor**

7            "The balance of hardships favors enjoining a vote in which shareholders were not

8    provided material information."  *Severson*, 2012 U.S. Dist. LEXIS 152392, at *17.  Because this

9    litigation would proceed well beyond the February 22 Special Meeting – and perhaps even

10   beyond the expiration of Mr. Okada's elected term in 2014 – Mr. Okada will suffer great inequity

11   if his candidacy is determined based on the one-sided and materially misleading January 3 Proxy.

12   Conversely, Wynn Resorts will suffer minimal – if any – harm if forced to correct its disclosures

13   so that they are no longer false and misleading.  *See id.* at *16 ("[I]t is appropriate for the court to

14   address material disclosure problems through the issuance of a preliminary injunction that persists

15   until the problems are corrected."); *Krauth v. Executive Telecard, Ltd.*, 890 F.Supp. 269, 292

16   (S.D.N.Y.1995) (enjoining vote until management distributed corrected proxy materials).  At

17   worst, the Company will be able to raise Mr. Okada's candidacy at the 2013 Annual Meeting

18   scheduled for May, where it can provide shareholders with a fair and accurate account of why the

19   directorship earned by Mr. Okada must be revoked.

20           Critically, Wynn Resorts has delayed for too long to argue for Mr. Okada's immediate

21   removal.  Given that the Compliance Committee admittedly began its investigations into

22   purported improprieties indulged in by Mr. Okada *before* he garnered shareholders' approval for

23   a three-year extension of his term at the 2011 Annual Meeting, the threats posed by his

24   "unsuitability" are of no real urgency.  After aborting its attempt to hold a similar Special

25   Meeting almost a year ago, and after failing to seek the two-thirds vote necessary to remove Mr.

26   Okada at its regular meeting of shareholders on November 2, 2012, the Executive Committee

27   cannot now honestly assert that a removal vote is "imperative."

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4              PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### D.    A Preliminary Injunction Is in the Public's Interest

In addition to benefiting Wynn Resorts' shareholders at large, a preliminary injunction will also serve the public interest.  As this Court aptly observed, in explaining why the business judgment rule did not apply to shareholder voting matters:

> [S]hareholders normally have "only two protections against perceived inadequate business performance.  They may sell their stock …, or they may vote to replace incumbent board members."  Indeed, one of the justifications for the business judgment rule's insulation of directors from liability for almost all of their decisions is that unhappy shareholders can always vote the directors out of office.  Thus, interference with shareholder voting is an especially serious matter…. [W]hen a board interferes with shareholder voting it interferes with the very "allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation."

*Shoen v. AMERCO*, 885 F. Supp. 1332, 1340-41 (D. Nev. 1994) (quoting *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988)); *see also Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) ("[A]ssuming the existence of materially misleading information, a full disclosure of such information, prior to any vote based thereon, will best serve the shareholding public.").

Indeed, the very manner in which the Proxy is structured – providing that all executed and unrevoked proxies "will be voted 'FOR' the Removal Proposal and 'FOR' the Adjournment Proposal" unless otherwise specified by the shareholder – subverts ordinary corporate governance procedures and deprives Mr. Okada of the opportunity to seek re-nomination and a full and fair vote at the 2014 Annual Meeting.  FD <u>Ex. A</u> at 15; *see Shoen*, 885 F. Supp. at 1342 ("What [the defendant] ignores, however, is that while shareholders still can vote their shares freely, the range of choices available to them has been narrowed by the advancement of the meeting date and [the plaintiff]'s consequent inability to campaign.").  Strikingly, even if the Removal Proposal fails to secure enough votes, the Executive Committee has authorized itself "to continue to seek to obtain a sufficient number of additional votes to approve the Removal Proposal."  FD <u>Ex. A</u> at 14.  These procedural sleights of hand undermine investors' expectation of accountability in the boardroom, and failure to enjoin the Special Meeting would send the wrong message regarding the appropriate means of presenting favored boardroom proposals to shareholders.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72860956.4

21

Case No. 13-CV-00136-JCM-PAL
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  **IV.**     <u>**CONCLUSION**</u>

2         For the foregoing reasons, Mr. Okada's motion for preliminary injunction should be

3  GRANTED.

4

5  Dated: January 28, 2013                   By  <u>/s/ Charles H. McCrea, Jr.</u>

6                                    LIONEL SAWYER & COLLINS
                                  SAMUEL S. LIONEL (SBN 1766)

7                                    CHARLES H. McCREA, JR. (SBN 104)
                                  STEVEN C. ANDERSON (SBN 11901)

8                                    MORGAN, LEWIS & BOCKIUS LLP

9                                    MARC J. SONNENFELD*
                                  JOSEPH E. FLOREN*

10                                    BENJAMIN P. SMITH*
                                  CHRISTOPHER J. BANKS*

11                                    Attorneys for Plaintiff

12                                    KAZUO OKADA
                                  *pro hac vice application forthcoming

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB1/ 72860956.4

22

Case No. 13-CV-00136-JCM-PAL