LIONEL SAWYER & COLLINS
SAMUEL S. LIONEL (SBN 1766)
slionel@lionelsawyer.com
CHARLES H. McCREA, JR. (SBN 104)
cmccrea@lionelsawyer.com
STEVEN C. ANDERSON (SBN 11901)
sanderson@lionelsawyer.com
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Tel:    702.383.8888
Fax:   702.383.8845

MORGAN, LEWIS & BOCKIUS LLP
MARC J. SONNENFELD*
msonnenfeld@morganlewis.com
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel:   215.963.5000
Fax:   215.963.5001

JOSEPH E. FLOREN*
jfloren@morganlewis.com
BENJAMIN P. SMITH*
bpsmith@morganlewis.com
CHRISTOPHER J. BANKS*
cbanks@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA  94105-1126
Tel:   415.442.1000
Fax:   415.442.1001

Attorneys for Plaintiff
KAZUO OKADA
* pro hac vice application forthcoming

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KAZUO OKADA, an individual,<br><br>               Plaintiff,<br><br>    vs.<br><br>WYNN RESORTS, LIMITED, a Nevada Corporation,<br><br>               Defendant. | Case No.<br><br>**DECLARATION OF KAZUO OKADA IN SUPPORT OF MOTION TO ENJOIN FEBRUARY 22, 2013 SHAREHOLDER VOTE** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72850958.2

1

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

I, Kazuo Okada, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration and if called upon to do so I could and would competently testify to such matters.

2. Because I am not fluent in English, I have reviewed and approved a Japanese translation of this declaration, a true and correct copy of which is attached hereto as Exhibit A. The verification for this English-language certified translation is attached hereto as Exhibit B.

3. I am a citizen of Japan and a resident of Hong Kong. After graduating from a technical high school specializing in electricity, I founded, in 1969, Universal Lease Co. Ltd., which is now known as Universal Entertainment Corporation. Through Okada Holdings Limited, I am the majority owner of Universal Entertainment Corporation. I also serve as Chairman of Universal Entertainment Corporation.

4. The remarkable success of Wynn Resorts, Ltd. (the "Company") would not have been possible without the financial support and guiding vision I have provided to it over the years. The Company I helped to form, and have served for more than a decade, has provided thousands of jobs for Las Vegas residents and millions of dollars in tax revenues for Clark County and the State of Nevada.

5. In 2000, I agreed to provide seed capital for what would eventually become Wynn Resorts. Through my company's United States subsidiary, Aruze USA, I contributed $260 million of start-up cash to Valvino Lamore, LLC ("Valvino"), the Company's predecessor, to finance the renovation of the Desert Inn and the construction of Wynn Las Vegas. In April 2002, Aruze USA and I contributed an additional $120 million to Valvino. I contributed another $72.5 million to Wynn Resorts when the Company went public in October 2002 and also invested $2.5 million in bonds issued by two Company subsidiaries, raising our total investment to $455 million.

6. Both because of my gaming machine business, and because of Aruze USA, Inc.'s ownership of Company stock, my companies and I have been found "suitable" by the State Gaming Control Board and Nevada Gaming Commission.

7. I have served as a Director of the Company since its inception in October 2002. In

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72850958.2

2

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

1  this role, it has been my job to insure that the business of the Company is being conducted
2  correctly.
3      8.    As a result of my significant investments in the Company and its predecessors,
4  Aruze USA was also the largest single shareholder of the Company until the Executive
5  Committee of the Company involuntarily redeemed and canceled Aruze USA, Inc.'s 24,549,222
6  shares of stock on February 18, 2012. The Company did not pay me the value of my stock, which
7  the Company has admitted is nearly $3 billion dollars. Instead, the Company has issued to me a
8  promissory note for $1.9 billion payable in ten years, and bearing negligible interest. I am
9  informed and believe that these actions were undertaken by Mr. Wynn and his allies on the Board
10 of Directors to eliminate my independent voice on the Board and consolidate power and control
11 of the Company.
12     9.    I am informed and understand that the Executive Committee of the Company now
13 seeks to hold a special meeting of the Company's remaining shareholders on February 22, 2013
14 to vote to remove me as a Director. Like the purported share redemption, this is another
15 misguided and improper effort by Mr. Wynn and his allies to silence my independent voice as a
16 Director and to consolidate power and control.
17     10.    Any suggestion that my continued service as a Director of the Company poses a
18 material risk to shareholders, or a risk to the Company from a gaming regulatory standpoint, is
19 false, as demonstrated by the Company's own actions. I was asked to resign as a Director in late
20 2011, and asked again in February 2012. I refused on both occasions. I understand that the
21 Company's Executive Committee filed paperwork with the Securities and Exchange Commission
22 in March 2012 seeking a special shareholder meeting to remove me as a Director. However, the
23 Company never acted upon its filing or dared to place the decision regarding my service as a
24 Director in the hands of fellow shareholders. Thus, it has been more than one year since I was
25 asked to resign, and nearly one year since the Executive Committee accused me of posing a
26 "material risk" to the Company, but the Company has taken no formal action – until now – to
27 secure my removal.
28     11.    I have been concerned about and have questioned the Company's activities in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72850958.2

3

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

Macau. I was the only director to vote against an unprecedented $135 million USD donation by the Company to the University of Macau Development Foundation. This incredible donation was presented to me at the April 2011 board meeting as something that Mr. Wynn had already decided upon, and it was after I objected to this donation that the Company initiated a series of aggressive steps against me. I believe that my removal is being sought now to preclude me from further questioning the Company's activities in Macau.

