James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
PISANELLI BICE PLLC
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169
Telephone: 702.214.2100
Facsimile: 702.214.2101

Paul K. Rowe, Esq. *(pro hac vice forthcoming)*
pkrowe@wlrk.com
Bradley R. Wilson, Esq. *(pro hac vice forthcoming)*
brwilson@wlrk.com
S. Christopher Szczerban, Esq. *(pro hac vice forthcoming)*
scszczerban@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: 212.403.1000

Robert L. Shapiro, Esq. *(pro hac vice forthcoming)*
RS@glaserweil.com
GLASER WEIL FINK JACOBS HOWARD
AVCHEN & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: 310.553.3000

Attorneys for Wynn Resorts, Limited

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KAZUO OKADA, an individual,

Plaintiff,

v.

WYNN RESORTS, LIMITED, a Nevada corporation,

Defendant.

Case No. 2:13-cv-00136-JCM-PAL

**WYNN RESORTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Wynn Resorts, Limited respectfully submits this memorandum of law in opposition to plaintiff Kazuo Okada's Motion for Preliminary Injunction (the "Motion").

**PRELIMINARY STATEMENT**

On February 22, 2013, the stockholders of Wynn Resorts, Limited ("Wynn Resorts" or the "Company") will be asked to vote on the removal of one director, Kazuo Okada, from the Wynn Resorts board of directors (the "Board"). His removal is unanimously recommended by the Company's other directors, seven out of eight of whom have no employment relationship with Wynn Resorts.

Mr. Okada's application in this Court for a preliminary injunction against the scheduled vote is the latest in a series of legal attacks by Mr. Okada on Wynn Resorts and its Board, each of which has been unsuccessful. Rather than acting as a director and pursuing Wynn Resorts' interests, Mr. Okada has been behaving as an adversary, using his knowledge of the Company from his years on the Board to concoct spurious theories in an effort to harm Wynn Resorts and deflect attention from his own wrongful conduct. His conduct — providing illicit payments to influence Philippine gaming regulators — has resulted in ongoing investigations of Mr. Okada by the Nevada Gaming Control Board, the U.S. Department of Justice and the FBI, the Securities and Exchange Commission, the Osaka Stock Exchange, and the Philippine government itself.

In the course of pursuing his own interests at all costs, Mr. Okada has engaged in a litigation vendetta against the very company he is supposed to protect, ordering the first of his three successive out-of-state law firms to undertake the removal of Wynn Resorts' state court action — a removal that Judge Hicks of this Court found to lack any reasonable basis and to justify an award of attorneys' fees against Mr. Okada — and then bringing on a preliminary injunction motion in state court in September 2012, designed to reverse the redemption of the shares he controlled. That motion was denied on the ground that Mr. Okada failed to show a likelihood of success on the merits. Mr. Okada continues to pursue breach of fiduciary duty claims in state court attacking the Board's unsuitability determination and the redemption.

Hoping for a different outcome, in this action, he switches his emphasis from his state court pleadings to a different theory. After a year of arguing that the redemption of his

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

company's shares by the Wynn Resorts Board was retaliation for his supposed opposition to a charitable pledge to the University of Macau, Mr. Okada now pivots away from his allegations about the Macau pledge — which the Nevada gaming regulators investigated and determined to be unfounded — and levels new accusations concerning the Company's acquisition of development rights to land in the Cotai region of Macau. But these allegations are equally unfounded and have nothing at all to do with the issue to be decided by the stockholders.

The two bases on which the Board made its determination to seek Mr. Okada's removal are set forth in Wynn Resorts' definitive proxy statement dated January 3, 2013:

*First*, the finding of the Board that Mr. Okada (along with two companies he controls) is an "unsuitable" person within the meaning of the Company's Articles of Incorporation, a finding that rests in large part on a detailed written report submitted to the Board in February 2012 by Louis Freeh, former Director of the FBI and a former federal judge, which details Mr. Okada's illicit activities surrounding a planned Philippine casino-resort Mr. Okada is developing.

*Second*, the belief held by the Board that Wynn Resorts will have no chance of obtaining the gaming licenses it is currently applying for in Pennsylvania and Massachusetts unless Mr. Okada is removed as a director, since Pennsylvania has required that Mr. Okada file for licensure and Massachusetts is insisting that *every* director be individually licensed, and there is, the Board believes, no chance Mr. Okada would be licensed in those states. The loss of the opportunities to expand into these two states would derail Wynn Resorts' strategic plan and significantly damage the Company's future growth.

Those reasons are why Wynn Resorts is seeking the two-thirds stockholder vote needed for Mr. Okada's removal. On this Motion, Mr. Okada does not, and cannot, carry his burden of showing that those statements are false or misleading. He disagrees with the findings of the Freeh Report — but he cannot even raise an issue as to the sincerity of the Board's belief that those findings are reliable, or the reasonableness of the Board's decision to rely on that report. As explained in more detail below, Mr. Okada has had the Freeh Report for 50 weeks, has challenged it in state court, and claims he did not have the chance to present exculpatory

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

evidence — but neither on this Motion nor in state court has he shown that there exists any exculpatory evidence, let alone that the Board should not be able to rely on Mr. Freeh's report.

As to Wynn Resorts' need to remove Mr. Okada as a director if it is to succeed in its business strategy of expanding into Pennsylvania and Massachusetts, Mr. Okada's showing is equally deficient. He does not even assert, much less provide evidence, that he *could* be licensed in those states; that the Board does not reasonably believe he cannot; or that such a licensing failure would not in fact be important to Wynn Resorts' business prospects. As the Ninth Circuit has made clear in *Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009), where a plaintiff brings a securities claim that challenges a corporation's expression of belief, it must show that the corporation does not actually hold the belief to prevail. (*See infra*, pages 13-15.)

Mr. Okada's motion papers are based on the completely incorrect legal premise that Wynn Resorts must not only say what it believes to be accurate, but also adopt in its proxy statement what Mr. Okada believes (or says he believes) to be accurate. Simply put, the law only requires Wynn Resorts to be accurate in what is affirmatively said, and to avoid omissions that render what *is* said inaccurate.

Mr. Okada was, of course, free to attempt to mount his own proxy solicitation *against* the Board's removal recommendation and to "tell his story" in his own solicitation. But Section 14(a) of the Securities Exchange Act of 1934 and the SEC proxy rules promulgated thereunder do *not* require Wynn Resorts to adopt Mr. Okada's version of events. Both the case law discussed in this memorandum and the accompanying declaration of former Nevada Governor Robert J. Miller demonstrate that Mr. Okada has not come close to showing that the proxy statement contains any material inaccuracies or omits to state any material facts required to avoid misleading the Wynn Resorts stockholders.[1]

As a threshold matter, Mr. Okada cannot demonstrate that there exists a private right of action under Section 14(a) or Rule 14a-9 that allows him to obtain relief. Only stockholders

---

[1] *See* Declaration of Robert J. Miller, dated February 5, 2013 ("Miller Decl."). The exhibits submitted with Governor Miller's declaration will be referenced herein as "Miller Ex. __." Certain other materials cited in this memorandum are attached to the accompanying Declaration of James J. Pisanelli, dated February 6, 2013, and will be referenced herein as "Pisanelli Ex. __."

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

have standing to assert a private action under the federal securities laws where the claim is a misleading proxy statement. Mr. Okada is not a stockholder and has no vote to cast or be solicited. Federal law — especially since the United States Supreme Court's decisions in *Stoneridge* and *Virginia Bankshares*, which strictly limit the implication of new private rights of action — does not support allowing a non-stockholder such as Mr. Okada to bring a proxy claim. (*See infra*, pages 9-12.)

