James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
PISANELLI BICE PLLC
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169
Telephone: 702.214.2100
Facsimile: 702.214.2101

Paul K. Rowe, Esq. *(pro hac vice forthcoming)*
pkrowe@wlrk.com
Bradley R. Wilson, Esq. *(pro hac vice forthcoming)*
brwilson@wlrk.com
S. Christopher Szczerban, Esq. *(pro hac vice forthcoming)*
scszczerban@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: 212.403.1000

Robert L. Shapiro, Esq. *(pro hac vice forthcoming)*
RS@glaserweil.com
GLASER WEIL FINK JACOBS HOWARD
AVCHEN & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: 310.553.3000

Attorneys for Wynn Resorts, Limited

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KAZUO OKADA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>WYNN RESORTS, LIMITED, a Nevada corporation,<br><br>Defendant. | Case No. 2:13-cv-00136-JCM-PAL<br><br>**DECLARATION OF ROBERT J. MILLER IN SUPPORT OF WYNN RESORTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

ROBERT J. MILLER, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am a resident of Clark County, Nevada and a director of Wynn Resorts, Limited ("Wynn Resorts" or "the Company"), Chairman of the Compliance Committee of Wynn Resorts, and Chairman of the Nominating and Corporate Governance Committee of the board. I also serve as presiding director for executive sessions of the independent members of the Wynn Resorts board. From 1989 to 1999, I served as Governor of the State of Nevada.

2. I make this declaration in opposition to the motion by Kazuo Okada for a preliminary injunction. I have personal knowledge of the facts set forth herein unless otherwise so stated and could, if called to testify as a witness, testify competently to them.

3. I have reviewed the definitive proxy statement filed by Wynn Resorts and believe it to be complete and accurate in all material respects.

### The Wynn Resorts board

4. Wynn Resorts has a nine-member board of directors. Excluding Kazuo Okada, seven of Wynn Resorts' eight directors have no employment relationship with the Company (myself, John J. Hagenbuch, Ray R. Irani, J. Edward Virtue, Alvin V. Shoemaker, D. Boone Wayson, and Elaine P. Wynn). Stephen A. Wynn, Chairman and Chief Executive Officer of Wynn Resorts, is the only member of Wynn Resorts' management on the board. This has been the composition of the board since December 13, 2012. A majority of the board has been composed of directors with no employment relationship with the Company at all relevant times.

5. Since February 18, 2012, the business and affairs of the Company have been managed by the Executive Committee of the board, which consists of all board members other than Mr. Okada.

### The Compliance Committee

6. In 2002, the Company adopted a "Compliance Program," which has been periodically reviewed and amended. The Compliance Program states that it is designed to mitigate the "dangers of unsuitable associations and compliance with regulatory requirements." It describes the duties of the Compliance Committee and provides that the Committee has an affirmative obligation to investigate all senior executives, directors, and key employees "in order

to protect the Company from becoming associated with an Unsuitable Person." Under the program, the term "Unsuitable Person" refers to anyone "that the Company determines is unqualified as a business associate of the Company or its Affiliates based on, without limitation, that Person's antecedents, associations, financial practices, financial condition, or business probity."

7. The Compliance Program also requires the Company to report to Nevada gaming authorities to keep them "advised of the Company's compliance efforts in Nevada and other jurisdictions." Specifically, the Company has an obligation to self-report — that is, to inform the gaming regulators of significant compliance-related issues.

<u>History of compliance concerns related to Mr. Okada</u>

8. At all times relevant to this litigation, Mr. Okada has been a member of the Wynn Resorts board of directors. It is my understanding that Mr. Okada is the Chairman and majority owner of Universal Entertainment Corporation ("Universal"), a Japanese corporation. Mr. Okada also indirectly controls Aruze USA, Inc. ("Aruze"), a Nevada corporation that is wholly owned by Universal. Until February 18, 2012, Aruze was a 19.66% shareholder in Wynn Resorts.

9. As Chairman of the Compliance Committee, I have reviewed certain investigative reports, and from these, I have learned the following facts. Mr. Okada began developing a large casino resort in the Philippines some time in 2007 or 2008. Wynn Resorts was not a partner or participant in the project, and Mr. Okada attempted to persuade Wynn Resorts to participate in the project in some way.

