LIONEL SAWYER & COLLINS
SAMUEL S. LIONEL (SBN 1766)
slionel@lionelsawyer.com
CHARLES H. McCREA, JR. (SBN 104)
cmccrea@lionelsawyer.com
KETAN D. BHIRUD (SBN 10515)
kbhirud@lionelsawyer.com
STEVEN C. ANDERSON (SBN 11901)
sanderson@lionelsawyer.com
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada  89101
Telephone:   702.383.8888
Facsimile:    702.383.8845

MORGAN, LEWIS & BOCKIUS LLP
MARC J. SONNENFELD*
msonnenfeld@morganlewis.com
1701 Market Street
Philadelphia, Pennsylvania  19103
Telephone:   215.963.5000
Facsimile:    215.963.5001

JOSEPH E. FLOREN*
jfloren@morganlewis.com
BENJAMIN P. SMITH*
bpsmith@morganlewis.com
CHRISTOPHER J. BANKS*
cbanks@morganlewis.com
One Market, Spear Street Tower
San Francisco, California  94105-1126
Telephone:   415.442.1000
Facsimile:    415.442.1001

Attorneys for Plaintiff,
KAZUO OKADA
*pro hac vice application submitted

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KAZUO OKADA, an individual, | Case No. 2:13-cv-00136-JCM-NJK |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| WYNN RESORTS, LIMITED, a Nevada corporation, | |
| Defendant. | |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiff Kazuo Okada's Motion for Preliminary Injunction sets forth numerous material misstatements and omissions of fact made in the January 3, 2013 Proxy Statement ("Proxy") of defendant Wynn Resorts, Limited ("WRL" or the "Company") impugning Mr. Okada's character, integrity and personal reputation.  The misstatements are not mere representations of the "beliefs" and "opinions" of the WRL Board or Executive Committee; rather, they are affirmative misrepresentations of alleged facts supporting those claimed "beliefs" and "opinions."  By definition, WRL's personal attacks on Mr. Okada's integrity are material if false and thus warrant an order enjoining WRL's planned February 22, 2013 shareholders vote, which otherwise will be premised upon false and material misinformation.  17 C.F.R. § 240.14a-9, note b.  Without an injunction, shareholders will be misled.

WRL's false and misleading statements include, but are not limited to, the following:

| PROXY STATEMENT | MATERIAL MISREPRESENTATION / OMISSION |
|---|---|
| Freeh Sporkin & Sullivan LLP conducted an "independent investigation into Mr. Okada and his activities …." (Proxy at 3-4). | **The Freeh investigation was not "independent"**<br>• Freeh admits that investigation was completed "under the sole direction of the [WRL] Compliance Committee," whose members were financially interested  01/28/13 Declaration of Joseph E. Floren ("FD") <u>Ex. F</u> at 1. |
| " … Mr. Okada failed during the [Freeh] interview or subsequently, to offer evidence to contradict the findings of the Freeh Report or to exculpate himself or his affiliates."  (*Id.* at 5) | **The Freeh Report made no final "findings"**<br>• The Freeh Report states only that "substantial evidence" suggests that Mr. Okada "appear[s] to have engaged" in FCPA violations based and that this provides no more than a "basis to review Mr. Okada's continued suitability to be a major shareholder and director of Wynn Resorts."  FD <u>Ex. F</u> at 1-2, 46-47.<br>**Mr. Okada was never provided an opportunity to "contradict" or respond to the Freeh Report**<br>• Mr. Okada was not given the opportunity to produce exculpatory evidence before WRL took final action and sued him.  01/28/13 Declaration of Kazuo Okada ("OD") ¶¶ 14-21; Motion 9:15-10-7.<br>• Mr. Okada has been denied access to the "evidence" supposedly supporting the Freeh Report for more than ***50 weeks.***  02/11/13 Reply Declaration of Kazuo Okada ("ODR") ¶3; OD ¶ 20.<br>• Mr. Okada has repeatedly denied the material allegations of the Freeh Report.  ODR ¶3. |
| "Mr. Okada … has not signed | **Mr. Okada Has Acknowledged Prior Versions of the** |

| | |
|---|---|
| the Company's Code of Conduct … and not participated in mandatory FCPA training …." (*Id.* at 4) | **Company's Code of Conduct, and His Efforts to Participate in FCPA Training Were Denied by the Company**<br>• Mr. Okada endorsed prior versions of the Code of Conduct, and attempted to endorse the November 2011 amended version so as to allow him to continue to pursue an opportunity the Company passed on.  ODR ¶¶ 11-12; OD ¶ 22; Motion 11:5-16.<br>• Mr. Okada sought to participate in the October 31, 2011 FCPA training by listening to a recording, and the Company initially agreed, but the Company then reneged on its agreement.  ODR ¶13; OD ¶ 23; Motion 11:17-26. |
| "[T]he company cannot support and advance applications for gaming licenses on behalf of Mr. Okada … Without the receipt of necessary licenses, the Company will not be able to pursue its planned expansion into Pennsylvania and Massachusetts … Accordingly, the Special Meeting has been called for the purpose of removing Mr. Okada from the Board." (*Id.* at 9) | **The Company Will Be Required to Advance Gaming Licenses on Behalf of Mr. Okada Regardless of His Status as a Director**<br>• WRL will be required to submit to licensure on behalf of Mr. Okada regardless of his status as a director.  Declaration of  Matthew J. Stafford ("SD") ¶¶16-18.<br>• Lack of licensure in Pennsylvania or Massachusetts, and even a finding that Mr. Okada is "unsuitable," will have no impact upon WRL' securing of a license in Massachusetts or Pennsylvania, as WRL has been on notice of.  SD ¶10.<br><br>**Mr. Okada Could Readily Become Licensed in Pennsylvania and Massachusetts**<br>• Mr. Okada is licensed in 135 separate jurisdictions and has never been denied licensure.  SD ¶3; Declaration of Robert Ziems ("ZD") ¶¶4-6; ODR ¶14.<br>• The Company has not even attempted to seek licensing of Mr. Okada in Pennsylvania and Massachusetts. ODR ¶15. |
| "Mr. Okada … falsely represent[ed] to multiple people that he (and/or Universal Entertainment) and the Company were involved in a joint venture together in the Philippines." (*Id.* at 4) | **The Company Was Aware of, and Endorsed, the Philippine Venture; Nothing Was Falsely Represented**<br>• WRL provides no evidence of any "false[]" representations by Mr. Okada<br>• The Company knew of and initially encouraged the Philippines project, including by way of a visit to the Philippines by Mr. Steve Wynn in 2010.  FD Ex. M at 106; FD Ex. P at 9; Complaint ¶ 62.<br>• Mr. Okada was nominated and recommended for reelection to the Board months after the Company supposedly discovered Mr. Okada's "false representations."  FD Ex. B; FD Ex. D at 8-9. |
| "The pledge [to the University of Macau] was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions …. The sole dissenting vote was cast | **The Company Has No Long-Standing Practice of Providing Philanthropic Support**<br>• Only prior donation reported on SEC filings is a $10 million donation to the Macau museum in 2006.  FD Ex. R at 42-43.<br><br>**Mr. Okada Objected to More than the Mere Length of Time of the Donation** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                                           Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

| by Mr. Okada whose stated objection was to the length of time over which the donation would occur, not its propriety." (*Id.* at 7-8) | • OD ¶11 |
|---|---|