12. Since 2011, I have made repeated requests through my employees to inspect various books and records of the Company, including records regarding the Company's activities in Macau, as I am entitled to do as a Director. These efforts have been repeatedly rejected by the Company, and required my lawyers to file court papers to obtain the records. The Company also resisted these legal efforts, but ultimately did produce some records after proceedings were held in Nevada state court. After translation, I reviewed a variety of these records. They were meaningless and had nothing to do with what I requested. I am still awaiting the production of meaningful documents by the Company.

13. More recently, I independently obtained copies of documents that, on their face, purport to be underlying agreements between Mr. Steven Wynn and an individual named "Ho Ho" regarding land rights for the Company's planned Cotai strip casino resort in Macau. As a fiduciary, and as a Director, I recently wrote to the Board to obtain further information regarding these purported agreements, which I view with suspicion, and to urge the appointment of a special investigator to lead an independent investigation regarding them. A true and correct copy of the letter sent to my fellow Directors of the Company is attached hereto as <u>Exhibit C</u>.

14. I understand that the Executive Committee also seeks my removal as a Director based upon the so-called "Freeh report" prepared by Freeh, Sporkin and Sullivan LLP. Although I was a Director of the Company while the Freeh investigation was ongoing, and the subject of the investigation, the investigation took place without my knowledge or meaningful participation.

15. Neither Mr. Freeh nor any of the Company's lawyers provided me with any information or documents regarding Mr. Freeh's investigation while it was taking place. Indeed, even though I was not informed of the subject matter of Mr. Freeh's investigation beforehand, I

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72850958.3

4

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

voluntarily agreed to be interviewed by Mr. Freeh. I submitted to a day-long interview by Mr. Freeh in Tokyo on February 15, 2012. Prior to this interview, I was unaware that Freeh Sporkin had any questions concerning hospitality payments that had been reimbursed by Universal years earlier, and had little or no knowledge of those matters.

16. Mr. Freeh provided his forty-seven page report to the Executive Committee just three days later, indicating to me that his report was largely if not entirely complete by the time I voluntarily submitted to an interview.

17. Through counsel, I asked to see a draft of Mr. Freeh's report before it was finalized to provide any supplemental information necessary for an accurate report, and to correct any errors. These requests were rejected.

18. Instead, on February 17, 2012, just hours before I understand the Freeh report was delivered to the Executive Committee, Mr. Freeh provided my legal counsel at Paul Hastings the option of proffering all responsive materials in my possession regarding the report (which we still had not seen) in less than nine hours or responding to the report after its disclosure and consideration by the Board. Mr. Wynn also threatened through counsel, and in a communication to Aruze USA, that the Freeh report would be distributed and considered by the Board if I did not sell my shares in Wynn Resorts to Mr. Wynn personally at a substantial discount.

19. At 2:00 am on February 19, 2012 in Japan (9:00 am on February 18, 2012 in the United States), a Board meeting was held. Given the short notice for this special meeting, I was required to participate by telephone. Mr. Freeh apparently presented his report at this meeting, but because there was no translator provided, I could not participate in the meeting. I was also cut-off from the call.

20. Since the time the Freeh report was provided to the Board, and publicly disseminated by the Company, I have asked to see the exhibits to the report. The Company has refused to provide the exhibits to me. Nor, to my knowledge, have the exhibits been made public or provided to shareholders. I understand that the Company considers the exhibits to the Freeh report "confidential," even though I am a Director of the Company.

21. I likewise have not been provided with earlier reports commissioned by the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/ 72850958.3

5

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

Company to investigate the dealings of my companies in the Philippines, or the prospects for establishing a world-class resort in the Philippines. Nor, to my knowledge, have these earlier investigations and/or reports been made public or provided to shareholders. The Company has also claimed that these reports are "confidential."

22. I understand that the Executive Committee also questions my refusal to sign the Company's November 2011 (Amended) Code of Conduct, prepared after I was asked to resign from the Company as a Director. I hold a deep sense of commitment to professional and ethical business dealings, as Mr. Wynn has publicly acknowledged, and as the Company has previously acknowledged with respect to many prior versions of the Company's Code of Conduct. Through my attorneys, I attempted to reach an agreement regarding certain limited provisions within the Amended Code of Conduct regarding my ability to develop a casino in the Philippines – an opportunity that I kept the company aware of – but the Company elected not to pursue. Unfortunately, no agreement could be reached.

23. I further understand that the Executive Committee questions my failure to attend a training session on Foreign Corrupt Practices held by the Company on October 31, 2011, again after I was asked to resign as a Director of the Company. Because of my travel schedule, and the press of business, I was unable to attend the scheduled training session, as the Company was advised nearly a week before the training. The Company refused to reschedule the training. I thereafter requested a recording of the training session. This request was also refused.

24. Throughout these incidents and actions, my sole purpose and course of conduct has been centered on restoring the Company to a healthy state with respect to its operations.

25. I would suffer serious injury if the Executive Committee of the Company were allowed to hold a special meeting of shareholders to remove me as a Director premised on false claims that I pose a material threat to the Company's gaming operations, failed to respond to allegations of the Freeh report (I was in fact provided no opportunity to do so), or failed to acknowledge Company trainings and policies.

\\

\\

Morgan, Lewis & Bockius LLP
Attorneys at Law
San Francisco

DB1/ 72850958.3

6

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE

1  I declare under penalty of perjury under the laws of the United States that the foregoing is
2  true and correct.
3  Executed on _January 28_, 2013.

_____
Kazuo Okada

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB1/ 72850958.2

7

DECL. OF K. OKADA ISO MTN. TO ENJOIN
FEBRUARY 22, 2013 SHAREHOLDER VOTE