But even assuming, *arguendo*, that Mr. Okada has standing, as set forth in detail below, his application for an injunction should be denied:

- Federal law is clear that a corporation soliciting votes from its stockholders is under no obligation to adopt the version of events of parties with whom it has a dispute, especially where, as here, the corporation *has* disclosed the other side's contentions and allegations. In this case, Wynn Resorts has filed publicly with the SEC Mr. Okada's entire 38-page complaint as additional "Soliciting Material" related to its proxy statement. In other words, *stockholders are being informed by Wynn Resorts itself, as part of the Company's own proxy solicitations*, that Mr. Okada challenges the Company's view of what has occurred and that Mr. Okada believes the stockholders should take into account matters outside the four corners of the proxy statement. Wynn Resorts is not required to do more. (*See infra*, pages 16-19.) Mr. Okada's views and Mr. Okada's "facts" are part of the total mix of information available to stockholders. (*See infra*, pages 19-20.)
- A further federal law principle barring Mr. Okada's attack on the proxy statement is that a litigant cannot bootstrap a state claim into a federal disclosure claim by alleging that facts relevant to an unproven state law tort have not been disclosed. Here, Mr. Okada has alleged and litigated in state court, in a fiduciary duty lawsuit, the same claims he makes in this Court — that the Freeh Report was a pretext, that his rights were trampled on by the Board, and that the Company supposedly engaged in improper conduct in Macau. To allow these same claims to support a federal law disclosure remedy would be to bootstrap the allegations in a manner barred by the Supreme Court's decision in *Santa Fe Industries, Inc.* v. *Green*, 430 U.S. 462, 479 (1977). (*See infra*, pages 15-16.)

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

And, the legal principles aside, many of the supposed "facts" that Mr. Okada claims should have been disclosed are simply not true.[2] In support of these assertions, Mr. Okada has submitted only a conclusory declaration that does not remotely carry his evidentiary burden. While the Company is not required on this Motion to disprove Mr. Okada's version of events, Wynn Resorts nonetheless brings to the Court's attention below the falsity of his key allegations.

Finally, Mr. Okada has failed to meet his burden on the equities. (*See infra*, pages 28-30.) As a practical matter, Mr. Okada will suffer no harm if he is removed from the Board, as he has already been quarantined from decision-making; indeed, he has admitted he is "not providing any services as a director of Wynn Resorts" at this time (Pisanelli Ex. 1 at 47). The fact that Mr. Okada waited 45 days after Wynn Resorts filed its preliminary proxy statement disclosing the Executive Committee's reasons for seeking to remove him from the Board before asking this Court to intervene on an "emergency" basis demonstrates that he faces no imminent irreparable harm. In contrast, if a preliminary injunction issues, Wynn Resorts could lose the opportunity to obtain valuable licenses in Pennsylvania and Massachusetts, and would be unfairly "stigmatized," even if the injunction is limited and Wynn Resorts ultimately prevails.

**STATEMENT OF FACTS**

Wynn Resorts is a publicly-traded Nevada corporation that operates destination resort-casinos in Las Vegas and Macau. At all relevant times, its Board has been composed of a majority of directors with no employment relationship with the Company.[3] (Miller Decl. ¶ 4.)

Mr. Okada is a Wynn Resorts director. He is the Chairman and controlling shareholder of Universal Entertainment Corporation ("Universal"), a Japanese corporation. Mr. Okada also controls Aruze USA, Inc. ("Aruze"), a Nevada corporation wholly owned by Universal. Until February 2012, Aruze was a 19.66% stockholder of Wynn Resorts. (Miller Decl. ¶ 8.)

---

2 If it is required to respond to the complaint in this action, Wynn Resorts intends to deny Mr. Okada's allegations (as the Company has previously done in its state court pleadings).

3 On December 13, 2012, Wynn Resorts announced that it was decreasing the size of its Board from twelve to nine members. Independent directors Russell Goldsmith and Allan Zeman and management directors Linda Chen and Marc D. Schorr stepped down from the Board, and the Company appointed Jay Hagenbuch as an additional independent director.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

A.  **The Wynn Resorts Board discovers evidence of Mr. Okada's misconduct.**

In or about 2008, Mr. Okada began developing a casino resort in the Philippines. Although Wynn Resorts was not a participant, on multiple occasions between 2008 and 2010, Mr. Okada sought to persuade the Company to assume a role in the venture. (Miller Decl. ¶ 9.)

In the summer of 2010, Wynn Resorts' management prepared a report on the business climate in the Philippines, which caused the Compliance Committee to form concerns about any involvement by the Company and/or its affiliates (*e.g.*, Mr. Okada) in that country.  In early 2011, management retained an independent firm to do preliminary investigative work concerning the Philippines and Mr. Okada's activities there.  The Board discussed the results of that preliminary investigation at a meeting on February 24, 2011 that Mr. Okada attended.  At this Board meeting, Mr. Okada was clearly made aware that the Board was greatly concerned about any direct or indirect Wynn Resorts involvement in the Philippines. (Miller Decl. ¶¶ 10-11.)

During this meeting, Mr. Okada stated his view that making gifts to government officials was a recognized and accepted way of doing business in parts of Asia, and that it was all a question of using third parties.  His comments surprised and concerned other Board members, prompting further inquiry.  The matter was discussed again by the Board at a meeting held on July 28, 2011, and by the Compliance Committee on September 27, 2011, when it reviewed the results of a separate, third-party investigative report conducted at the Company's request related to Mr. Okada's activities in the Philippines. (Miller Decl. ¶¶ 13-15.)

On October 29, 2011, the Compliance Committee determined to retain Freeh Sporkin & Sullivan, LLP.  Louis Freeh is the former Director of the FBI and a former federal judge. Mr. Freeh investigated for several months.  Through multiple trips to the Philippines and Macau, numerous interviews, and detailed documentary research, Mr. Freeh and his team uncovered detailed prima facie evidence of serious wrongdoing by Mr. Okada and his associates, including evidence that Mr. Okada and his associates provided valuable gifts to senior officials of PAGCOR, the gaming regulator in the Philippines.  Mr. Freeh conducted a full-day interview of Mr. Okada on February 15, 2012 in Tokyo, Japan. Mr. Okada was represented at the interview by attorneys from the Paul Hastings law firm. Following the interview, Mr. Freeh invited Mr. Okada

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

and his counsel to submit whatever exculpatory evidence they possessed that might bear on Mr. Freeh's investigation. Mr. Okada presented no such evidence. (Miller Decl. ¶¶ 17-25.)

B. **Mr. Okada is found "unsuitable" and quarantined.**

Mr. Freeh presented a 47-page written report (the "Freeh Report") at a Board meeting held on February 18, 2012. (Miller Decl. ¶ 26 & Ex. 1.) The Freeh Report was subsequently filed publicly with the SEC on February 22, 2012. (Pisanelli Ex. 2.) The Freeh Report found, among other things, "substantial evidence that Mr. Okada, his associates and companies have apparently been engaging in a longstanding practice and pattern of committing prima facie violations of anti-bribery laws, particularly the FCPA" (Miller Ex. 1 at 43) and that "Mr. Okada strongly believes and asserts that when doing business in Asia, he should be able to provide gifts and things of value to foreign government officials" (*id.* at 1).

At the conclusion of the Board's discussions of the Freeh Report on February 18, 2012, and upon the advice of expert gaming counsel, the Board unanimously (other than Mr. Okada) determined that Mr. Okada, Universal, and Aruze were "Unsuitable Persons" within the meaning of the Articles of Incorporation, on the ground that Mr. Okada's continued affiliation with Wynn Resorts through Aruze's stock ownership was "likely to jeopardize" the Company's existing and potential future gaming licenses. (Miller Ex. 2 at Art. VII, § 1(l).) Based on that determination, and pursuant to the Articles, the Board redeemed Aruze's shares, effective immediately, and caused the Company to issue a promissory note in exchange. (Miller Decl. ¶¶ 27-30.)

The Board also took steps to quarantine Mr. Okada, and protect Wynn Resorts from any undue influence by him, by creating an Executive Committee — from which "unsuitable" directors were excluded — to manage the Company's business and affairs. It was the judgment of the Board that forming an Executive Committee was an acceptable means of quarantining Mr. Okada in lieu of undertaking the burden and expense of calling a special stockholders meeting to consider a proposal to remove him from the Board. (Miller Decl. ¶¶ 31-32.)