10. In the summer of 2010, a senior executive of Wynn Resorts prepared a report on the business climate in the Philippines that caused the Compliance Committee to become increasingly concerned about Mr. Okada's business involvement in that country. Thereafter, in early 2011, management retained an independent third-party firm to do preliminary investigative work concerning the Philippines and Mr. Okada's activities there.

11. The Wynn Resorts board discussed the results of that preliminary investigation at a board meeting on February 24, 2011. Mr. Okada was present at the meeting. At that time, Mr. Wynn advised the board that Mr. Okada had arranged a meeting for him with Philippine

President Aquino. Based on the information the board had received about endemic corruption in the Philippines, the independent directors unanimously advised management that any involvement in the Philippines was inadvisable, and the board strongly recommended that Mr. Wynn cancel the meeting with President Aquino. Management agreed with the board's recommendation. At this board meeting, Mr. Okada was clearly made aware that the board was greatly concerned about any direct or indirect Wynn Resorts involvement in the Philippines.

12. Also at the February 24, 2011 board meeting, Kim Sinatra, Wynn Resorts' General Counsel, updated the board on Foreign Corrupt Practices Act ("FCPA") matters, particularly with respect to Wynn Resorts' program of director compliance and education. Such updates were and are part of the Compliance Committee's efforts, as part of the overall Compliance Program, to insure that Wynn Resorts does not risk compliance problems that could affect its present and future licensing status, which in turn is critical to the Company's business and its prospects for the future.

13. In the course of this meeting, Mr. Okada made the surprising and disturbing comment that, in his view, making gifts to government officials was a recognized and accepted way of doing business in parts of Asia, and that it was all a question of using third parties. Needless to say, this comment raised concerns for me and others about Mr. Okada's ability and willingness to comply with Wynn Resorts' compliance policies and with anti-corruption statutes such as the FCPA.

14. The Wynn Resorts board again discussed Mr. Okada's business activities in the Philippines at a board meeting held on July 28, 2011. Mr. Okada confirmed to the board that he was proceeding with the Philippines project. In the course of the meeting, certain of the Company's independent directors, including me, expressed concern with regard to probity issues related to Mr. Okada and the possible effect that Mr. Okada's involvement in the Philippines would have on Wynn Resorts. Following that board meeting, in August 2011, the Company received additional information from a separate independent investigatory firm that raised further questions about the business climate in the Philippines and Mr. Okada's activities there.

15. At a meeting held on September 27, 2011, the Compliance Committee reviewed the results of a third-party investigative report that had been conducted at the Company's request and that addressed the current political environment in the Philippines and the issues related to Mr. Okada's project there. Three days later, representatives of the Company met with Mr. Okada's lawyers to discuss the Committee's concerns with regard to Mr. Okada's involvement in the Philippines project. These concerns included, among other things, whether Mr. Okada had violated Philippine law in acquiring the land for his project. I was informed that the discussion at this meeting with Mr. Okada's representatives was unproductive.

16. On October 31, 2011, Mr. Okada failed to attend a long-scheduled training session for board members concerning the Foreign Corrupt Practices Act. Every other Wynn Resorts director attended, either in person or by telephone. Management informed the directors that Mr. Okada had RSVP'd for the training session in mid-September, and later asked the Company to translate the training materials into Japanese, which they did. But in the end, Mr. Okada did not participate.

### The Freeh investigation

17. On October 29, 2011, the Compliance Committee determined to retain Freeh Sporkin & Sullivan, LLP, and specifically Louis Freeh. Mr. Freeh is the former director of the FBI and a former federal judge. We believed his experience and reputation were the finest in the field, and that his firm had the resources to pursue the somewhat difficult task of investigating matters arising out of Mr. Okada's conduct in Asia. That decision was based on the concerns raised by and the information gathered in the preliminary investigations that had been conducted by firms retained by the Company, and on Mr. Okada's troubling comments about FCPA compliance.

18. The Wynn Resorts board met on November 1, 2011. Mr. Okada, who attended the meeting in person, was advised that the Compliance Committee intended to retain Mr. Freeh to do an in-depth investigation of his activities, and Mr. Okada attempted to persuade us not to engage Mr. Freeh. At this meeting, Mr. Wynn explained to Mr. Okada that Mr. Okada would be breaching his fiduciary duties as a director of Wynn Resorts if Mr. Okada — as it appeared he

5

was planning — used information he obtained as a Wynn Resorts director concerning the Company's marketing to Asian customers to siphon off to the Philippines profitable business from Wynn Resorts' existing and planned Macau properties. Mr. Okada strongly disagreed.