Instead of defending the statements actually contained in (or omitted from) WRL's Proxy, WRL's Opposition offers a variety of specious legal arguments designed to distract from the real issues.  For example, WRL contends that Mr. Okada has no standing to pursue a claim under Section 14(a) of the Securities Exchange Act of 1934, as amended, by conveniently ignoring the evidence submitted that Mr. Okada is pursuing this action to protect the interests of shareholders—including himself.  WRL also claims that the false statements and material omissions in its Proxy are irrelevant, because they were either cured through the public filing (but not direct mailing) of a copy of Mr. Okada's Complaint (which the Company simultaneously denied) with the Securities and Exchange Commission ("SEC"), or because shareholders could in theory conduct their own factual investigation and discover the whole truth that way.  The law does not support these contentions.  What is important are the statements actually made (or not made) in the Proxy mailed to shareholders—not what information a shareholder could theoretically discovery by him/herself.

The misrepresentations and concealments in WRL's Proxy are material and should be corrected so that WRL's shareholders can vote on a fair and truthful record.

## II.    ARGUMENT

### A.    Mr. Okada Has Standing To Pursue A Private Right Of Action Under Section 14(a)

#### 1.    Mr. Okada Brought This Action To Protect Shareholders And In His Capacity As WRL's Largest Beneficial Shareholder

WRL contends Mr. Okada lacks standing because he allegedly is not a shareholder, but glosses over the fact that Mr. Okada contests WRL's purported redemption of his shares and disputes WRL's claim that he is not a shareholder.  Complaint ¶5.  Indeed, as set forth in Mr. Okada's Complaint, he is properly the beneficial owner, through his majority ownership of Universal Entertainment Corp. ("UEC") and its wholly-owned subsidiary, Aruze USA, Inc. ("Aruze"), of 19.66% of WRL's shares—making him the beneficial owner of the largest single

1  shareholdings of WRL stock.  *Id.*  WRL cannot deny Mr. Okada standing by its unilateral act of

2  purportedly redeeming his shares.

3  It is in this capacity—as the largest single beneficial shareholder (albeit disputed) of WRL

4  stock—that Mr. Okada brings this lawsuit and advocates for WRL shareholders' interests, in

5  addition to his own interests as a director and the sole subject of the false and misleading Proxy.

6  Mr. Okada's pleadings make clear that he seeks injunctive relief to protect shareholders' interests.

7  Complaint, ¶¶2, 5, 9, 43.  Specifically, he seeks to protect the shareholders' ability to conduct "an

8  honest and informed shareholder vote," to preserve "independent voices … [on the] company's

9  board" and ensure that he can continue to "exercise the good stewardship of Wynn Resorts as a

10  major shareholder and director that he has shown since the Company's inception."  *Id.*  Moreover,

11  Mr. Okada has submitted a declaration setting forth that his "sole purpose and course of conduct

12  has been centered on restoring the Company to a healthy state with respect to its operations."  OD

13  ¶24, *see also id.* ¶¶7-9.

14  WRL presents ***no evidence*** disputing that Mr. Okada seeks injunctive relief to protect

15  shareholders' interests or that he is acting in his capacity as a contested, beneficial shareholder to

16  protect his own shareholder interests.

17  **2.  Mr. Okada Has a Right of Action to Seek Injunctive Relief in**
18  **Furtherance of Shareholders' Interests and Congress's Intent**
   **in Enacting Section 14(a)**

19  A private right of action is proper under Section 14(a) where, as here, injunctive relief is

20  sought to remedy certain material misstatements or omissions in proxy solicitation materials.

21  *Mills v. Elec. Auto Lite Co.*, 396 U.S. 375, 383-85 (1970).  "Use of a solicitation that is materially

22  misleading is itself a violation of the law . . . [and] injunctive relief would be available to remedy

23  such a defect if sought prior to the stockholders' meeting."  *Id.* at 383.  "A plaintiff must allege

24  three elements to satisfy the constitutional component of standing: (1) injury in fact; (2) a

25  traceable causal connection between the defendant's conduct and the injury; and (3) that the

26  injury is likely to be redressed or prevented by the relief sought."  *Western Dist. Council of*

27  *Lumber Prod. & Indus. Workers v. Louisiana Pacific Corp.*, 892 F.2d 1412, 1415 (9th Cir.

28  1989).  Here, unless the upcoming shareholder vote is enjoined, Mr. Okada stands to suffer injury

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4                                Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1  caused by WRL's false and misleading proxy statement both as a shareholder interested in good

2  governance and an honest and informed vote, and as a director who stands to lose his right to

3  participate in management of the company he co-founded.[1]

4        After ignoring Mr. Okada's standing as a disputed shareholder, WRL erroneously

5  contends that a party's standing to pursue a Section 14(a) claim can derive only from its

6  shareholder status.  This is not true, and ***none*** of WRL's cases limit a director's right to seek

7  injunctive relief to prevent Section 14(a) violations prior to the vote on a tainted proposal to

8  remove that director.  To the contrary, many cases have confirmed non-shareholder plaintiffs'

9  standing to sue for Section 14(a) violations.  In *Palumbo v. Deposit Bank*, 758 F.2d 113 (3d Cir.

10  1985), for example, a former director brought suit against a bank challenging his exclusion from

11  the bank's Board of Directors and seeking to set aside the election of new directors because of

12  misrepresentations in a proxy solicitation.  *Id*. at 114-15.  The Third Circuit held, "Standing

13  depends on injury, and we believe that one who alleges that he has been wrongfully ousted from a

14  Board of Directors because management improperly persuaded other shareholders not to vote for

15  him, has articulated an injury cognizable under section 14(a)."  *Id.* at 116.

16        WRL attempts to differentiate *Palumbo* by arguing that the plaintiff there was also a

17  shareholder.  Op. at 11.  However, that status was incidental to *Palumbo*'s reasoning, which

18  determined standing based solely on the plaintiff's director status.  *Palumbo*, 758 F.2d at 116.