C. **Wynn Resorts calls a special meeting to remove Mr. Okada from the Board.**

As disclosed in the proxy statement, part of Wynn Resorts' strategic plan is "to expand its operations into new jurisdictions"— namely, Pennsylvania and Massachusetts — where the

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Company has applied for approval from state gaming authorities to build and operate major projects. (Miller Ex. 10 at 9.) Without these licenses, "the Company will not be able to pursue its planned expansion" into these jurisdictions, which "management and the Executive Committee believe are important to the Company's future growth and profitability." (*Id.*)

On December 7, 2012, Wynn Resorts received a letter from the Pennsylvania gaming regulator requesting that Mr. Okada submit to be individually licensed in connection with Wynn Resorts' pending application. (Miller Decl. ¶ 36 & Ex. 7.) Upon receiving the letter, the Executive Committee formed a view that Massachusetts would likely impose the same requirement (in fact, the Company has subsequently learned that Massachusetts will require *all* directors to submit for licensure). (Miller Decl. ¶ 37.) Prior to December 7, the Company had not expected that Mr. Okada would be required to be licensed in these states. (*Id.*)

The proxy statement explains that in light of Mr. Freeh's findings and the Board's unsuitability determination, "the Company cannot support and advance applications for gaming licenses on behalf of Mr. Okada, and believes that Mr. Okada would not be eligible to receive such licenses in any event" — and that therefore Wynn Resorts has deemed it necessary to call the special meeting for the purpose of removing Mr. Okada from the Board. (Miller Ex. 10 at 3.)

Wynn Resorts announced on December 13, 2012 that it was calling a special meeting. (Miller Decl. ¶ 39 & Ex. 8.) Wynn Resorts filed its preliminary proxy statement in connection with the special meeting on December 14, 2012 (Miller Ex. 9), and filed its definitive proxy statement on January 3, 2013 (Miller Ex. 10). The definitive proxy statement announced the date of the special meeting — February 22, 2013 — and included extensive disclosures regarding the Background of the Removal Proposal and the Reasons for the Removal Proposal. These disclosures had been included in the preliminary proxy statement in substantially the same form.

## ARGUMENT

### I. MR. OKADA LACKS STANDING TO PURSUE A PRIVATE RIGHT OF ACTION UNDER SECTION 14(a).

The language of Section 14(a) unquestionably does not provide an express right of action to non-stockholders like Mr. Okada. *See* 15 U.S.C. § 78n(a). Mr. Okada thus does not have standing to pursue this action unless this Court *implies* a private right of action in his favor.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Several decades ago, the Supreme Court recognized a limited private right of action under Section 14(a) for stockholders whose proxies were solicited with materials that contained material misstatements or omissions. *See Mills* v. *Elec. Auto-Lite Co.*, 396 U.S. 375, 383-85 (1970); *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 432-33 (1964). But since it decided *Mills* 43 years ago, the Supreme Court has not expanded the scope of that private right of action any further. When it was asked to do so in *Virginia Bankshares* — a case involving minority stockholders whose votes were not required to effectuate a proposed merger — the Court refused and made a point to "recognize the hurdle facing any litigant who urges us to enlarge the scope of the action beyond the point reached in *Mills*." 501 U.S. at 1104 n.4 (1991).

*Virginia Bankshares* is part of a long and unbroken line of Supreme Court decisions — all announced after *Borak* and *Mills* — which make clear that courts should imply rights of action rarely and only upon a finding that Congress specifically intended to provide such a right. *See, e.g.*, *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 164-65 (2008); *Alexander* v. *Sandoval*, 532 U.S. 275, 286-87 (2001); *Va. Bankshares*, 501 U.S. at 1102-04; *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 578 (1979). Absent clear congressional intent to create a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander*, 532 U.S. at 286-87. The prior "method for discerning and defining causes of action" applied in *Borak* — which focused on the "'congressional purpose' expressed by a statute" — is a dead letter. *Alexander*, 532 U.S. at 287; *see also, e.g.*, *Stoneridge*, 552 U.S. at 164 ("Though the rule once may have been otherwise . . . it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one.").

Consistent with the Supreme Court's refusal to expand the boundary established in *Mills* and *Borak*, the federal courts have repeatedly held that only voting stockholders have standing to assert claims under Section 14(a). *See, e.g.*, *7547 Corp.* v. *Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 229-30 (5th Cir. 1994) ("we are unwilling to expand standing under section 14(a) . . . to interest-holders who are not qualified to vote"); *Tenet Healthcare Corp.* v. *Community Health Sys., Inc.*, 839 F. Supp. 2d 869, 872 (N.D. Tex. 2012) ("there is not evidence

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

of congressional intent to grant standing for the target corporation . . . under Section 14(a)"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 241 (S.D.N.Y. 2004) ("no class member who lacked voting rights has standing to assert a 14(a) claim").

The First Circuit's decision in *Royal Business Group., Inc.* v. *Realist, Inc.*, 933 F.2d 1056 (1st Cir. 1991), is directly on point. The court in that case denied standing to a hostile bidder that had waged a proxy contest against incumbent management, finding "absolutely no hint in the language or structure of the statute, or in the legislative history, that Congress was concerned with the rights of proxy contestants as opposed to the rights of shareholders." *Id.* at 1060-61. The First Circuit denied standing even though the proxy contestant, unlike Mr. Okada, was also a current stockholder. *See id.* at 1061-62 ("plaintiff's specific claim arises from its role as a proxy contestant, not from its role as a shareholder"; "we do not believe that standing can be conferred, without more, by the mere coincidence that a proxy contestant also enjoys shareholder status").

Mr. Okada's motion papers do not address the critical threshold issue of his standing in any depth. Indeed, the beginning and end of Mr. Okada's standing analysis is a "see also" citation to a single case, *Palumbo* v. *Deposit Bank*, 758 F.2d 113 (3d Cir. 1985), which appears in the middle of a discussion about irreparable harm. (*See* Motion at 19.) But *Palumbo* lends no support to a claim that Mr. Okada has a private right of action under Section 14(a). As the Fifth Circuit has explained, although the plaintiff in *Palumbo* claimed that he had been "ousted from his position as director via an allegedly misleading proxy statement," the plaintiff had a right of action under Section 14(a) because he was also the issuer's largest shareholder. *7547 Corp.*, 38 F.3d at 230 ("Palumbo's status as a shareholder with voting privileges cannot be overlooked."). To the extent that the court in *Palumbo* intended the case to have broader application, the holding is "contrary to the current direction of implied remedies," Thomas Lee Hazen, *The Law of Securities Regulation* § 10.3[2], as embodied in subsequent Supreme Court decisions like *Stoneridge*, *Alexander*, and *Virginia Bankshares*.[4]

---

[4] Wynn Resorts has found only a single case in which a court recognized an implied right of action under Section 14(a) for a proxy contestant that was not a stockholder. *See Capital Real Estate Inv. Tax Exempt Fund Ltd. P'ship* v. *Schwartzberg*, 929 F. Supp. 105, 106-08 (S.D.N.Y. 1996). In *Schwartzberg*, however, the court applied the wrong purpose-based standard in

Returning to this case, Mr. Okada has made no attempt to demonstrate that Congress intended to establish a private right of action under Section 14(a) in favor of a non-stockholder director who is facing removal from the board. Nor could Mr. Okada make such a showing, as there is nothing in the language of the statute or its legislative history that evidences any such congressional intent. Accordingly, Mr. Okada does not have standing under Section 14(a) to challenge the proxy solicitation, much less to enjoin the stockholder vote to which it relates.

## II. MR. OKADA IS NOT ENTITLED TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY JUNCTION.

"A preliminary injunction is an 'extraordinary remedy' and is appropriate only when the party seeking the injunction 'establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Managed Pharmacy Care* v. *Sebelius*, __ F.3d __, 2012 WL 6204214, at *5 (9th Cir. Dec. 13, 2012) (quoting *Winter* v. *Natural Res. Def. Council*, Inc., 555 U.S. 7, 20, 24 (2008)). "A moving party is required to make a showing that all of these requirements have been met." *Loretero* v. *City of Henderson*, 2012 WL 6135646, at *2 (D. Nev. Dec. 10, 2012) (citing *Am. Trucking Ass'n* v. *City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

This is a "heavy burden" and a "difficult task." *Earth Island Institute* v. *Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). In the Ninth Circuit, "[i]n order to demonstrate its likely success on the merits, the moving party must necessarily demonstrate it will overcome defenses raised by the non-moving party." *Perfect 10, Inc.* v. *Amazon.com, Inc.*, 487 F.3d 701, 714 (9th Cir. 2007). And "plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Center for Food Safety* v. *Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011); *see also Small* v. *Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611

assessing whether the plaintiff had a private right of action. *Id.* at 109 ("there are implied causes of action for violation of the antifraud provisions of the securities laws where they are necessary to achieve Congress' remedial purposes"); *cf. Touche Ross*, 442 U.S. at 578 ("[t]he invocation of the 'remedial purposes' of the 1934 Act is . . . unavailing"). The court did not even consider the issue the Supreme Court has declared to be "determinative" — whether "the statute Congress has passed . . . displays an intent to create . . . a private right [and] a private remedy." *Alexander*, 532 U.S. at 286. *Schwartzberg* is accordingly of no precedential value.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

F.3d 483, 491 (9th Cir. 2010) ("[I]ssuance of a preliminary injunction based only on the possibility of irreparable harm is inconsistent with the extraordinary nature of the remedy."). In short, "[a] party seeking a preliminary injunction must make 'a clear showing' that it is entitled to such an 'extraordinary and drastic remedy.'" *Carney* v. *Bank of America Corp.*, 481 Fed. App'x 317, 318 (9th Cir. 2012) (quoting *Mazurek* v. *Armstrong*, 520 U.S. 968, 972 (1997)). Mr. Okada has not come close to doing so here.