19. Also at the November 1, 2011 board meeting, the Wynn Resorts board ratified the Compliance Committee's decision to hire Mr. Freeh and the Committee formally retained Mr. Freeh to conduct an investigation and produce a report related to Mr. Okada and his business activities in the Philippines. Mr. Okada, both orally and in writing, agreed to cooperate with Mr. Freeh's investigation.

20. I understand that, in making this motion, Mr. Okada has argued that Mr. Freeh was not an independent investigator because he conducted his investigation under the direction of the Compliance Committee and that the outcome of Mr. Freeh's investigation was "preordained." I believe these contentions to be untrue. While Mr. Freeh was retained by the Committee, and the Committee monitored the progress of his investigation, Mr. Freeh's charge was to conduct a comprehensive and independent investigation into Mr. Okada's activities and produce an objective report of his findings. Neither the Committee nor the board interfered with Mr. Freeh's investigation or directed him to reach any preordained conclusions.

21. Over a three-month period, Mr. Freeh and/or his colleagues made several trips to the Philippines and Macau; conducted numerous interviews; and engaged in detailed documentary research of public records. By early 2012, Mr. Freeh and his team had uncovered detailed prima facie evidence of serious wrongdoing by Mr. Okada and his associates.

22. In early 2012, I received a preliminary briefing from Mr. Freeh indicating that his investigation had revealed serious issues concerning the legality, under Philippine law, of Mr. Okada's purchase and title to the land on which his new casino project was to be built. Moreover, Mr. Freeh had found evidence from records maintained by Wynn Macau, and from interviews of Wynn Macau personnel, that Aruze provided gifts of value at Wynn Macau to senior officials of PAGCOR (including its Chairman, Mr. Cristino Naguiat), and that Mr. Okada was aware of this. (PAGCOR is a Philippine governmental agency that is both the regulator and operator of gaming in that country.) Mr. Freeh also uncovered evidence that Mr. Okada's

associates had requested anonymity for a VIP guest they did not wish to be registered. This individual was later determined to be Chairman Naguiat of PAGCOR.

23. I understand that Mr. Okada has submitted a declaration to the Court in which he claims that the payments to the PAGCOR officials uncovered in Mr. Freeh's investigation were made by Wynn Resorts and later "reimbursed" by Universal. That is not accurate. Mr. Freeh's investigation showed that the payments were made from Mr. Okada's "City Ledger Account," which was an account funded by Mr. Okada and/or his affiliates that was used for charges incurred by Mr. Okada and his associates at various Wynn Resorts properties.

24. As Chairman of the Compliance Committee, I decided that before Mr. Freeh concluded his investigation and produced his report, Mr. Okada should be offered the opportunity to submit exculpatory evidence. For several weeks, Mr. Okada would not commit to a date for an interview with Mr. Freeh. Finally, Mr. Okada agreed to let Mr. Freeh interview him, in Tokyo, on February 15, 2012. I was informed that one or more of Mr. Okada's attorneys from the Paul Hastings firm were present at the interview.

25. As is reflected in the 47-page "Freeh Report" that was presented to the Compliance Committee and the Wynn Resorts board on February 18, 2012, Mr. Freeh concluded that Mr. Okada had not presented any persuasive evidence whatsoever to rebut what Mr. Freeh had found, and that while Mr. Okada had offered broad denials of involvement in any of the misconduct, the evidence uncovered in Mr. Freeh's investigation cast substantial doubt on Mr. Okada's credibility. The Freeh Report is attached hereto as Exhibit 1.

<u>The February 18, 2012 board meeting and the redemption of Aruze's shares</u>

26. At a Wynn Resorts board meeting held on February 18, 2012, at which several experienced translators were prepared to provide expert translation services, Mr. Freeh provided the board (including Mr. Okada) with a detailed summary of his investigation and his findings. The Chairman then declared that there would be a two-hour recess to allow the board members who had executed a confidentiality agreement to read the Freeh Report — that is, all members other than Mr. Okada, who refused to execute the agreement, which had been translated into Japanese — following which the meeting would resume with a discussion of the Freeh Report. Prior to

taking the recess, the Chairman inquired of Mr. Okada whether he had any questions or comments. Mr. Okada did not respond. Thereafter, the decision was made that Mr. Okada would not be re-connected to the portion of the meeting that would involve a discussion of the Freeh Report.