19  Numerous other cases have similarly found a party's standing to pursue a private right of action

20  under Section 14(a) derived from other than shareholder status.  *See, e.g.*, *Ameribanc Investors*

21  *Group v. Zwart*, 706 F. Supp. 1248, 1251-54 (E.D. Va. 1989) (holding that target corporation of

22  proxy had right under Section 14(a) to challenge false and misleading statements therein via

23  request for injunctive relief); *Crane Co. v. Harsco Corp.*, 511 F. Supp. 294, 300 (D. Del. 1981).

24        Mr. Okada's situation is directly analogous to that of the plaintiff in *Crane*, whose

25  standing derived not from his status as a shareholder who relied on misrepresentations in a proxy

26  statement, but rather as the party with the most knowledge of the misrepresentations and who was

27

28

---

[1] *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-15 (2d Cir. 2003) (denial of right to participate in company's management can constitute irreparable harm).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5                                    Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1   best situated to protect shareholders who likely would rely on the misrepresentations.  511 F.

2   Supp. at 300.  Here, Mr. Okada is a party with direct knowledge of the falsity and misleading

3   nature of the statements contained in WRL's proxy solicitation; he therefore has standing to

4   challenge them and stand up for good governance.  *Id.*; *see also Stahl v. Gibraltar Financial*

5   *Corp.*, 967 F.2d 335, 338 (9th Cir. 1992) (plaintiff who learns of material defect in proxy has §

6   14(a) standing regardless of actual reliance on misstatement).

7   　　　　As even the cases cited by WRL concede, whether a plaintiff has standing to pursue a

8   private right of action under Section 14(a) depends not upon his status as a shareholder, but rather

9   upon the interests the plaintiff seeks to protect and the relief sought.  That is why the First Circuit

10   found the plaintiff lacked standing to seek damages in *Royal Bus. Group, Inc. v. Realist, Inc.*, 933

11   F.2d 1056, 1061 (1st Cir. 1991)—a case WRL claims is "directly on point."  Opp. at 11.  Like the

12   plaintiff in *Palumbo*, the plaintiff in *Royal* was both a shareholder and director.  933 F.2d at 1060-

13   61.  However, unlike Mr. Okada and the plaintiff in *Palumbo*, the *Royal* plaintiff sought money

14   damages for its expenses in a proxy battle rather than an injunction.  *Id.*  Consequently, the First

15   Circuit found the plaintiff was merely acting as a "disappointed proxy contestant[]," and not in

16   the interests of "safeguarding the voting process" or of shareholders who stood to obtain no

17   benefit from the plaintiff's lawsuit.  *Id.*  Mr. Okada, by contrast, seeks only an injunction, and

18   does so solely to ensure that shareholders may exercise their voting rights without the taint of

19   WRL's misrepresentations.

20   　　　　*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), on which WRL relies

21   heavily for the purported limitation of rights to sue, similarly involved a claim for damages ***after***

22   the vote on a misleading proxy had already occurred.  The Supreme Court rejected the damages

23   claim because in the circumstances of that case the minority shareholders' votes were simply not

24   necessary to effectuate the challenged transaction under applicable law or the company's bylaws

25   (because the defendant, who controlled 85% of the stock, had the votes to accomplish it), such

26   that the vote was merely "cosmetic" and a false and misleading proxy could not have caused the

27   harm for which plaintiffs sought damages.  *Id.* at 1099-1100, 1105.  Another federal court

28   recently reaffirmed that Virginia Bancshares does not limit Section 14(a) standing to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1   shareholders.  See International Jensen Inc. v. Emerson Radio Corp., 1997 WL 43229, at *3-5

2   (N.D. Ill. 1997).  Here, by contrast, Mr. Okada may not be removed from his position as director

3   absent the affirmative vote of two-thirds of WRL shareholders, which votes WRL seeks through

4   the Proxy.  The other cases cited by WRL to support its contention that non-shareholders cannot

5   have Section 14(a) standing are likewise cases where the non-shareholder plaintiffs sought money

6   damages rather than injunctive relief that would have safeguarded the voting process.[2]  *See also*

7   LOSS, SELIGMAN & PAREDES, SECURITIES REGULATION, § 11-C-4(b) ("[Proxy] actions for

8   injunction do not present the increasingly troublesome question whether a money judgment

9   should go to the corporation or to the plaintiff.").

10       "In enacting section 14(a), Congress intended to guarantee the integrity of the processes of

11   corporate democracy."  *Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 232 (9th Cir. 1975).  Plaintiffs

12   who intend "to vindicate the voting rights of shareholders" and seek relief "to serve the statutory

13   purpose of safeguarding the corporate voting process" have standing to pursue a private right of

14   action under Section 14(a).  *Royal Bus. Group,* 933 F.2d at 1060-61.  Those are precisely the

15   goals of Mr. Okada's motion—***which WRL fails to contest in its Opposition***.  Thus, Mr. Okada

16   has standing to pursue a private right of action under Section 14(a).

17       **B.       Mr. Okada Has Shown A Likelihood Of Success On The Merits**

18       WRL erroneously claims Mr. Okada cannot obtain an injunction based on false or

19   misleading statements set forth as purported "facts" in WRL's Proxy unless he can prove that "the

20   [WRL] Executive Committee *did not actually* believe what it said."  Opp. at 14 (emphasis in

21   original).  That is a straw man; Mr. Okada's Motion does not rely on the falsity of the Executive

22   Committee's "beliefs."  FD Ex. A at 8.  That is the subject of other litigation pending in Nevada

23   state court.  Rather, Mr. Okada challenges the materially misleading statements offered as support

24

25   [2] *See 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211 (5th Cir. 1994); *Tenet Healthcare Corp. v. Community Health Sys., Inc.*, 839 F. Supp. 2d 869 (N.D. Tex. 2012), and *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004).  Contrary

26   to WRL's contention, these cases do not establish or support a precedent generally restricting a private right of action brought under Section 14(a) to "voting stockholders" or "stockholders with

27   voting rights."  Instead, these cases turn on whether particular plaintiffs articulated a cognizable injury sufficient to warrant Section 14(a) protection and thus Section 14(a) standing.  Mr. Okada

28   has articulated such an injury.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  for the WRL Executive Committee's alleged beliefs, without which a reasonable shareholder

2  would have no reason to vote "yes."  Because the purported facts set forth in the Proxy contain

3  numerous materially false and misleading statements, an injunction is warranted.