## III. MR. OKADA HAS NOT DEMONSTRATED ANY LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Governing federal law defeats Mr. Okada's claims on the merits.

Section 14(a) of the Securities Exchange Act of 1934, and SEC Rule 14a-9 promulgated thereunder set the rules for proxy solicitation and prohibit any solicitation containing materially false or misleading information. *See* 15 U.S.C. § 78n(a); 17 CFR § 240.14a-9. An omitted fact is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976). "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not. To be actionable under the securities laws," however, "an omission must be misleading." *Brody* v. *Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Umbriac* v. *Kaiser*, 467 F. Supp. 548, 553 (D. Nev. 1979) ("While full and fair disclosure is required, complete revelation is not.").

#### 1. Statements of belief or opinion are not actionable under the proxy rules when the beliefs are accurately described and honestly held.

The central premise of Mr. Okada's submission is that the Executive Committee's "purported reasons" for recommending removal are false and misleading. (Motion at 1.) Those reasons are disclosed and explained in the proxy statement and are repeatedly expressed in terms of the Executive Committee's beliefs. The proxy statement says that the Executive Committee: "*believes* that Mr. Okada has not been acting in the best interests of the Company"; "*believes* that Mr. Okada's affiliation with the Company poses material risks to the Company and that it is essential from a gaming regulatory standpoint to remove Mr. Okada from the Board"; and "*believes* that Mr. Okada would not be eligible to receive" necessary gaming licenses in

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Pennsylvania and Massachusetts. (Miller Ex. 10 at 8-9 (emphasis added).) These same reasons — again presented as what "[t]he Executive Committee believes" — are highlighted for stockholders in bullet points in a cover letter from Wynn Resorts' Chairman that accompanies the proxy statement. (Miller Ex. 10 at Notice of Special Meeting of Stockholders.)

Mr. Okada cannot state a claim based on a disagreement with what he calls the "purported reasoning behind the Removal Proposal" (Motion at 1) unless he can prove that the Executive Committee *did not actually believe* what it said in the proxy statement. When the challenged statements are "opinions, not statements of fact, they can give rise to a claim under [the securities laws] only if . . . the statements were *both* objectively *and subjectively* false or misleading." *Rubke*, 551 F.3d at 1162 (emphasis added).[5] "All courts to have addressed the issue since *Virginia Bankshares* have concluded that a defendant's stated opinion or belief is not actionable under § 14(a) unless (1) the speaker did not actually hold the opinion, and (2) the opinion was objectively false or misleading." *Paskowitz* v. *Pacific Capital Bancorp*, 2009 WL 4911850, at *8 (C.D. Cal. Nov. 6, 2009); *accord, e.g., In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1264-65 (N.D. Cal. 2000) ("The teaching of *Virginia Bankshares* is that an opinion is only false if the speaker does not in fact hold that opinion.").[6]

*Paskowitz*, a case in which Pacific Capital Bancorp was soliciting stockholder votes in favor of a proposed reverse stock split, provides a clear illustration of this principle. 2009 WL 4911850. The plaintiff brought suit under Section 14(a), claiming that it was false and misleading for the corporation to have said in the proxy statement, "We believe the Reverse

---

[5] In *Virginia Bankshares*, the Supreme Court held that "statements of belief and opinion . . . made with knowledge that the directors did *not* hold the beliefs or opinions expressed" could be actionable under Section 14(a) in certain circumstances. 501 U.S. at 1090 (emphasis added).

[6] Cases standing for this proposition, whether in the context of a claim under Section 14(a) or under another provision of the securities laws, are legion. *See Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 n.4 (2d Cir. 2011) (same standard applies). Indeed, two courts have had occasion to apply the rule in the last two months alone. *See Buttonwood Tree Value Partners, LP* v. *Sweeney*, __ F. Supp. 2d. __, 2012 WL 6644397, at *6 (C.D. Cal. Dec. 10, 2012) ("When a plaintiff challenges opinion statements under the securities law, the plaintiff must allege 'with particularity that the statements were both objectively and subjectively false or misleading.'" (quoting *Rubke*)); *MHC Mut. Conversion Fund, L.P.* v. *United Western Bancorp, Inc.*, __ F. Supp. 2d __, 2012 WL 6645097, at *10 (D. Colo. Dec. 19, 2012) (same).

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Stock Split will . . . enhance the liquidity of the holders of our common stock." *Id.* at *7. In dismissing this claim, the court noted that the relevant disclosure was "more appropriately construed as a statement of belief or opinion of the Board of Directors" and explained:

> Plaintiff challenges this *belief* in much the same way he does with other proxy statements — by *disagreeing* with the proxy's disclosures. Plaintiff simply alleges that Defendants' belief that a reverse stock split will enhance the liquidity of their shareholders is, in *his* view, potentially misleading. The failure to allege any *facts*, let alone provable, particularized facts as required by § 14(a), that Defendants *did not believe* its stated opinion, or that it was otherwise objectively false, is fatal to Plaintiff's . . . claim.

*Id.* at *8 (emphasis in original).

Likewise here, Mr. Okada has not pleaded particularized facts — much less presented evidence — showing that the Executive Committee does not actually believe that Mr. Okada's continued presence on the Board poses a material risk to Wynn Resorts and jeopardizes its pending applications for new gaming licenses in Pennsylvania or Massachusetts. Although Mr. Okada may disagree with the Executive Committee's reasoning process, his mere disagreement with the Executive Committee's honestly held beliefs is not actionable under Section 14(a).

In a line of cases similar to the "opinion or belief" decisions discussed above, the federal courts have rejected proxy claims where the essence of the claim was, as here, an attempt to bootstrap a state-law fiduciary breach claim into a federal claim by alleging the non-disclosure of "facts" that are assertedly relevant to supposed director misconduct. This strand of cases derives from the Supreme Court's decision in *Santa Fe*, which requires federal courts to avoid turning state law issues of corporate conduct into federal disclosure claims. 430 U.S. at 479. As this Court described the doctrine in *Umbriac*, "in effectuating the disclosure policies of the federal securities laws, care must be taken to avoid 'federalizing the substantial portion of the law of corporations.'" 467 F. Supp. at 553 (quoting *Santa Fe*).

Since *Santa Fe*, the federal courts have been careful to prevent a litigant from obtaining relief based on the theory that a supposed fact should have been disclosed, where that fact is relevant "only to support an action for breach of state-law fiduciary duties." *Field* v. *Trump*, 850

F.2d 938, 948 (2d Cir. 1988). Here, Mr. Okada *has already brought* his state law claims in the state court. *Santa Fe* bars him from litigating these same claims in this Court under the guise of disclosure claims. *See, e.g.*, *Lewis* v. *Chrysler Corp.*, 949 F.2d 644, 651 (3rd Cir. 1991) ("While management motives . . . may have been self-serving as alleged, Chrysler's failure to disclose management's entrenchment scheme is not actionable under the federal securities laws."); *Kas* v. *Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty"); *Kademian* v. *Ladish Co.*, 792 F.2d 614, 622 (7th Cir. 1986) ("a plaintiff may not 'bootstrap' a state law claim into a federal case" by alleging that the defendants failed "to reveal . . . their impure motives"); *Biesenbach* v. *Guenther*, 588 F.2d 400, 402 (3d Cir. 1979) (a contrary "approach . . . would clearly circumvent the Supreme Court's holding in *Santa Fe*").