27. When the board meeting reconvened, there was a general discussion of the Freeh Report and its implications for Wynn Resorts and its shareholders. The board then received advice from two attorneys from separate law firms, each of whom is expert in gaming law, and asked questions of them. There was a consensus among the members of the board that Aruze's status as a substantial shareholder of the Company jeopardized the gaming licenses held by Wynn Resorts and could jeopardize future efforts by Wynn Resorts to become licensed in other jurisdictions.

28. After further extensive discussion, the directors present voted unanimously to declare Mr. Okada, Aruze, and Universal "Unsuitable Persons" within the meaning and according to the criteria specified in Article VII of the Wynn Resorts Articles of Incorporation. (The Articles are attached as Exhibit 2 to this declaration.) In connection with this determination, the board received advice from the gaming law experts present at the meeting, including on the topics of the likely response of Nevada gaming regulators to a lack of action by the board, to a delay in action by the board, and related matters.

29. The board then considered the amount at which to value the Aruze shares within the meaning of Article VII, and whether to redeem the Aruze shares with cash or with a promissory note having the terms specified in Article VII. In connection with these questions, the board received information and advice from the independent investment banking firm of Moelis & Company, from Duff & Phelps, and from the Company's chief financial officer. At the conclusion of the board's discussion of these matters, the board determined to issue to Aruze a promissory note on the terms set forth in the Articles of Incorporation.

30. The board instructed management to advise Aruze of the redemption of its shares and the board's decision to issue to it a promissory note in exchange. That redemption notice is attached as Exhibit 3 to this declaration.

8

31. Also at the board meeting held on February 18, 2012, the board discussed whether, in light of its finding that Mr. Okada was an "Unsuitable Person" as defined in the Articles, Mr. Okada should be removed as a director of the Company. In the course of this discussion, the Chairman noted that directors of a Nevada corporation can only be removed by a two-thirds vote of the shareholders. After receiving advice from corporate counsel present at the meeting, the board determined to form an Executive Committee, consisting of all of the members of the board other than Mr. Okada, which would have all of the powers of the board during the periods between annual meetings of the board.

32. On February 18, 2012, Wynn Resorts gave notice to the Nevada Gaming Control Board that the board had found Mr. Okada, Aruze, and Universal to be "Unsuitable Persons" and redeemed Aruze's shares pursuant to Article VII in exchange for a promissory note. The Company also advised the Nevada Gaming Control Board of the formation of the Executive Committee of the board, from which Mr. Okada would be excluded, and the Nevada Gaming Control Board was comfortable with that structure. To my knowledge, the Nevada Gaming Control Board has expressed no concern with respect to the board's unsuitability determination, the redemption of Aruze's shares, or the board's decision to issue a promissory note to Aruze.

<u>Major news organizations report that investigations of Mr. Okada are ongoing</u>

33. The Nevada Gaming Control Board has commenced an investigation into the matters raised in the Freeh Report and, Wynn Resorts has reason to believe, into allegations that affiliates of Universal made $40 million of payments in 2010 to Rodolfo Soriano, a former consultant to PAGCOR. Respected news organizations like Reuters and The Asahi Shimbum, one of the largest national newspapers in Japan, have published reports on this investigation and the underlying allegations. Examples of such reports from the November and December 2012 time period are attached as Exhibits 4 through 6 of this declaration.

34. According to these and other news reports, the United States Department of Justice and the FBI, the Securities and Exchange Commission, the Osaka Stock Exchange, and the Philippine Department of Justice are also actively investigating the conduct of Mr. Okada and his companies in connection with their development of the Philippine project.

9

#### Wynn Resorts seeks to expand into new jurisdictions

35.	As part of Wynn Resorts' strategic plan to expand its operations into new jurisdictions, the Company is currently applying to state gaming authorities in Pennsylvania and Massachusetts for gaming approval to build and operate significant new projects. Wynn Resorts' management and the Executive Committee believe that the contemplated expansion into Pennsylvania and Massachusetts is important to the Company's future growth and profitability.

36.	Wynn Resorts submitted a License Application to the Pennsylvania Gaming Control Board on November 15, 2012. On December 7, 2012, the licensing bureau of the Pennsylvania Gaming Control Board sent a letter to Wynn Resorts requesting additional information and documentation in support of the Company's application. That December 7 letter, which is attached as Exhibit 7 to this declaration, specifically requested that Wynn Resorts supply documentation with respect to Mr. Okada, given his membership on the Company's board.