**1. WRL's False And Misleading Statements Are Not Immunized
By Characterization Of Some WRL Conclusions As "Beliefs"**

5  "Section 14(a) . . . makes it unlawful for directors to provide information that is false or

6  misleading with respect to *any* material fact in a proxy statement."  *St. Louis Police Ret. Sys. v.*

7  *Severson*, 2012 U.S. Dist. LEXIS 152392, at *11 (N.D. Cal. Oct. 23, 2012) (emphasis added); *see*

8  *also Shoen v. AMERCO*, 885 F. Supp. 1332, 1346-48 (D. Nev. 1994) (finding Rule 14a-9

9  violation where proxy "omitted mention of at least one material fact").  Although WRL's Proxy

10  characterizes certain conclusions in terms of "beliefs" allegedly held by the WRL Executive

11  Committee, because the "facts" presented in support of those alleged "beliefs" are false or

12  misleading, those supporting statements are material and therefore actionable.  *Virginia*

13  *Bankshares*, 501 U.S. at 1090-91 ("[T]here is no room to deny that a statement of belief by

14  corporate directors about a recommended course of action, *or an explanation of their reasons for*

15  *recommending it*, can take on sufficient importance in the mind of a reasonable shareholder to be

16  deemed material.") (emphasis added).  Indeed, affording directors carte blanche to cite materially

17  false and misleading facts in support of their "beliefs" would nullify the "broad remedial purpose

18  of Rule 14a–9 . . . to ensure disclosures by corporate management in order to enable the

19  shareholders to make an informed choice."  *In re Bank of Am. Corp. Sec., Derivative, & ERISA*

20  *Litig.*, 757 F. Supp. 2d 260, 289-90 (S.D.N.Y. 2010) (quoting *TSC Indus., Inc. v. Northway, Inc.*,

21  426 U.S. 438, 448 (1976)).

22  WRL's Opposition offers *Paskowitz v. Pacific Capital Bancorp*, 2009 WL 4911850 (C.D.

23  Cal. 2009), to support the overbroad proposition that "the Executive Committee's honestly held

24  beliefs [are] not actionable under Section 14(a)."  Opp. 15:15-16.  But *Paskowitz* documented that

25  "many, if not all of the alleged risks inherent in a reverse stock split that Plaintiff contends were

26  negligently omitted were actually disclosed."  *Id*. at *5.  *Paskowitz* found that the plaintiff there

27  failed to identify any materially misleading statements or omissions and thus could not prevail

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

simply by contesting the defendant board's ultimate conclusion. *Id.* at *8. *Paskowitz* and the other cases cited by WRL[1] thus only stand for the unremarkable proposition, irrelevant here, that a plaintiff who seeks to challenge only ***statements of opinion*** must show that the opinions themselves are not genuine.

In contrast, Mr. Okada challenges specific, factual statements—not just alleged "beliefs"—in the Proxy. Such statements are by definition materially false or misleading where, as here, they "directly or indirectly impugn[] character, integrity or personal reputation, or directly or indirectly make[] charges concerning improper, illegal or immoral conduct or associations without factual foundation." 17 C.F.R. § 240.14a-9, note b. Such misstatements have given rise to numerous successful Section 14(a) actions, and should here as well.[2]

## 2. The Proxy Contains False And Misleading Factual Statements

### a. WRL's Preordained "Investigations"

WRL's Proxy does *not* limit its comments about its investigation, the Freeh Report or the WRL Board's "unsuitability" determination to statements about the WRL Executive Committee's "beliefs" about Mr. Okada. To the contrary, the Proxy claims as fact numerous unsupportable assertions directly impugning Mr. Okada's "character, integrity or personal reputation," including: that Freeh was retained to conduct an "independent investigation regarding Mr. Okada's activities" (Proxy, *3), that WRL took actions to "protect the Company and its operations for an unsuitable person" then identified as Mr. Okada (Proxy, *3); that the Freeh Report "uncovered and documented … more than three dozen instances over a three year period in which Mr. Okada and his associates engaged in improper activities" (Proxy, *3); that "The Freeh Report was the culmination of a year-long investigation by the Company" (Proxy, *4); and

---

[1] *See Fait v. Revisions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) (choice of accounting treatment for goodwill and loan loss reserves); *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 6644397 at *6 (C.D. Cal. 2012) (accountant's financial opinion not objectively false); *MHC Mut. Conversion Fund, L.P. v. United Western Bancorp, Inc.*, 2012 WL 6645097, at *1-2 (D. Colo. 2012) (choice of accounting treatment for securities sales).

[2] *See, e.g., Severson*, 2012 WL 5270125, at *6 (history of transactions preceding proposed incentive plan were material omissions); *Krauth*, 890 F. Supp. at 292 (misleading election proxy); *Gillette Co. v. RB Partners*, 693 F.Supp. 1266, 1286 (D. Mass. 1988) (misleading insinuation that group backing director-candidates was composed primarily of foreign entities); *Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F. Supp. 787, 791-92 (S.D.N.Y. 1978) (misleading election proxy).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                                          Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1   that "Mr. Okada failed, during [his February 15, 2012 interview by Mr. Freeh] or subsequently, to

2   offer evidence to contradict the findings of the Freeh Report or to exculpate himself or his

3   affiliates" (Proxy, *5). *See* FD Ex. A.

4       Critically, WRL's Opposition fails to dispel the fact that both the Freeh Report and the

5   two previous "reports" were "conducted under the sole direction" of a "Compliance Committee"

6   consisting of two *conceded* insiders and Robert Miller, a director of WRL since 2002.  *See* Opp.

7   20:25-26; Mot. 9:8-9; FD Ex. D at 9.  Nor does the Opposition explained why the Proxy omits

8   that, shortly after the Compliance Committee initiated its investigation, members Marc Schorr

9   and John Strzemp each held equity stakes in WRL valued at more than $31.4 million and stood to

10  gain tremendously from concluding that Aruze USA—holder of nearly 1/5 of the Company's

11  outstanding stock—was "unsuitable" to possess shares.[3]   Indeed, on February 21, 2012 (the first

12  day of trading after the Board redeemed Mr. Okada's $2.9 billion shareholdings for a promissory

13  note with a face value of $1 billion less), WRL stock rose $6.71, or 5.9%.  BD Ex. E.[4]

14      Independence turns on whether a corporate decisionmaker is "for any substantial reason,

15  incapable of making a decision with only the best interests of the corporation in mind.'"  *In re*

16  *Oracle Corp. Derivative Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003) (quoting *Parfi Holding AB v.*

17  *Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001)).  WRL cannot describe the

18  Compliance Committee as "independent" when its members held such an enormous personal

19  financial stake in the outcome of their "investigation."  FD Ex. A at 9.  Nor can the same be said

20  regarding Steve Wynn and certain other members of the Executive Committee at the time they

21  voted to deem Mr. Okada "unsuitable."  *See supra*, at n.4.  This obvious conflict of interest is not

22  disclosed in the Proxy, despite nine references to Mr. Okada as an "Unsuitable Person" therein.