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

These principles were recently applied in *Brown* v. *Brewer*, 2010 WL 2472182, at *23-24 (C.D. Cal. June 17, 2010), a shareholder class action arising from News Corp.'s acquisition of Intermix Media. In that case, the court granted a motion for summary judgment as to Section 14(a) proxy claim that the defendants "fail[ed] to disclose that Viacom" — a potential competing bidder to News Corp. — "was allegedly stonewalled or otherwise prevented from making a bid during the auction" of Intermix. *Id.* at *23. Expressly relying on the D.C. Circuit's discussion of the *Santa Fe* doctrine in *Kas*, the court in *Brown* recognized that such allegations of director misconduct could "not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty." *Id.*

**2. The securities laws do not recognize a claim for nondisclosure of disputed allegations and characterizations.**

Corporations are not obliged to accept an adversary's disputed version of events and disseminate that story to their stockholders. *See, e.g.*, *Kademian*, 792 F.2d at 622 ("The defendants' failure to describe, in terms as dramatic as those chosen by the plaintiffs . . . does not state a claim under the securities laws."); *Kahn* v. *Wien*, 842 F. Supp. 667, 678 (E.D.N.Y. 1994) ("A proxy statement need not negatively characterize all the facts that are disclosed or

expressly verbalize all adverse inferences from those facts."), *aff'd*, 41 F.3d 1501 (2d Cir. 1994). When "a genuine and vigorous dispute exists as to whether the material which the plaintiff alleges is required to be disclosed is actually a fact," a company need only disclose "the possibility of the alleged fact, and the conflicting positions taken by the parties." *Avnet, Inc.* v. *Scope Indus.*, 499 F. Supp. 1121, 1125 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1057 (2d Cir. 1981) (summary order).

Consistent with the *Avnet* decision, courts have consistently held that when a dispute exists, the securities laws require only that the disputed issues and possible outcomes be disclosed. *See, e.g.*, *Quinn* v. *Anvil Corp.*, 620 F.3d 1005, 1011-12 (9th Cir. 2010) (in proxy case, affirming denial of preliminary injunction predicated on nondisclosure of allegations in plaintiff's complaint); *Sea Containers Ltd.* v. *Stena AB*, 890 F.2d 1205, 1210 (D.C. Cir. 1989) ("it would hardly seem proper for the district court to order Sea Containers to disclose what it denies"); *Taro Pharm. Indus., Ltd.* v. *Sun Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010) (securities laws "not designed to force" parties to "admit the . . . underlying allegations" of their adversaries). "[D]isclosure of the dispute is sufficient," regardless of whether it is a "dispute as to facts or an alleged legal violation." *Bally Total Fitness Holding Corp.* v. *Liberation Inv., L.P.*, 2005 WL 3525679, at *1 (D. Del. Dec. 22, 2005) (denying preliminary injunction on Section 14(a) claim); *accord, e.g.*, *Ranger Oil Ltd.* v. *Petrobank Energy & Resources Ltd.*, 2000 WL 33115906, at *12 (S.D.N.Y. May 23, 2000) (denying preliminary injunction and stating: "[W]hen a genuine and vigorous dispute exists as to whether the material which the plaintiff alleges is required to be disclosed is actually a fact, the law requires only that the disputed facts and the possible outcomes be disclosed.").[7]

The Ninth Circuit's decision in *Quinn* demonstrates this principle. In that case, Anvil proposed an amendment to its articles that would have eliminated the stock ownership and legal claims of Quinn, a former employee who had initiated a series of lawsuits against Anvil. *Quinn*,

---

[7] *See also, e.g.*, *Vestcom Int'l, Inc.* v. *Chopra*, 114 F. Supp. 2d 292, 300 (D.N.J. 2000); *Bally Gaming Int'l, Inc.* v. *Alliance Gaming Corp.*, 1995 WL 579643, at *5-6 (D. Del. Sept. 29, 1995); *Weeden* v. *Cont'l Health Affiliates, Inc.*, 713 F. Supp. 396, 399 (N.D. Ga. 1989); *West Point-Pepperell, Inc.* v. *Farley, Inc.*, 711 F. Supp. 1088, 1094 (N.D. Ga. 1988); *Mgmt. Assistance, Inc.* v. *Edelman*, 584 F. Supp. 1021, 1031-32 (S.D.N.Y. 1984); *Condec Corp.* v. *Farley*, 573 F. Supp. 1382, 1386-87 (S.D.N.Y. 1983).

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

620 F.3d at 1008-09. The Anvil board disseminated proxy materials explaining the effect of the proposed amendment, and Quinn moved to enjoin the vote on the amendment, contending that the proxy materials omitted supposedly material facts — including Quinn's allegations of undervaluation of the stock in his pending lawsuit. *Id.* at 1011. The court rejected those arguments on two grounds: First, "the greater specificity concerning Quinn's allegations and the nature of his lawsuit that Quinn suggests was required was not necessary." *Id.* Second, "Quinn has not established that there is a substantial likelihood that this information would have been important to shareholders in deciding how to vote on the Amendment." *Id.*

*Brown* v. *Brewer* is also on point. As noted above, the plaintiff in that case alleged that the defendant directors of Intermix violated Section 14(a) by failing to disclose in the proxy statement that they had favored News Corp. over a competing bidder in a sale of Intermix. The court reasoned that because "there is no duty of self-accusation, these proffered material omissions cannot support a Section 14(a) claim." 2010 WL 2472182, at *24. It explained that the "allegedly omitted details are not necessarily *facts*, but rather factual *allegations*," and concluded that "unless and until judgment is granted in Plaintiff's favor, their omission from the Proxy simply could not have been material." *Id.* (emphasis in original).

**3. Disclosure of an adversary's contentions moots proxy claims where the facts are in dispute.**

If there was any doubt about the insufficiency of Mr. Okada's claims under these tests, it is put to rest by the case law holding that where a company has disclosed its adversary's allegations and theories — as Wynn Resorts has done here (Pisanelli Ex. 3) — it has indisputably discharged its disclosure obligations and mooted any claims of nondisclosure. "[T]he courts that have considered this issue have generally held that annexing a copy of a complaint to an amended filing is sufficient to satisfy [securities law] requirements and moot any [securities law] claim." *Taro Pharm.*, 2010 WL 2835548, at *10 (dismissing proxy claims related to a tender offer); *see also, e.g.*, *Ranger Oil*, 2000 WL 33115906, at *11 ("[A]ny deficiency in [defendant's] disclosure has been ameliorated by [its filing] of the entire amended complaint");

*Weeden*, 713 F. Supp. at 400 (disclosure duty "fully satisfied" by filing attaching complaint); *Lewis* v. *Potlatch Corp.*, 716 F. Supp. 807, 810 (S.D.N.Y. 1989) (dismissing Section 14(a) claim).

There is no requirement, however, that companies take the further step of admitting allegations that are genuinely believed to be false. As the *Taro Pharmaceuticals* court reasoned, a company should not be "placed in a position of being forced to either admit liability which it disputes, or violate the securities law by failing to disclose the alleged, disputed violation." 2010 WL 2835548, at *16; *accord Sea Containers*, 890 F.2d at 1210; *Vestcom*, 114 F. Supp. 2d at 300 ("Plaintiff cannot avoid the mootness problem by claiming that defendants' filing remains false until they admit their prior, alleged wrongdoing."); *Edelman*, 584 F. Supp. at 1032 ("An admission of guilt as to a disputed fact is not required by the proxy rules."). In short, a defendant has no duty of "self-flagellation" — whether by endorsing "conclusory accusations" or by "characterize[ing] its behavior in a pejorative manner in its public disclosures." *Solow* v. *Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (citing *Mo. Portland Cement* v. *Cargill*, 498 F.2d 851, 873 (2d Cir. 1974)), *aff'd*, 2013 WL 149902 (2d Cir. Jan. 15, 2013)).

**4. Companies need not reiterate matters of public knowledge that are already part of the "total mix" of available information.**

When the information allegedly omitted from a proxy statement is already known to the market, no securities law violation can arise. "Companies are under no obligation to disclose information already in the public domain." *Szymborski* v. *Ormat Tech., Inc.*, 776 F. Supp. 2d 1191, 1199-1200 (D. Nev. 2011); *see, e.g.*, *Berry* v. *Valence Tech., Inc.*, 175 F.3d 699, 703 n.4 (9th Cir. 1999) ("A reasonable investor is presumed to have information available in the public domain . . . .") (quoting *Whirlpool Fin. Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995)); *In re Textainer P'ship Sec. Litig.*, 2005 WL 3801596, at *6 (N.D. Cal 2005) ("the securities laws do not require disclosure of information that is readily available in the public domain."). "[T]he 'total mix' of information," which is the context in which the materiality of an alleged omission must be assessed, "normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Paskowitz*, 2009 WL 4911850, at *6 (citing *TSC Indus.*, 426 U.S. at 400). SEC

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

filings, analyst reports, news articles, and general knowledge all contribute to the "total mix." *See, e.g.*, *Heliotrope Gen., Inc.* v. *Ford Motor Co.*, 189 F.3d 971, 976 (9th Cir. 1999); *Wozniak* v. *Align Tech., Inc.*, 2011 WL 2269418, at *7 n.5 (N.D. Cal. June 8, 2011). Here, as noted below, certain information Mr. Okada alleges should have been included in the proxy statement was already known to the market and thus cannot provide a basis for any injunction.