37.	Prior to December 7, the Company did not know whether or not Mr. Okada would be required to be licensed individually in these new jurisdictions. It was clear from the Pennsylvania Gaming Control Board's letter, however, that Mr. Okada would be required to submit to licensure in Pennsylvania. Moreover, upon receiving the December 7 letter, management and the Executive Committee formed a view that it was highly likely that Mr. Okada would also be required to submit to licensure in Massachusetts (the Company has subsequently learned that Massachusetts will, in fact, require all of its directors to submit for individual licensure). It was therefore apparent that unless Mr. Okada could be individually licensed, Wynn Resorts would not be able to pursue its planned expansion into Pennsylvania and Massachusetts.

#### The proposal to remove Mr. Okada from the Wynn Resorts board

38.	The Executive Committee considered the findings in the Freeh Report, as well as the reports regarding ongoing investigations of Mr. Okada and his companies and their activities in connection with the Philippine project, and determined that Wynn Resorts could not support applications for individual gaming licenses on behalf of Mr. Okada in Pennsylvania or Massachusetts. Moreover, the Executive Committee did not believe that Mr. Okada would be eligible to receive such licenses in any event. The Executive Committee therefore determined

that it was in the best interests of Wynn Resorts and its shareholders to call a special meeting for the purpose of considering a proposal to remove Mr. Okada as a member of the board.

39. Wynn Resorts announced that it was calling the special meeting in a press release, dated December 13, 2012, which is attached hereto as Exhibit 8. The next day, the Company advised the Pennsylvania Gaming Control Board that it was seeking to remove Mr. Okada from the board and that therefore Mr. Okada should not be required to submit for licensure in that jurisdiction.

40. On December 14, 2012, Wynn Resorts filed a preliminary proxy statement with the SEC, which is attached as Exhibit 9 to this declaration. Wynn Resorts filed a definitive proxy statement with the SEC on January 3, 2013. It is attached hereto as Exhibit 10. The definitive proxy statement announced the date of the special meeting — February 22, 2013 — and included seven pages of disclosures regarding the Background of the Removal Proposal and the Reasons for the Removal Proposal.

41. Although I understand that Mr. Okada had a legal right to solicit proxies from Wynn Resorts' shareholders in opposition to the removal proposal, he has not pursued a proxy campaign in connection with the special meeting. I have no reason to believe Mr. Okada does not have the financial wherewithal to run such a proxy context.

42. Institutional Shareholder Services ("ISS"), a leading provider of proxy advisory services to large institutional investors, has recommended that its clients who are Wynn Resorts shareholders vote "FOR" the proposal to remove Mr. Okada from the Board. The ISS report explaining its recommendation is attached as Exhibit 11 to this declaration. ISS's report states that a "vote FOR the removal of Okada is warranted in light of the material risk that Okada's directorship poses to the company's ability to receive gaming licenses for operations that are currently in the company's pipeline and to maintain its current gaming licenses."

Mr. Okada's January 24 letter to the Executive Committee

43. On January 24, 2013 — the same day that he filed this lawsuit — Mr. Okada sent a letter to each of the members of the Executive Committee accusing Wynn Resorts and its Chairman of engaging in improper conduct in connection with Wynn Macau, Limited's

development of a casino-resort in the Cotai area of Macau.  (Wynn Macau, Limited ("Wynn Macau") is an indirect subsidiary of Wynn Resorts.)  The principal focus of the letter was a series of agreements related to the Cotai land concession that Mr. Okada claimed to have obtained "Independently from my role as a Director."

44. Although the status of Wynn Macau's efforts to obtain the Cotai land concession was discussed at multiple board meetings between 2005 and 2012, prior to January 24, 2013, Mr. Okada never expressed any concern to the board about the Cotai agreements attached to his letter or the transactions reflected by those agreements.  It is also my understanding that Mr. Okada never sought documents related to these agreements or the Cotai land concession in the books and records action he pursued in Nevada state court.

### The Cotai agreements

45. I have no reason to believe there is any validity to Mr. Okada's accusations of wrongdoing in connection with the transactions reflected in the Cotai agreements attached to his January 24, 2013 letter.