23      Mr. Okada has detailed at length in his Motion how Mr. Freeh's "investigation" was in

24

25  [3] *See* FD Ex. D at 26 (equity stakes of various directors as of March 1, 2011); FD Ex. A at 8 (Compliance Committee concluded its "year-long investigation" as of February 18, 2013); BD Ex. D (closing price of Wynn Resorts stock on March 1, 2011).  Moreover, 10,000 shares of stock vested in Mr. Schorr on May 7, 2012 and 50,000 more shares will

26  vest in December, 2016, in addition to 50,000 in additional stock options that will vest each year Schorr remains with Wynn Resorts as CEO.  BD Ex. B at 44.

27  [4] Based on the directors' shareholdings as of the next publicly available listing, this translated into an instant benefit of $2.01 million and $1.68 million one-day gain for Messrs. Schorr and Strzemp, respectively, not accounting for any additional benefit derived from stock options.  BD Ex. B at 22.  Virtually all other directors present at the February

28  18, 2011 meeting likewise reaped substantial financial benefit from the "unsuitability" vote.  *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10                          Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1  fact a hastily-prepared ambush (not a year-long investigation) that provided Mr. Okada no

2  meaningful opportunity to provide contrary evidence at the time of the interview or the two days

3  thereafter before Mr. Okada's shareholdings were redeemed, and how Mr. Freeh's firm misled

4  Mr. Okada into believing he would be provided an opportunity to respond factually after

5  submission of Freeh's initial report.  *See* Mot. 9:15-10:13.  These are not matters of opinion; they

6  are matters of fact shown by a timeline and correspondence that WRL blithely claims are

7  irrelevant so long as the WRL Executive Committee allegedly believed the Freeh Report was

8  unbiased.  Opp. 21:3-6.

9      The Opposition faults Mr. Okada for failing to dispel all allegations against him after the

10  WRL forcibly redeemed his shares and took steps to effectively exclude him from Board

11  participation.  *See* Opp. 21:16-22:2.  But the Opposition (and more importantly, the Proxy)

12  neglects to disclose that *not one* of the various interview memoranda or other documents

13  identified as being in the Freeh Report's Appendix (cited over 100 times in the Report) has been

14  disclosed to Mr. Okada so that he might respond to them.  ODR ¶3; OD ¶20.  Just as no court of

15  law would take a "final brief" (FD Ex. K) at face value without evaluating its underlying evidence

16  and authorities, an advocate cannot prepare an opposition without analyzing the same.  Moreover,

17  Aruze USA's shares were redeemed on the same day the Freeh Report was finalized and

18  presented to the Executive Committee, and there is no point in expediting the public rebuttal that

19  will occur during ongoing litigation to recover those shares, proceedings in which discovery has

20  just begun.

21      WRL also disingenuously claims its characterizations of the Freeh Report are irrelevant

22  because "shareholders are free to read Mr. Freeh's record of what Mr. Okada said and decide for

23  themselves if his statements and 'evidence' contradict Mr. Freeh's conclusions."  Opp. at 21:14-

24  15.  However, the Freeh Report was not included in the Proxy, and shareholders who received

25  and voted on WRL's January 3 Proxy have never been provided a copy of the report to read as

26  they were WRL's Proxy.  Nor have shareholders *ever* been granted access to the appendices,

27  where the actual "evidence" was contained.

28      Finally, even what WRL claims the Freeh Report allegedly "uncovered and documented"

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11                                    Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1    are false.  The Freeh Report did not establish "more than three dozen instances over a three year

2    period in which Mr. Okada and his associates engaged in improper activities" as alleged in the

3    Proxy (FD Ex. A at 8); rather, it only found what it characterized as "evidence" suggesting that

4    Mr. Okada "appear[ed] to have engaged" in misconduct, while admitting that this evidence

5    provided no more than a "basis to review Mr. Okada's continued suitability to be a major

6    shareholder and director of Wynn Resorts."  FD Ex. F at 1-2, 46-47.  The over-the-top statements

7    in the Proxy impugning Mr. Okada's character are thus materially false and misleading, and the

8    shareholder vote should be enjoined as a result.

9                    **b.**    **The Manufactured Urgency of the Removal Proposal**

10           The Proxy and Opposition misrepresent the "imperative" need to remove Mr. Okada as a

11   director by claiming that the Company will "have no chance of obtaining gaming licenses" in

12   Pennsylvania and Massachusetts unless Mr. Okada is removed, and that absent removal,

13   applications in these states are "doomed."  FD Ex. A at 14; Opp. at 3.  The alleged factual bases

14   for these statements are false.  Even if couched as "beliefs," they could not be reasonably

15   believed by ***anyone*** in the gaming industry, let alone WRL.  Indeed, the Company did not even

16   ask Mr. Okada whether he could become licensed in these states, which of course he can.

17           The Proxy first misleads with its suggestion that Mr. Okada's mere presence on the board

18   would be harmful to the Company's licensing applications in Massachusetts and Pennsylvania.

19   FD Ex. A at 13-14.  Mr. Okada holds approximately 135 gaming licenses in North America, and

20   has been deemed "suitable" in ***each*** of these jurisdictions.  *See* Declaration of Robert Ziems

21   ("ZD") ¶¶4-6; ODR ¶14.  Mr. Okada has also previously been found "suitable" in Pennsylvania,

22   and anticipates re-licensure in the state (his prior registration needed to be renewed due to the

23   change of UEC's name).  *See* Declaration of Lynne Levin Kaufman ("LD") ¶¶3-7; Declaration of

24   Matthew J. Stafford ("JSD") ¶¶6-7.

25           Even since public disclosure of the Freeh Report—which the Company falsely contends

26   "dooms" any licensing application involving Mr. Okada—Mr. Okada has received new gaming

27   licenses in 17 jurisdictions, and renewal licenses in 5 jurisdictions.  ZD ¶6.  All jurisdictions in

28   which Mr. Okada is licensed have been informed of the Company's allegations against Mr.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12                              Case No. 13-CV-00136-JCM-NJK

PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1  Okada, as well as the Executive Committee's finding of purported "unsuitability," but **none**

2  (including Pennsylvania) have followed the same hasty and misguided course as the Executive

3  Committee.  ZD ¶¶6-7; JSD ¶13.  Mr. Okada has **never** had a license application denied or been

4  deemed "unsuitable" in any jurisdiction, and Mr. Okada is confident in his ability to obtain

5  (re)licensure in Pennsylvania and Massachusetts, as well as other states.  *Id.*; ODR ¶14.  This is

6  because suitability determinations are based on years-long and truly independent investigations,

7  and not media reports, untested allegations, or orchestrated "investigations" with predetermined

8  outcomes, as the Proxy misleadingly suggests.  ZD ¶3.