**B. <u>None of Mr. Okada's disclosure claims has any merit</u>.**

**1. The Freeh Report.**

In February 2012, Wynn Resorts attached the Freeh Report as an exhibit to a public filing with the SEC. (Pisanelli Ex. 2.) The proxy statement informs stockholders where they can find the report (Miller Ex. 10 at 3), and Wynn Resorts included a link to the report in a subsequent solicitation letter to stockholders (Pisanelli Ex. 4). The Freeh Report's contents are thus indisputably part of the total mix of available information — and that has been true for a year.

At no point in the twelve months that have passed since the Freeh Report was made public has Mr. Okada come forward with even a shred of evidence that might contradict the report's findings. Time and again, Mr. Okada has told the state and federal courts that he intends, someday, to prove that Mr. Freeh got the facts wrong. But so far, that day hasn't come. There is certainly no exculpatory evidence to be found anywhere in Mr. Okada's motion papers. In fact, as ISS observed in recommending that its institutional clients support the removal proposal, even Mr. Okada's pleading in this Court "does not explicitly deny the prima facie charges of the Freeh Report." (Miller Ex. 11 at 5.)

Unable to dispute Mr. Freeh's findings, Mr. Okada attacks his integrity. The proxy statement is false, Mr. Okada contends, because it refers to Mr. Freeh's investigation as having been "independent." Mr. Okada bases the claim of falsity on a statement in the Freeh Report that the investigation was conducted "under the sole direction" of the Compliance Committee — a committee that is chaired by former Nevada Governor Miller — and the fact that two-thirds of the committee's members are members of Company management. (Motion at 9.) But the fact that Mr. Freeh was retained by the Compliance Committee is disclosed in the proxy statement (Miller Ex. 10 at 3), the composition of the Committee was disclosed in the Company's annual

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

meeting proxy statement (Pisanelli Ex. 5 at 21), and Mr. Okada's allegations about Mr. Freeh's supposed lack of independence have now been shared with the stockholders in Wynn Resorts' own solicitation materials (Pisanelli Ex. 3). No further disclosure is required. In particular, the Company is not obliged to accept the (false) inference that Mr. Freeh did not conduct his investigation in an unbiased fashion, since it believes Mr. Freeh's record and reputation, along with the way he conducted his investigation, demonstrates he acted without bias.

Mr. Okada next challenges the statement in the proxy that "although he denied the allegations against him, Mr. Okada failed, during the interview [with Mr. Freeh] or subsequently, to offer evidence to contradict the findings in the Freeh Report." (Miller Ex. 10 at 5.) This is a true statement, and Mr. Okada does not contend otherwise. Neither at his February 15, 2012 interview in Tokyo, nor at any time since, has Mr. Okada presented any exculpatory evidence. (Miller Decl. ¶¶ 24-25.) All he has offered are conclusory denials of involvement in any wrongdoing — denials that Mr. Freeh found not credible in light of the evidence. (Miller Ex. 1 at 46.) Once again, shareholders are free to read Mr. Freeh's record of what Mr. Okada said and decide for themselves if his statements and "evidence" contradict Mr. Freeh's conclusions.

Mr. Okada's claims that this disclosure is nevertheless misleading because it "gives the false impression" that Mr. Okada had an opportunity to present exculpatory evidence before Mr. Freeh presented his findings to the Board. (Motion at 10.) Mr. Okada does not and cannot explain, however, why a supposed lack of opportunity to present exculpatory evidence in February 2012 would be a material fact for the stockholders given that Mr. Okada has now had a *full year* to come forward with such evidence but has failed to do so.[8] In any event, Mr. Okada's claim that he was not given a fair opportunity to rebut Mr. Freeh's claims before the Board acted is belied by the record. Mr. Okada was aware of Mr. Freeh's investigation from its inception, and he agreed, both orally and in writing, to cooperate with that investigation. (Miller Decl.

---

[8] Wynn Resorts has denied in a state court pleading Mr. Okada's allegation that Mr. Okada was told that the Board would not consider the Freeh Report if Mr. Okada would agree to sell his shares to Mr. Wynn at a discount. (Motion at 10.) The Company has disclosed to its stockholders the fact that Mr. Okada is making this allegation, and no further disclosure by is required. *See Avnet*, 499 F. Supp. at 1125; *Bally Total Fitness*, 2005 WL 3525679, at *1.

¶¶ 18-19.) Mr. Freeh conducted a full-day interview of Mr. Okada in Toyko, at which Mr. Okada was represented by counsel, including a former United States Attorney. (Miller Decl. ¶ 24.)

**2. The Code of Conduct and mandatory FCPA training.**

The Proxy Statement accurately reports that "Mr. Okada is the only director of the Company who has not signed the Company's Code of Conduct, despite repeated requests by the Company, and not participated in mandatory Foreign Corrupt Practices Act training for directors for the past two years." (Miller Ex. 10 at 4.) Mr. Okada does not deny that these are true statements. Instead, he presents a series of purported excuses for his failure to sign the code or attending the training, and argues that the excuses should be disclosed. (Motion at 10-12.)

The securities laws, however, do not require Wynn Resorts to present its stockholders with a lengthy recitation of Mr. Okada's excuses followed by a point-by-point rebuttal demonstrating their invalidity. *See Edelman*, 584 F. Supp. at 1031-32. Were the Company to engage in such an exercise, it would point out the absurdity of Mr. Okada's contention that he could not attend FCPA training on October 31, 2011 because he was supposedly "obligated to be overseas and it was not feasible for him to attend" (Motion at 11), a statement that is directly belied by the fact that Mr. Okada confirmed his availability on that date and personally attended a Board meeting *in Las Vegas* the very next day (Miller Decl. ¶¶ 16, 18). But there is no need to bog down on these matters. Wynn Resorts has attached Mr. Okada's complaint to its own solicitation materials, and its stockholders have thus been apprised of Mr. Okada's stated reasons for withholding his signature and skipping mandatory compliance training and may consider those reasons in deciding how to votes their shares at the special meeting. *Taro Pharm.*, 2010 WL 2835548, at *10 ("annexing a copy of a complaint to an amended filing is sufficient").

Equally, Mr. Okada's claim that he is a "strong believer in conducting business ethically" and "repeatedly made [that] clear to Company representatives" (Motion at 11) is unpersuasive. Mr. Okada said *at a Board meeting* that, in his view, making gifts to government officials is a recognized and accepted way of doing business in parts of Asia, and that it is simply a matter of using third parties. (Miller Decl. ¶ 13.) While Mr. Okada's complaint alleges that "Mr. Okada never made the statements attributed to him . . . at the February 2011 Board meeting" (Pisanelli

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Ex. 3 at ¶ 58), Mr. Okada's sworn declaration contains no such denial. Nor would a denial be credible in any event: as the Freeh Report makes clear, at least six of the directors present at that Board meeting recalled Mr. Okada making these disturbing remarks. (Miller Ex. 1 at 11.)

**3. The imperative need to remove Mr. Okada from the Board.**

The proxy statement describes the Board's strategic plan to expand the Company's business into Pennsylvania and Massachusetts and explains that Mr. Okada's status as a director would doom the Company's pending applications for gaming licenses in those jurisdictions. The Executive Committee's reasons for seeking to remove Mr. Okada *now* are set forth in detail in Governor Miller's declaration. As Governor Miller explains, the Company learned for the first time on December 7, 2012 that the Pennsylvania Gaming Control Board would require that Mr. Okada apply for individual licensure in connection with Wynn Resorts' pending application. (Miller Decl. ¶ 36.) With that development, the Company promptly decided to seek Mr. Okada's removal. (Miller Decl. ¶¶ 37-38.)