46. I understand that Mr. Okada argues in his motion papers that the transactions reflected in the Cotai agreements involved "shady dealings" with "obscure" foreign companies.  I believe these assertions are baseless.  In fact, the key evidence of supposed wrongdoing that Mr. Okada relies on in his motion papers — a $50 million payment made to a Macau company called Tien Chiao Entertainment and Investment Company Limited — was disclosed by Wynn Resorts in a 2009 filing with the SEC.  That filing, which is attached hereto as Exhibit 12, expressly states that in August 2008, a Wynn Resorts affiliate had agreed to "make a one-time payment in the amount of $US50 million in consideration of Tien Chiao's relinquishment of certain rights with respect to its business interests in the potential Cotai project."  The transparent nature of this transaction is entirely inconsistent with Mr. Okada's claim that the $50 million payment was an illicit bribe.

47. Furthermore, I am advised that the parties to the Cotai agreements were represented by sophisticated international law firms — Skadden Arps represented the Wynn Resorts affiliate, while Paul Hastings represented Tien Chiao and its predecessor — and engaged

in extensive negotiations over a period of several years.  I also understand that the Company carefully vetted Tien Chiao and its principals to ensure that dealing with them would not expose Wynn Resorts to potential FCPA liability.  In fact, that the 2006 and 2008 Cotai agreements attached to Mr. Okada's letter contain FCPA certification clauses, in which Tien Chiao expressly represented and warranted that the payments contemplated by those agreements — including the payment discussed in Wynn Resorts' 2009 SEC filing —  would not result in an FCPA violation.

48.    Nor is it the case that the Cotai agreements and the transactions reflected therein were kept secret from the Wynn Resorts board or the shareholders.  As noted above, these matters were discussed at multiple meetings of the Wynn Resorts board between 2005 and 2012.  Moreover, beginning in 2006, many of the Company's public filings with the SEC contained disclosures related to Wynn Macau's efforts to obtain the Cotai land concession — including with respect to the Cotai land agreement with Tien Chiao.  Additional examples of such public filings are attached hereto as Exhibits 13 through 16.

<u>Charitable contribution to the University of Macau</u>

49.    Mr. Okada's letter of January 24, 2013 also refers to a $135 million charitable pledge by Wynn Macau to the University of Macau Development Fund that was approved by the Wynn Macau and Wynn Resorts boards in April 2011.  The Macau pledge was discussed in the Company's public filings with the SEC (an example is attached as Exhibit 17 to this declaration).  As the boards were advised at the time, the Macau pledge was reviewed in advance by outside counsel well-versed in FCPA compliance matters.  The Nevada Gaming Control Board recently advised the Company that it has concluded its investigation of Mr. Okada's allegations regarding the Macau pledge and determined that those allegations are unfounded.

50.    Mr. Okada was the only member of either board to vote against the Macau pledge.  I understand that Mr. Okada has suggested in his motion papers that he objected to the pledge on the ground that it appeared improper from an FCPA compliance perspective.  This is not true.  Mr. Okada's objection pertained solely to the length of the commitment, not its propriety.

13

51. In his January 24, 2013 letter to the Executive Committee, Mr. Okada asserts that his opposition to the Macau pledge "provoked" a response from Wynn Resort that ultimately led to the redemption of Aruze's shares in February 2012. Mr. Okada has made a similar allegation in the pending state court lawsuit, and I have been advised that Mr. Okada repeats this claim in the papers he submitted to this Court.

52. Mr. Okada's claim that Wynn Resorts started to investigate him in response to the position he took at the board meeting in April 2011 has no basis in fact. As the discussion above makes clear, the Compliance Committee was already investigating Mr. Okada's business activities in the Philippines — and had developed significant concerns about his probity — before Mr. Okada objected to the Macau pledge.

<u>Harm resulting from an injunction</u>

53. If the Court were to grant the injunction requested by Mr. Okada, it would create a substantial risk of significant harm to Wynn Resorts.

54. As discussed above, if Mr. Okada remains a member of the board of directors, the Executive Committee does not believe the Company can obtain the gaming licenses that it needs to expand into Pennsylvania and Massachusetts. Time is of the essence with respect to Wynn Resorts' pending licensing applications in those jurisdictions. Even a temporary delay in the Company's efforts to remove Mr. Okada from the board would therefore jeopardize Wynn Resorts' strategic plan to expand its operations and potentially cost the Company and its stockholders billions of dollars in additional revenues over the long term.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 5, 2013.

*[signature]*
ROBERT J. MILLER