9          WRL concedes through its conduct that there is no "imperative" need to remove Mr.

10  Okada as a director given the Company's abandonment of a previous March 2012 proxy effort to

11  remove Mr. Okada (FD Ex. G) and its failure to call for a removal vote at the 2012 Annual

12  Meeting of Shareholders in November 2012 (FD Ex. H).  The Company struggles to overcome its

13  prior inaction, and justify its Proxy, by claiming that it only learned on December 7, 2012—

14  supposedly for the "first time"—that Pennsylvania and Massachusetts would require Mr. Okada

15  to apply for individual licensure in connection with the Company's applications.  Opp. 23:9-13.

16          These contentions are specious.  Any casino operator, and certainly WRL, would know

17  from the outset that these states would require Mr. Okada to apply for individual licensure.  **Every**

18  gaming jurisdiction requires officers and directors of a corporate applicant to submit to some

19  form of licensure and suitability determination.  JSD ¶¶5-6.  Such a requirement is common

20  knowledge in the gaming industry (JSD ¶¶5-7), is mandated by Pennsylvania and Massachusetts

21  law (JSD ¶¶7-8), and is prominently featured in gaming board publications and websites  (JSD

22  ¶¶6, 8).  For example, the application materials for the Pennsylvania Gaming Control Board

23  specify that it is "MANDATORY" that all officers and directors of an applicant submit to an

24  examination as to their suitability.  JSD ¶¶6-7, Ex.A.  Given that WRL submitted its Pennsylvania

25  application on November 15, 2012 (*see* MD ¶36), it is inconceivable that WRL only learned of

26  this requirement for the "first time" on December 7, 2012.

27          Compounding its misleading contentions regarding the purported urgency of Mr. Okada's

28  removal is the Proxy's false contention that absent removal of Mr. Okada, "the Company will not

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13                                                Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1    be able to pursue its planned expansion into Pennsylvania and Massachusetts." FD Ex. A at 14.

2    Even if Mr. Okada were deemed "unsuitable," this would ***not*** jeopardize the gaming applications

3    of WRL in Massachusetts or Pennsylvania.  JSD ¶10.  WRL has been on notice of this:

4    Massachusetts Gaming Commission Chairman Stephen Crosby has publicly stated that, upon a

5    finding of "unsuitability" of any officer or board member of WRL, the gaming board would

6    simply ask that the "unsuitable" person be removed before "OK'ing" the applicant company's

7    license.  JSD ¶10.  This is common industry practice: findings of "unsuitability" as to an

8    individual owner or director of a company rarely if ever jeopardize license applications.  *Id.*

9          Finally, the Proxy misleads by claiming that removal of Mr. Okada from the board of

10    WRL will eliminate the Company's need to "support and advance gaming licenses on behalf of

11    Mr. Okada."  FD Ex. A at 14.  If the Company were, in fact, supporting and advancing such

12    applications, it would have told Mr. Okada about it, but it did not.  In all events, Aruze USA of

13    which Mr. Okada is president and the principal owner (indirectly, through its parent company), is

14    either the largest shareholder or (if the Company's involuntary redemption of shares is

15    determined to be valid) the largest creditor of WRL, and indisputably holds a multi-billion dollar

16    interest in the Company.  Both Pennsylvania and Massachusetts are thus likely to require Mr.

17    Okada, as a representative of Aruze USA, Inc., to submit to suitability determinations in

18    connection with the WRL applications anyway, as either a shareholder or creditor.  JSD ¶¶16-18.

19    Thus, the contention that Mr. Okada's removal from the board will somehow lessen the

20    Company's application and investigation burden in Pennsylvania and Massachusetts is false.

21                    **c.      Mr. Okada's Commitment to Ethics and Legal Compliance**

22          Once again, the Opposition skews legal doctrine to paint materially misleading omissions

23    from its proxy materials as "disputed allegations."  *Compare* Opp. 22:10-23, *with Taro Pharm.*,

24    2010 WL 2835548, at *9-10 (attaching separate, preexisting legal claims against defendant's

25    subsidiary to 13D amendment avoided Williams Act liability).  Mr. Okada has detailed at length

26    in his Motion how the Proxy omitted material facts about the Company's Amended Code of

27    Conduct and FCPA training that render its statements materially misleading.  Mot. 10:27-12:1.

28          The Opposition adds reference to allegedly "disturbing remarks" that Mr. Okada

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

supposedly made during a February 2011 Board meeting.  Opp. 22:25-23:3.  This allegation was also disseminated to shareholders as if it were an established fact. FD Ex. A at 9 (claiming that Mr. Okada allegedly told WRL directors that "in his view, gifts to regulators are permissible in Asia").  As a threshold matter, the Proxy does not disclose that Mr. Okada only speaks Japanese, and neither it nor Governor Miller's declaration make any effort to establish the accuracy of the English translation that produced the "disturbing remarks" allegedly overheard by Board members.  ODR ¶¶2, 6.  Second, the Freeh Report contains *six different recitations* of what Mr. Okada supposedly said during the February 24, 2011 board, some of which were completely innocuous.  FD Ex. F at 11.  None of these were referenced in the Proxy.  Third, the February 2011 Board minutes say *nothing* about Mr. Okada's purported opposition to FCPA compliance in the five paragraphs devoted to that subject, which is presumably why the Freeh Report did not cite them.  *See* ODR ¶5; ODR Ex. C at 3.  Fourth, Mr. Okada himself vehemently denies making any statement during the February 2011 meeting intended to suggest that giving gifts to officials in return for benefits is in any way permissible.  ODR ¶4. And finally, just a few months after these supposedly "disturbing remarks" were made, the Company renominated Mr. Okada to its Board of Directors and recommended that shareholders vote to once again approve him.  FD Ex. B; FD Ex. D at 8-9.  The Company's claims about these remarks are false or, at best, materially misleading.

### d.      Mr. Okada's Investment in the Philippines

The Proxy falsely claims as fact that the Company retained an "independent investigatory firm" to investigate Mr. Okada's activities in the Philippines "In January 2011, after the Company became aware that Mr. Okada was falsely representing to multiple people that he (and/or Universal Entertainment Corporation) and the Company were involved in a joint venture together in the Philippines."  FD Ex. A at 9.  Mr. Okada denied this statement in its entirety in his Motion and produced evidence that Mr. Freeh's firm was in fact not hired until ten months later, that the Company was long aware of his activities in the Philippines, that Mr. Wynn publicly admitted to providing advice and support to UEC's Philippines project for years, and that the Company continued to recommend Mr. Okada's suitability as a director for at least several months after

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

Case No. 13-CV-00136-JCM-NJK

PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1  learning about Mr. Okada's allegedly "false[]" representations.  *See* Mot. at 13-16.