These facts are fairly summarized in the proxy statement: "the Company cannot support and advance applications for gaming licenses on behalf of Mr. Okada, and believes that Mr. Okada would not be eligible to receive such licenses"; "Without the receipt of such licenses . . . the Company will not be able to pursue its planned expansion into Pennsylvania and Massachusetts"; "Accordingly, the Special Meeting has been called for the purpose of removing Mr. Okada from the Board." (Miller Ex. 10 at 9.) These disclosures demonstrates the falsity of Mr. Okada's contention that the "Proxy fails to disclose why it is now supposedly urgent to remove [him] from the Board given that it has not been urgent since early 2012." (Motion at 12.)

Notably absent from Mr. Okada's submission is any claim or evidence that he *could* be licensed in Pennsylvania or Massachusetts. The fact that Mr. Okada was licensed in another state (Nevada) eight years ago (*see* Motion at 13) lends no support to such a contention. That licensing decision was made long before Mr. Okada engaged in the misconduct described in the Freeh Report and is therefore not remotely germane to the question of Mr. Okada's eligibility for

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

a license today.[9] Indeed, as discussed in Governor Miller's declaration (at ¶¶ 33-34), news organizations like Reuters and The Asahi Shimbum in Japan have reported on ongoing investigations by the Nevada Gaming Control Board, the FBI, and other United States and international authorities into allegations that affiliates of Universal arranged to pay $40 million to a former PAGCOR consultant in the Philippines with close ties to the government officials with direct oversight for Mr. Okada's development project in that country. (*See* Miller Decl. ¶¶ 33-34 & Exs. 4-6.) As Reuters has reported, the Nevada Gaming Control Board's investigation, in particular, could "jeopardize [Mr. Okada's] gaming license in Las Vegas." (Miller Ex. 5.)

In sum, Mr. Okada has not supplied any evidence that, contrary to the sworn testimony presented by Wynn Resorts, the Company does "not believe its stated opinion" that Mr. Okada's status as a director will prevent licensure in Pennsylvania and Massachusetts, or that that opinion is "objectively false." *See Paskowitz*, 2009 WL 4911850, at *8 (granting motion to dismiss Section 14(a) claim for failure to allege "provable, particularized facts" that the defendants' stated beliefs were not honestly held).

Nor can Mr. Okada succeed on a proxy claim against Wynn Resorts by faulting it for failing to "remind shareholders" about certain events that occurred in the past year and were disclosed in prior SEC filings. (Motion at 12-13, 15.) By definition, something you "remind" someone about is something they already know, and this failure-to-remind theory is not recognized in federal securities law. Wynn Resorts needn't "remind" its stockholders that it has not previously asked them to remove Mr. Okada from the Board in the period since he was found to be unsuitable (including at the 2012 annual meeting) — that is obvious from the fact that he remains on the Board and the stockholders are being asked to remove him *now*. Similarly, there is no need for Wynn Resorts to remind stockholders that Mr. Okada was re-nominated to the Board in April 2011 — had he not been, there would be no need to hold a special meeting.[10] But

---

9 In any event, the fact that Mr. Okada, Aruze, and Universal were licensed in Nevada in 2005 is part of the total mix of public information. (*See* Pisanelli Ex. 6 at 4.)

10 In addition to being obvious, the fact that Mr. Okada was re-nominated to the Board in April 2011 and the fact that Wynn Resorts did not seek to remove him at the 2012 annual

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

even if such reminders were somehow warranted, Wynn Resorts provided them when it filed Mr. Okada's complaint in this action with the SEC. *See Taro Pharm.*, 2010 WL 2835548, at *10; *Lewis*, 716 F. Supp. at 810.

**4. Compliance concerns related to Mr. Okada's Philippine project.**

The proxy statement describes in detail how, beginning in July 2010, Wynn Resorts' management and the Compliance Committee developed concerns about Mr. Okada's business activities in the Philippines and the potential effect that Mr. Okada's actions there could have on the Company. (Miller Ex. 10 at 4.) As disclosed therein, prior to retaining Mr. Freeh in October 2011, Wynn Resorts received three reports (two from third parties) regarding the risks of participating in the gaming industry in the Philippines. (*Id.*) The independent investigative reports also uncovered evidence of potentially significant wrongdoing by Mr. Okada in connection with his Philippine development project. (*Id.*; *see also* Miller Decl. ¶¶ 10-11, 14-15.)

Mr. Okada contends that the proxy statement's description of these events is misleading because it does not remind stockholders of earlier public statements and SEC filings in which the Company's representatives and affiliates acknowledged Mr. Okada's plan to enter the Philippine market. (Motion at 14-15.) But nowhere in the proxy statement does Wynn Resorts deny that it was aware of Mr. Okada's plans in 2008. The Company does not "remind" stockholders that it knew of Mr. Okada's plans at that time because that fact is not material (and because there is no "duty to remind"). The material facts, which are discussed in the proxy statement, are the facts showing Wynn Resorts' increasing concerns about Mr. Okada's activities in the Philippines — concerns that did not emerge until mid-2010. (Miller Decl. ¶¶ 9-10.)

Wynn Resorts was under no obligation to supply its stockholders with the immaterial information identified by Mr. Okada. *See Quinn*, 620 F.3d at 1011; *West Point-Pepperell*, 711 F. Supp. at 1094. Nor was it required to tell Mr. Okada's biased and misleading version of the

---

meeting are clear from public SEC filings — the existence of which the Company's stockholders received notice by mail with instructions on how to access the filings online — and are thus part of the total mix of available information. (*See* Pisanelli Ex. 6 at 4 & Ex. 7.) Similarly, the fact that Wynn Resorts filed a preliminary proxy statement in March 2012 but ultimately chose not to call a special meeting to remove Mr. Okada at that time is clear from the very existence of that SEC filing (Pisanelli Ex. 7), as well news reports that appeared at the time (*e.g.*, Pisanelli Ex. 8).

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Philippine story in communicating with its stockholders. *See Kahn*, 842 F. Supp. at 678; *Brown*, 2010 WL 2472182, at *24 ("the allegedly omitted details are not necessarily *facts*, but rather factual *allegations*, and unless and until judgment is granted in Plaintiff's favor, their omission from the Proxy simply could not have been material") (emphasis in original). Mr. Okada could have filed his own proxy materials to tell whatever story he wanted about these events, but chose not to. In any case, the Company has now publicly filed Mr. Okada's complaint with the SEC, which moots any possible claim that stockholders have been deprived of his views on these issues. *See Taro Pharm.*, 2010 WL 2835548, at *10.[11]

**5. Mr. Okada's spurious and irrelevant Cotai allegations.**

Mr. Okada's final theory of non-disclosure relates to Wynn Resorts' efforts to obtain a land concession for a new casino-resort in the Cotai region of Macau. (Motion at 16-18.) The Cotai project is an important strategic initiative for the Company, and over the years, Wynn Resorts' SEC filings have consistently apprised the stockholders of the Company's progress toward the receipt of a land concession and other necessary approvals from the Macau government. Wynn Resorts has provided the Court with examples of such SEC filings as exhibits to Governor Miller's declaration. (*See* Miller Decl. ¶¶ 45-48 & Exs. 12-16.)

The Cotai project, however, has absolutely nothing to do with the issues the stockholders will be deciding at the special meeting, and Wynn Resorts has therefore not referenced the Cotai project in discussing the background of the removal proposal or the Executive Committee's reasons for recommending that Mr. Okada be removed. *See* 17 C.F.R. § 240.14a-9 (omitted facts are only material if they are "necessary in order to make the statements" that *are* contained in the proxy "not false or misleading"). Apart from attending Board meetings at which Cotai was discussed, Mr. Okada has had absolutely no involvement in the Cotai project. Cotai is not

---

[11] As noted above, Mr. Okada contends that Wynn Resorts should also have reminded stockholders that it re-nominated him for election to the Board at a time when the Company was beginning to develop concerns about his actions in the Philippines. (Motion at 15.) But the Company was not obliged to accept and disclose the inference that Mr. Okada contends should be drawn from the timing of the nomination, an inference it rejects. By disclosing Mr. Okada's complaint (Pisanelli Ex. 3), Wynn Resorts discharged whatever disclosure obligation it had in this regard. *Taro Pharm.*, 2010 WL 2835548, at *10; *Ranger Oil*, 2000 WL 33115906, at *11.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

mentioned anywhere in the Freeh Report, or in any of the recent reports concerning additional potential wrongdoing by Mr. Okada. In short, there is *no* possibility, much less a "substantial likelihood," that a "reasonable [Wynn Resorts] shareholder would consider" a discussion about Cotai "important in deciding how to vote." *TSC Indus.*, 426 U.S. at 449.