2         In its Opposition, WRL presents zero evidence of any alleged "false" statements by Mr.

3  Okada.  WRL admits to knowing about the Philippines project for years.  Both such statements

4  should thus be corrected immediately.  As for the rest, WRL claims it did not need to be disclosed

5  in the Proxy to shareholders because shareholders could allegedly find it themselves elsewhere

6  and/or that the burden should be on Mr. Okada to wage an expensive proxy battle to provide the

7  additional facts.   However, as detailed below, the Company is in error in its suggestion that a

8  Section 14(a) defendant can defeat any lawsuit simply by forwarding a copy of the plaintiff's

9  complaint to the SEC.  Opp. 26:6-8; *see infra* at Part II-B-4.  The assertion that Mr. Okada should

10  be required to launches his own expensive and time-consuming proxy campaign to correct

11  WRL's unlawful and misleading statements is similarly ridiculous.  Opp. 26:4-6.

### e.         Continuing Deception in Macau

13         Despite its repeated admonition of Mr. Okada's case as derived from "factual allegations"

14  rather than "facts," the Opposition meanwhile advances its own invented theory that Mr. Okada

15  raised misleading statements in the Proxy regarding Cotai for the secret purpose of advancing

16  separate litigation.  Opp. 27:12-18.  Mr. Okada's Motion explains how "statements that *are*

17  contained in the proxy"[5] cast doubt on his actions as a director by deflecting his lone dissent

18  against a $135 million donation to a public institution in Macau.  Mot. 16:6-26.  The Motion then

19  cites additional authority – both from the public domain as well as from his recent letter to the

20  Board – substantiating his dissent and demonstrating how the Proxy attempts to undercut Mr.

21  Okada's contributions as a steward of WRL.  *Id*. at 16:27-18:7.

### 3.         Mr. Okada's Claim Is Not Based on Breaches of State Law Duties By WRL or Its Executive Committee

24         WRL's Opposition invokes *Santa Fe Industries, Inc. v. Green*, 460 U.S. 462 (1977), as

25  another manufactured obstruction to reaching the actual issues in this case.  Mr. Okada should be

26  sent to state court, argues the Opposition, because his federal law cause of action for misleading

27  statements to shareholders by a publicly registered company is in fact a state-law claim for breach

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[5] Opp. 26:21-22 (emphasis in original).

1   of fiduciary duty.  Opp. at 15.  But this is a straightforward case of proxy fraud, as to which

2   mismanagement by WRL's officers and other directors is not at issue.  Indeed, Mr. Okada does

3   not even assert here that WRL is purportedly breaching a fiduciary duty to him with respect to the

4   Proxy.

5       As acknowledged in the Proxy, UEC and Aruze (but not Mr. Okada) have countersued

6   WRL for various torts, including breach of fiduciary duty, and those claims have survived WRL's

7   motion to dismiss in Nevada state court.  FD Ex. A at 12.  But those claims are wholly

8   independent from Mr. Okada's claims here; this Motion involves solely whether the Executive

9   Committee may seek Mr. Okada's removal from the board by way of its false and misleading

10  Proxy, and has nothing in common with the cases cited by WRL where plaintiffs attempted to

11  bootstrap fiduciary breach claims into proxy violations.  *Compare Lewis v. Chrysler Corp.*, 949

12  F.2d 644, 651-52 (3d Cir. 1991) (failure to disclose breach of duty of loyalty to shareholders not

13  actionable); *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988) (allegations of "garden-variety

14  mismanagement" and "failing to maximiz[e] value for . . . shareholders" more appropriate for

15  state court).   In *Brown v. Brewer*, also cited by WRL, the court ***sustained*** three of four Section

16  14(a) claims regarding material omissions from a proxy statement, and dismissed the final claim

17  only in light of numerous contemporaneous disclosures that cured alleged flaws in a merger

18  bidding process.  2010 WL 2472182, at *19-24 (C.D. Cal. June 17, 2010).

19          **4.      WRL's Subsequent Filing Of Mr. Okada's Complaint With
                       The SEC Does Not Cure The Misrepresentations It Sent**
20          **         Directly To Shareholders Three Weeks Earlier**

21      Shareholders are not expected to ferret out other and later SEC filings which, unlike the

22  Proxy, ***are not mailed to them***.  *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 801 F.

23  Supp. 1134, 1141-42 (S.D.N.Y. 1992) (neither Form 10-K nor press reports regarding defendant's

24  environmental record part of "total mix" available to shareholders); *Wenzel v. Patrick Petroleum

25  Co.*, 745 F. Supp. 211, 217–220 (D. Del. 1990) (disclosures in prospectus, press releases and

26  annual report insufficient to impute constructive knowledge to plaintiff); *Bertoglio v. Texas

27  International Co.*, 488 F.Supp. 630, 642-44 (D. Del. 1980) (presence of information in public

28  domain did not relieve defendant of duty to disclose).   That the Company attached Mr. Okada's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    claims in a later Form 8-K filing that a shareholder might find if she elected to search the

2    EDGAR database, while the Company simultaneously denied those claims, obviously cures

3    nothing.

4         WRL's Opposition relies almost entirely on caselaw discussing other sections of the

5    securities laws, none of which deal with the unique situation of a proxy solicitation mailed to

6    shareholders, immediately requesting—and leading to the immediate collection of, in many

7    cases—their proxies.[6]  WRL makes no attempt to establish that principles cited in Section 13 case

8    law can be translated to Section 14(a) litigation (they cannot).  In such cases, a subsequent filing

9    may be sufficient to cure a prior filing; but that is not this case, where shareholders were

10   approached directly and their proxies were collected.