The Cotai allegations are a classic instance of a proxy litigant alleging that a proxy statement is incomplete because it fails to disclose a supposed wrong committed by the directors. This is the kind of claim that the case law has consistently rejected, since the substance of the unadjudicated claim of wrongdoing cannot be a non-disclosure. This is true because the allegations are not "facts" but "factual allegations," *see Brown*, 2010 WL 2472182, at *24, and because any other rule of law would permit a litigant to bootstrap a state tort claim into a federal disclosure claim by alleging its omission, *see Santa Fe*, 430 U.S. at 479. (*See supra*, pages 15-18.)

Mr. Okada's Cotai claim, moreover, must be seen for what it is — a desperate attempt to create smoke after he has utterly failed to gain traction with his other claims. For more than a year, he has pressed state court claims based on the theory that he is being persecuted by the Board for supposedly objecting to the Macau charitable pledge. After bringing a books-and-records claim and litigating a preliminary injunction in state court, this claim led nowhere. Now he is taking a different tack and focusing on the Cotai land transaction, hoping that it will be given credence in the context of a preliminary injunction motion made on an abbreviated record. But even on this abbreviated record, it is clear that Mr. Okada has not shown that there is anything improper about the Cotai matter. Nor has Mr. Okada made such a showing with respect to the Macau pledge.

Although the law is clear that Wynn Resorts need not disprove Mr. Okada's outrageous allegations to defeat the Motion, the Company has nevertheless submitted testimony from Governor Miller that directly rebuts Mr. Okada's claims that the Macau pledge and the $50 million payment to a Macau company — transactions that were vetted at the Board level, reviewed by counsel for compliance with the FCPA, and promptly disclosed to *stockholders* — were bribes. (Miller Decl. ¶ 46 & Ex. 17 at 1.) Wynn Resorts can also report to the Court that the Nevada Gaming Control Board recently advised the Company that it was closing its

investigation of the Macau pledge based on a determination that Mr. Okada's allegations were unfounded. (Miller Decl. ¶ 49; Pisanelli Ex. 9.) Although it is not necessary for this Court to adjudicate these issues in the context of a proxy claim, Wynn Resorts is confident that any court that eventually does adjudicate the issues will conclude its conduct was appropriate and legal.[12]

Mr. Okada's accusations about the Cotai project and the Macau pledge are designed only to distract from his inability to rebut the overwhelming evidence of his own wrongdoing described in the Freeh Report. The accusations are baseless, and Wynn Resorts categorically denies them. By disclosing Mr. Okada's complaint in this action, and bringing his unfounded allegations to the attention of the Company's stockholders, Wynn Resorts has discharged its obligations under the securities laws. *Taro Pharm.*, 2010 WL 2835548, at *10; *Ranger Oil*, 2000 WL 33115906, at *11. There is no requirement that Wynn Resorts disclose Mr. Okada's allegations about Cotai and the Macau pledge as if they were true, *see Sea Containers*, 890 F.2d at 1210; *Solow*, 2012 WL 1813277, at *4 — and they most certainly are not.

**IV. THE EQUITIES WEIGH AGAINST AN INJUNCTION.**

**A. <u>There is no irreparable harm</u>.**

This Court has recognized that "[t]o satisfy the irreparable harm requirement, the movant must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Gladwill* v. *Ruby Pipeline, LLC*, 2013 WL 144268, at *8 (D. Nev. Jan. 10, 2013) (quotation omitted). But Mr. Okada will suffer *no* actual harm if he is removed from the Board. Because he has been determined to be an "Unsuitable Person," Mr. Okada is not eligible to serve on the Executive Committee that is managing the business and affairs of the Company. Mr. Okada has been quarantined in this way

12 Mr. Okada also falsely asserts that Wynn Resorts defied a state court order to provide information to Mr. Okada about how his capital contributions to the Company's predecessor entity were spent more than a decade ago. (Motion at 17.) Mr. Okada's lack of candor on this matter is stunning. His papers fail to advise this Court that Mr. Okada recently moved to compel the production of additional documents in a state court books-and-records litigation and the court *ruled in Wynn Resorts' favor*. (Pisanelli Ex. 10.) The Company has complied with all of the state court's orders, as the state court itself has recognized (Pisanelli Ex. 11 at 18), and there are no outstanding motions or other pending requests.

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

since February 2012. Indeed, Mr. Okada has acknowledged in deposition testimony that in light of his pending state court litigation with Wynn Resorts, he is "not providing any services as a director of Wynn Resorts" at this time (Pisanelli Ex. 1 at 47) or seeking to "promote or develop the business further" (*id.* at 52). This will not change if the Motion is granted.

Nor can Mr. Okada claim any equity in Wynn Resorts that will be indirectly affected if he is removed from the Board. All of the shares owned by Mr. Okada's company (Aruze) were redeemed by the Board in February 2012, and as a consequence, Mr. Okada has *no* direct or indirect equity investment in the Company. Mr. Okada (through Aruze) is simply a debtholder with a right to receive a fixed payment upon the maturity of his promissory note.

Moreover, Mr. Okada could have prevented whatever harm he might now claim to face by engaging in self-help. Mr. Okada could have told his story to the Company's stockholders directly by attempting to conduct a counter-solicitation in opposition to the removal proposal. Having failed to avail himself of this non-judicial remedy — which was indisputably available to Mr. Okada, and which he unquestionably had the financial capability to pursue — Mr. Okada lacks equity in applying to this Court for the extraordinary relief of a preliminary injunction.

Finally, Mr. Okada's "[l]ack of diligence" demonstrates that there is no irreparable harm and should "preclude the granting of preliminary injunctive relief." *Majorica, S.A.* v. *R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985). While Mr. Okada knew the substance of the Company's disclosures regarding the removal in mid-December, he waited 45 days after the preliminary proxy was filed before asking this Court to intervene. This unexcused delay sharply undercuts any claim of threatened irreparable harm and further warrants denial of the Motion. *See, e.g.*, *Gold Fields Ltd.* v. *Harmony Gold Mining Co.*, 2004 WL 2710030, at *5 (S.D.N.Y. Nov. 23, 2004) (denying injunction where plaintiff waited two weeks before challenging prospectus); *Plessey Co.* v. *Gen. Elec. Co. PLC*, 628 F. Supp. 477, 500 (D. Del. 1986) (three-week delay; "Plessey's contention of urgency at this late date seems somewhat disingenuous when one considers the substantial time period it had available to it in which to file this motion.").

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

**B. The balance of the equities weighs against an injunction.**

As discussed above, the Company has pending applications for new gaming licenses in Pennsylvania and Massachusetts that are essential to Wynn Resorts' planned expansion strategy, and thus the Company faces a substantial risk of significant financial injury if an injunction is granted and Mr. Okada remains on its Board. It is the view of the Executive Committee that those licenses cannot and will not be approved if Mr. Okada remains a member of the Board — indeed, that is the very reason why the Executive Committee has called the special meeting to remove Mr. Okada as a director. (*See* Miller Decl. ¶¶ 37-38, 54.)

Mr. Okada, by contrast, has no practical interest in retaining his directorship. He has no role in managing the Company, and no equity stake. Accordingly, the balance of harms tilts strongly in favor of Wynn Resorts and provides an additional ground for denying the Motion.

**CONCLUSION**

For all of the foregoing reasons, Wynn Resorts respectfully requests that the Court deny plaintiff's motion for a preliminary injunction.

DATED this 6th day of February, 2013.

PISANELLI BICE PLLC

By: [signature]
James J. Pisanelli, Esq., Bar No. 4027
Todd L. Bice, Esq., Bar No. 4534
Debra L. Spinelli, Esq., Bar No. 9695
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169

Paul K. Rowe, Esq. *(pro hac vice forthcoming)*
Bradley R. Wilson, Esq. *(pro hac vice forthcoming)*
S. Christopher Szczerban, Esq. *(pro hac vice forthcoming)*
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019

Robert L. Shapiro, Esq. *(pro hac vice forthcoming)*
GLASER WEIL FINK JACOBS HOWARD AVCHEN & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067

Attorneys for Wynn Resorts, Limited

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169