11        Other authority cited by WRL is also inapposite.  For example, in *Taro Pharm. Indus.,*

12   *Ltd. v. Sun Pharm. Indus., Ltd.*, the defendant omitted from its initial *tender offer* solicitation

13   disclosure of, *inter alia*, pending FDA actions against its subsidiary and alleged securities law

14   violations committed by its subsidiary's management.  2010 WL 2835548 (July 13, 2010

15   S.D.N.Y.), at *4.  The legal issues facing the offeror were cited in a complaint arising under

16   Section 13(d) of the Exchange Act, rather than Section 14(a), and thus related to documents

17   merely filed with the SEC.  The court dismissed the claim, noting that "annexing a copy of a

18   complaint to an amended filing is sufficient to satisfy Williams Act requirements and moot any

19   Williams Act claim" under Section 13(d).  *Id*. at *9-10.  Again, this differs from a proxy

20   solicitation.  Cases relied upon by *Taro Pharm.* are similarly inapposite.[7]

21        WRL rehashes the same argument—and authorities—when it claims that the materially

22   misleading statements and omissions in the Proxy are merely "disputed version[s] of events" and

23   that referencing the fact of Mr. Okada's Complaint in a Form 8-K filing nearly one month after

24

25   [6] *See Lewis v. Potlatch Corp.*, 716 F. Supp. 807, 810 (S.D.N.Y. 1989) (allegations that the Board falsely stated that
     it was not opposed to all takeover attempts was offset by multiple contemporaneous disclosures in defendant's

26   original proxy and supplement, in addition to annexing complaint).
     [7] *See, e.g., Ranger Oil Ltd. v. Petrobank Energy & Resources, Ltd.*, 2000 WL 33115906, at *11 (S.D.N.Y. 2000)

27   (refusing to enjoin tender offer "based on insider trading that is alleged to have occurred wholly in the past");
     *Management Assistance, Inc. v. Edelman*, 584 F. Supp. 1021 (S.D.N.Y. 1984) (deceptive press releases allegedly in

28   violation of § 10(b) and rule 10b-5 not actionable because "Section 14(a) . . . does not require the disclosure of all
     unadjudicated bad acts that are not directly related to the election in question").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18                    Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

distributing its Proxy to shareholders is a panacea for any and all Section 14(a) liability.  Opp.

16:24-18:16.  Nor do the additional authorities cited by WRL support its claim that such a

subsequent filing cures the misstatements contained in the proxy mailed to shareholders.  *See*

*Quinn v. Anvil Corp.*, 620 F.3d 1005, 1011 (9th Cir. 2010) (state-law fraud claim failed because

plaintiff failed to establish *materiality* of omitted facts);  *Avnet, Inc. v. Scope Indus.*, 499 F. Supp.

1121, 1125 (S.D.N.Y. 1980) (second amendment to Schedule 13D acknowledged legal

uncertainty regarding issuer's status of investment company and avoided Williams Act liability).

**5.     Scattering Clues Elsewhere In The Public Domain Cannot Cure**
**A Tainted Solicitation**

"The total mix of information" available to a reasonable shareholder consists only of

"facts *known or reasonably available* to shareholders."  *Paskowitz*, 2009 WL 4911850, at *6

(emphasis added).  The Opposition overextends this principle by attempting to impute to the

reasonable shareholder an encyclopedic knowledge of every filing with the SEC.  Opp. 19:17-18.

"A proxy statement should inform, not challenge the reader's critical wits."  *Virginia Bankshares*,

501 U.S. at 1097 (1991); *see also Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003) ("That an

investor could hypothetically conduct research to clarify ambiguities and discover omissions in

the proxy statement does not relieve the Board of its obligations under Rule 14a-9.").

A materially misleading proxy is not salvageable merely because its authors have

scattered clues in the public domain that would enable an intrepid investor to accurately assess the

underlying proposal.  In *Shaev*, the Third Circuit held that a proxy statement seeking shareholder

approval of an amendment to the company's management incentive plan was misleading.  320

F.3d at 381.  The proxy was not sufficient simply because it contained enough clues for a

shareholder to deduce that a separate, material predecessor plan existed.  *Id.*  Offering "cryptic

references" that additional material information exists does not amount to disclosure.  *Id.*; *see*

*also United Paperworkers*, 985 F.2d at 1198-2000 ("[A] reasonable shareholder who was

interested in [the subject of the vote] and had read both the Proxy Statement and the annual report

would have received no indication that additional information pertinent to the [vote] was

available in the 10-K Report."); *Severson*, 2012 WL 5270125, at *5 (disclosure in Form 8-K did

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19                                Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

1   not cure material omissions); *Fradkin v. Ernst*, 571 F. Supp. 829 (N.D. Ohio 1983) (discussion of

2   stock option plan was materially misleading despite relevant data elsewhere in proxy).

3       **C.**      **A PRELIMINARY INJUNCTION IS APPROPRIATE**

4           **1.**      **Mr. Okada faces irreparable harm**

5        Mr. Okada has demonstrated in his Motion that the right to participate in corporate

6   management has intrinsic value, and the loss of that power even for a short period may constitute

7   irreparable harm.  Mot. 19:3-20:5.  Despite WRL's extraordinary decision to "quarantine" Mr.

8   Okada from voting on any measures brought before the "Executive Committee," he still retains

9   important powers of corporate governance that will persist through the expiration of his term in

10   2014.  A Nevada director, for example, has a common law right to inspect the books and records

11   of a corporation, FD Ex. T, and Mr. Okada can use this power to hold Steve Wynn and the

12   Executive Committee accountable, as he has attempted to do by raising questions about Cotai.

13        That Mr. Okada will remain "quarantined" through 2014, moreover, is far from a

14   certainty.  And Mr. Okada's placement into "quarantine" is the product of actions taken by the

15   very defendant from whom Mr. Okada seeks relief.  To deny relief solely on equitable grounds

16   would necessarily ignore deliberate steps taken by corporate "fiduciaries" to quash WRL's lone

17   voice for responsible governance and accountability on behalf of shareholders.

18           **2.**      **WRL will suffer comparatively minimal harm**

19        As detailed in Mr. Okada's Motion, WRL has delayed for too long to argue for Mr.

20   Okada's immediate removal, passing up repeated attempts to raise the issue over the nearly one

21   year since declaring him an "unsuitable person."  *See* Mot. 12:12-13:16; 20:20-27.  But the

22   Company's own actions demonstrate that the threats posed by Mr. Okada's "unsuitability" are of

23   no real urgency, and instead a deliberate step in a calculated plot to deprive him of his

24   considerable financial and managerial stake in WRL.

25   ///

26   ///

27   ///

28   ///

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20        Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION

**III.     CONCLUSION**

For the foregoing reasons, Mr. Okada's Motion should be GRANTED.

Dated: February 11, 2013

LIONEL SAWYER & COLLINS
SAMUEL S. LIONEL (SBN 1766)
CHARLES H. McCREA, JR. (SBN 104)
KETAN D. BHIRUD (SBN 10515)
STEVEN C. ANDERSON (SBN 11901)

MORGAN, LEWIS & BOCKIUS LLP
MARC J. SONNENFELD*
JOSEPH E. FLOREN*
BENJAMIN P. SMITH*
CHRISTOPHER J. BANKS*

By  /s/ Ketan D. Bhirud
Attorneys for Plaintiff
KAZUO OKADA
*pro hac vice application submitted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21                              Case No. 13-CV-00136-JCM-NJK
PLAINTIFF'S REPLY I/S/O PRELIMINARY INJUNCTION